UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

In re:

Willowood USA Holdings, LLC, *et al.*
EIN: 81-0829193,

Debtors.[1]

Case No. 19-11079-KHT

Chapter 11

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDER AUTHORIZING, BUT NOT DIRECTING, PAYMENT OF CRITICAL VENDOR CLAIMS IN ORDINARY COURSE OF BUSINESS AND AUTHORIZING PAYMENT OF 503(b)(9) CLAIMS**

The above-captioned debtors and debtors in possession (the "**Debtors**"), in the above-referenced chapter 11 cases (the "**Cases**"), file this motion (the "**Motion**") for entry of interim and final orders, pursuant to sections 105(a), 363(b), 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2081-1 of the Local Bankruptcy Rules for the United States District Court of Colorado (the "**Local Rules**"), (i) authorizing, but not directing, the Debtors to pay the Critical Vendor Claims (as defined herein) as such claims become due in the ordinary course of business and authorizing the payment of 503(b)(9) Claims (as defined herein) as such claims become due in the ordinary course of business and in support thereof, state as follows:

**JURISDICTION AND VENUE**

1.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these chapter 11 cases, and the last four digits of their employer identification numbers, where applicable, are: Willowood USA Holdings, LLC (9193), Willowood USA, LLC (7337), Willowood, LLC, RightLine LLC (1429), Greenfields Holdings, LLC (5326), Greenfields Marketing Ltd.  The Debtors' corporate headquarters is located at 1350 17th Street, Suite 206 Denver, Colorado 80202.

18776083

2. The statutory bases for the relief requested herein are sections 105(a), 363(b), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 2081-1.

## BACKGROUND

3. On the date hereof (the "**Petition Date**"), each Debtor other than Willowood USA Holdings, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Willowood USA Holdings, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 15, 2019. The Debtors continue to manage their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4. No creditors' committee has been appointed in these Cases. No request for appointment of a trustee or examiner has been made.

5. A detailed description of the Debtors' business operations, capital structure, events leading up the Petition Date, and other matters are set forth in the Affidavit of Thomas M. Kim in Support of Motion Seeking Expedited Entry of First Day Orders (the "**Kim Affidavit**"), filed contemporaneously herewith. Additional facts in support of the specific relief sought are set forth herein.

6. The Debtors develop, formulate, register, and sell generic crop protection products primarily used in the United States agriculture industry. The Debtors function as a sales intermediary and virtual manufacturer between manufacturers of chemicals in China and India and their customers. The Debtors offer more than sixty products throughout the United States for use on many different crops. Among the Debtors' assets are registrations with the Environmental Protection Agency ("**EPA Registration**") that permit the Debtors to sell their products.

7. As described further in the Kim Affidavit, several recent events created a liquidity shortage that forced the Debtors to file for bankruptcy. Initially, the Debtors received two negative legal decisions in 2018 that permanently enjoined the Debtors from selling their most profitable product lines in the near-term and added millions of dollars more of liabilities than they projected for "data compensation" liabilities. These events, in addition to increased competition, millions of dollars of legal bills, and an abnormal 2018 busy season, dramatically decreased the Debtors' earnings and put tremendous pressure on their ability to borrow sufficient funds under the Debtors' revolving facility to meet their growth targets for 2019. As a result, the Debtors were severely restricted in their ability to draw down additional funds or obtain separate financing to help finance a lower margin, higher volume business model to offset the loss of their key products, meet their projected data compensation costs, and pay overdue amounts to a key supplier, Willowood Limited. Without sufficient cash or access to additional lending above their borrowing base formulas, the Debtors were unable to pay for previously received inventory sourced by Willowood Limited. As a result, Willowood Limited no longer supplied terms, for which the business required even when healthy, which further exacerbated the liquidity crunch. Additionally, Chinese suppliers faced mounting expense and regulatory pressures, with many key ingredients in short supply, which created a situation where suppliers were no longer providing credit. This too hurt the ability of the Debtors to source enough products to meet their growth plans.

8. Based on these constraints, the Debtors could not fund a typical buying pattern to grow or maintain current earnings without additional capital infusions. The Debtors attempted to obtain funding outside of bankruptcy from various sources, including their existing lenders, and equity holders but were unsuccessful. As a result, the Debtors concluded that a sale of their

assets would be the only means to preserve and maximize the value of their assets for the benefit of their stakeholders.

9. On October 31, 2018, the Debtors retained Piper Jaffray & Co. ("**PJC**") as their investment banker. With the assistance of PJC, the Debtors were able to execute an Asset Purchase Agreement with AMVAC Chemical Corporation (the "**Stalking Horse Bidder**") for the sale of a substantial portion of the Debtors' EPA Registrations. The Stalking Horse Bidder, as well as other potential purchasers, also seeks to step into the Debtors' customer relationships following the sale.

10. However, in light of the Debtors' current status of litigation matters and assets and liabilities, the Stalking Horse Bidder's offer was contingent upon the sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. The Debtors further believe that bankruptcy protection is necessary to secure requisite financing to complete a sale, ensure employee retention and maximum effort from their employees pending a sale, maintain customer and critical supplier relationships, and provide a platform for a competitive sale process for stakeholders in order to maximize value. Accordingly, the Debtors filed for bankruptcy and intend to sell substantially all of their assets through a section 363 sale.

**A.     Critical Vendors**

11. The Debtors have reviewed their accounts payable and prepetition vendor lists in order to identify those creditors most essential to their operations during these Cases, and the success of a sale of their assets (the "**Critical Vendors**"). The Debtors identified the Critical Vendors by considering, among other things, whether a manufacturer or service provider is the only provider of goods and services related to certain products and whether such a manufacturer

or service provider is able or likely to refuse to ship product or provide services to the Debtors or potential purchasers if their prepetition balances are not paid.

12. As discussed in further detail below, it is essential that the Debtors be able to maintain their business relationships with, and honor outstanding payment obligations to the Critical Vendors in light of the role that they play in the Debtors' continuation of their businesses and the success of a sale of their assets. Thus, in order to prevent irreparable harm to their relationships with their Critical Vendors and interrupting the supply of critical goods and services, the Debtors are seeking authority, but not direction, to pay, in their sole discretion, prepetition claims owing to the Critical Vendors (the "**Critical Vendor Claims**") in order to ensure the continued receipt of goods and services from the Critical Vendors, most of whom are not subject to written contracts with the Debtors. In assessing strategies to continue doing business with the Critical Vendors, the Debtors have considered the availability of alternative protections for each Critical Vendor. Because many of the Critical Vendors are the only practical source of such goods and services, such payment alternatives are not available. The Debtors have, therefore, determined that paying the Critical Vendor Claims is the most effective way to ensure that such Critical Vendors will continue to supply goods and services both now and in the future. Accordingly, the Debtors seek the Court's authorization, not direction, to pay any such outstanding amounts up to Critical Vendor Cap (as defined herein).

*Trade Creditors and Ordinary Course Obligations*

13. In the ordinary course of business, the Debtors engage various suppliers and service providers in connection with their operations, the absence of which would threaten the Debtors' ongoing operations and viability of the sale. The Debtors source the majority of their active ingredients from manufacturers in China and India. The active ingredients are processed

into end-use products (in a process referred to as "tolling") in third-party factories located in India, China, or the United States. These manufacturers and tollers are not party to long-term contracts with the Debtors. Instead, the Debtors enter into one-off agreements for shipments and tolling of products. Additionally, the Debtors rely on certain suppliers of specialized containers, labels, and certain finishing chemicals to support the manufacturing and sales process. Without the goods and services provided by many of these vendors, the Debtors' businesses as a whole would suffer immediate and irreparable harm.

14. The Debtors seek authority to pay $508,592.70 for prepetition claims held by approximately eleven suppliers and tollers that are critical to their ongoing operations as well as the sale of their assets. Certain of the suppliers and tollers are the only source of goods and services necessary for one or more of the Debtors' products. Additionally, certain of the tollers are currently holding the Debtors' inventory pending full payment. For instance, Helena Industries, LLC, which holds a prepetition claim of approximately $13,000, is currently holding over $3 million worth of the Debtors' inventory, much of which is still being tolled. Cooperation from each of these parties is necessary for the Debtors to sell their products during the current sales season.

15. If these suppliers and tollers are not paid for goods shipped and services performed prior to the Petition Date, they will, in all likelihood, cease current deliveries and services and refuse to provide future goods and services. Generally, the third parties have the ability to place a lien on any inventory or products in their possession and are free to cease tolling services if they are not paid. These suppliers and tollers may also refuse to provide goods and tolling services to purchasers of the Debtors' EPA Registrations.

16. Such an outcome would be devastating to the Debtors' current operations. The Debtors are currently in the middle of a short sales season. If scheduled supplies and tolling services are not provided, the Debtors would be unable to timely deliver finished products to their customers. Even where an alternative supplier or toller exists, there is currently insufficient time to utilize such an alternative. The Debtors customers need to take delivery of products in time for the products to be utilized by farmers. The process of arranging new supply and tolling agreements and receiving and tolling chemicals into end products can take months, which is beyond the end of the current sales season. If the Debtors attempt to switch to a new supplier or toller, they will miss their delivery deadlines. The Debtors would lose out on millions of dollars in revenues from current sale orders and anticipated future orders throughout this sale season. Additionally, in all likelihood, a failure to timely deliver would destroy the Debtors' relationships with their most significant customers.

17. The refusal to provide current and future supplies and tolling services and loss of key customers would also risk the success of the sale to the Stalking Horse Bidder and other potential purchasers. A change in relationships with suppliers, tollers, and the Debtors' main customers would arguably constitute a Material Adverse Change under the Asset Purchase Agreement, and allow the Stalking Horse Bidder to refuse to close.

*Operational Service Providers*

18. The Debtors also seek authority to pay $145,142.07 for prepetition claims held by eight parties that provide various services that are critical to the Debtors' continued operations and transfer of operations following a sale. These services include regulatory consulting, information technology services, and payroll and benefits related services. The service providers have gained a wealth of relevant institutional knowledge about the Debtors' operations. The

Debtors' rely on these services in order to timely react to changes in regulations, manage the movement and sale of their inventory and products, and to ensure that employees are appropriately compensated. Interruption of these services increases the risk that the Debtors will unintentionally violate various federal and state regulations or mismanage their supply chain. Given the tight timeframes for tolling arrangements and sales of their products, the Debtors operations and industry relationships may be substantially harmed by such problems.

19. Additionally, the regulatory consulting serves will be vital to a smooth sales process. These services insure that the Debtors remain compliant within their heavily regulated industry. Regulatory bodies, such as the Environmental Protection Agency, are in near constant contact with manufacturers and sellers of pesticides. The Debtors do not have employees with the expertise required to correctly react to regulatory changes or to determine what regulatory steps will be necessary to transfer the Debtors' assets post sale. The continued receipt of regulatory guidance from current parties that are familiar with the Debtors' business is vital to a successful transition after a sale.

**B.     503(b)(9) Claims**

20. Further, the Debtors estimate that they owe approximately $124,388.37 in prepetition trade claims that relate to deliveries of goods to the Debtors within 20 days prior to the Petition Date, which are entitled to priority under section 503(b)(9) of the Bankruptcy Code (collectively, the "**503(b)(9) Claims**"). Accordingly, the Debtors seek the Court's authorization, not direction, to pay any such outstanding amounts up to 503(b)(9) Cap (as defined herein).

**RELIEF REQUESTED**

21. The Debtors respectfully request entry of an order, pursuant to sections 105(a), 363(b), 503, and 507 of the Bankruptcy Code, (a) authorizing, but not directing, the Debtors to

pay the Critical Vendor Claims up to a maximum aggregate amount of $653,734.77, or the foreign currency equivalent thereof (the "**Critical Vendor Cap**") and (b) authorizing the payment of 503(b)(9) Claims as such claims become due in the ordinary course of business, up to a maximum aggregate amount of $124,388.37, or the foreign currency equivalent thereof (the "**503(b)(9) Claims Cap**"), (c) authorizing banks and financial institutions to honor and process all related checks and electronic payment requests, and (d) granting such other and further relief as requested herein or as the Court otherwise deems necessary or appropriate.

22. The Debtors further request that they be authorized to condition, in their sole discretion, the payment of a Critical Vendor Claim on the agreement of the Critical Vendor to continue supplying goods and services to the Debtors on (a) terms that are as, or more, favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the six months prior to the Petition Date (collectively, the "**Customary Trade Terms**") or (b) such other trade terms as are agreed to by the Debtors and the Critical Vendor.

## BASIS FOR RELIEF

### A. Ample Authority Exists To Support Payment of Trade Obligations

23. The Debtors submit that appropriate circumstances exist to justify payment of the Critical Vendors in the ordinary course of business, as contemplated by this Motion. The relief requested in this Motion will help minimize any disruption in the Debtors' business operations pending the sale of their assets and will help maximize the value of the Debtors' assets by assuring potential purchasers that relevant manufacturers and tollers will continue to provide goods and services. As set forth in more detail below, payment of the Critical Vendor Claims in the ordinary course is also appropriate and necessary due to the substantially foreign (non-U.S.)

nature of the Debtors' businesses. In order to avoid the potential erosion of value that would result from the refusal of Critical Vendors to continue doing business with the Debtors or purchasers of the Debtors' product lines, the Debtors believe that it is imperative that they be authorized, but not directed, to pay the Critical Vendors in the ordinary course, whether or not the obligations to such creditors arise before or after the Petition Date. Notably, this relief is especially appropriate given that the Debtors' foreign creditors may (a) not respect the automatic stay or the orders of a court in the United States, (b) otherwise seek relief before foreign courts, or (c) take such other actions that harm the Debtors' ongoing operations or encumber the sale.

24. There are several bases on which the Court could authorize the proposed payment of the Critical Vendors in the ordinary course of the Debtors' businesses. As an initial matter, the Court may authorize the Debtors to pay the Critical Vendor Claims arising or relating to the period before the Petition Date pursuant to section 363(b) of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use of a Debtors' assets outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, the Court must find that a sound business reason exists for the use of such assets. *See, e.g.*, *In re Colorado Wich LLC*, Case no. 18-13443-KHT (Bankr. D. Colo) (Docket No. 122) (authorizing the payment of prepetition debt and to a critical vendor pursuant to section 363(b)).

25. Additionally, the Court may authorize payment of the Critical Vendor Claims based on their equitable powers, either through the codification of such powers in section 105(a) of the Bankruptcy Code or through the "doctrine of necessity" or the "necessity of payment" doctrine, which allow a bankruptcy court to exercise their equitable power, allow payment of

critical prepetition claims not explicitly authorized by the Bankruptcy Code, and further support the relief requested herein. Section 105(a) of the Bankruptcy Code further empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may permit payments on account of prepetition obligations outside the context of a chapter 11 plan when such obligations are essential to the continued operation of a debtor's business. *See e.g.*, *In re Simple Solar Solutions, LLC*, Case No. 10-21850-MER (Bankr. D. Colo.) (Docket No. 89); *In re Just For Feet, Inc.*, 242 B.R. 821, 824 (Bankr. D. Del. 1999) (acknowledging that "[c]ertain prepetition claims . . . may need to be paid to facilitate a successful reorganization" and that "[s]ection 105(a) of the [Bankruptcy] Code provides a statutory basis for the payment of prepetition claims"); *In re Columbia Gas Svs., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that doctrine of necessity is standard in Third Circuit for enabling court to authorize payment of prepetition claims prior to confirmation of reorganization plan); *In re Boston & Maine Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (stating that court has power to authorize payments of claims for goods and services that are necessary to debtor's continued operation as a going concern); *In re Ionosphere Clubs*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989) (stating that section 105(a) of Bankruptcy Code permits payment of prepetition claims where necessary to rehabilitate debtor).

26. Finally, the Court could find that payment of the Critical Vendor Claims is a valid exercise of the Debtors' fiduciary duties. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, a debtor in possession is a fiduciary. Ample authority exists to allow payment of the Critical Vendor Claims, as courts have generally acknowledged that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations where necessary to

protect and preserve the estate, including an operating business's going-concern value. *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (noting that where sound business reasons are demonstrated, including preservation of debtors' business and protection of its ability to reorganize, payment of prepetition wages, salaries, and business expenses is justified); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("There are occasions when this [fiduciary] duty can only be fulfilled by the preplan satisfaction of a prepetition claim.").

27. Further, the Court and others in this district have previously authorized payment of prepetition debt to critical vendors. *See e.g.*, *In re Colorado Wich LLC*, Case no. 18-13443-KHT (Bankr. D. Colo) (Docket No. 122); *In re Kings Peak Energy, LLC*, Case No. 17-16046-EEB (Bankr. D. Colo.) (Docket No. 35); *In re Simple Solar Solutions, LLC*, Case No. 10-21850-MER (Bankr. D. Colo.) (Docket No. 89).

28. The nature of the Debtors' businesses and extent of their operations make payment on account of the Critical Vendor Claims essential to the preservation of the Debtors' businesses and value of the Debtors' estates for all creditors and parties in interest. The Debtors respectfully submit that they need to maintain and continue their relationships with various suppliers and tollers in order for the Debtors to continue to operate their business and to maximize the value of their assets.

29. If the Debtors are not able to fulfill the Critical Vendor Claims, the Debtors' businesses and successful sale would be threatened by the risk that suppliers and tollers could terminate their relationships with the Debtors or take other actions that could have a potentially deleterious effect on the Debtors' businesses as a whole, and the Debtors' ability to sell their assets. To this point, certain of the Critical Vendors are the only parties that supply active ingredients and tolling services required to produce certain of the Debtors' products. If any of

those suppliers or tollers decide to terminate service as a result of non-payment, the Debtors will be forced to cease operations related to certain products and, accordingly, would likely chill, if not completely stop, bidding for such products.

**B.      Ample Authority Exists To Support Payment of 503(b)(9) Claims**

30.     Under section 503(b)(9) of the Bankruptcy Code, a claim shall be accorded administrative expense priority where such claim is for the value of any goods received by the debtor within 20 days prior to the Petition Date if such goods were sold to the debtor in the ordinary course. See 11 U.S.C. § 503(b)(9).  Under section 507(a)(2) of the Bankruptcy Code, administrative expenses allowed under section 503(b) of the Bankruptcy Code are granted priority status. *See* 11 U.S.C. § 507(a)(2).  The 503(b)(9) Claims the Debtors seek to pay by this Motion are entitled to priority status under sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code and, accordingly, must be paid in full to confirm a plan of liquidation. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority under section 507(a)(2) of the Bankruptcy Code).

31.     As discussed above, the Debtors believe the amount of 503(b)(9) Claims is approximately $124,388.37.  In the interests of streamlining the administration of these Cases, and given that a chapter 11 plan necessarily will require the payment of administrative expenses in full (including "trade-related" administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code), the Debtors submit that the relief requested herein would only affect the timing and not the amount or priority of the claims of the applicable creditors.  Therefore, the payment of the 503(b)(9) Claims will not prejudice any unsecured creditors of the Debtors.

32.     Furthermore, although the 503(b)(9) Claims may not be required to be paid prior to confirmation of a chapter 11 plan, nothing in the Bankruptcy Code prohibits (a) the Debtors

from paying such claims sooner if it chooses to do so or (b) the Court from exercising its discretion to authorize the post-petition payment of such obligations prior to confirmation of a chapter 11 plan. *See In re Global Home Products LLC*, 2006 Bankr. LEXIS 3608, at * 10 (Bankr. D. Del. Dec. 21, 2006) (holding that timing of payment of claims under section 503(b)(9) of Bankruptcy Code is within discretion of Court).

## DEBTORS SATISFY BANKRUPTCY RULE 6003

33. Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding ... a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate ...." FED R. BANS. P. 6003(b). The Debtors submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

## DEBTORS SATISFY BANKRUPTCY RULE 6003

34. To implement the foregoing successfully, the Debtors respectfully request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the Debtors' operations, value, and ability to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

**NOTICE**

35. In compliance with Local Rule 2081-1(b), notice of this Motion has been or will immediately be served by facsimile, email, overnight mail, or hand delivery, to: (i) the United States Trustee for the District of Colorado (ii) those entities or individuals included on the Debtors' list of 20 largest unsecured creditors on a consolidated basis, (iii) Latham & Watkins LLP, Attn: Lindsey Henrikson, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611 and Markus Williams & Young LLC, Attn: James T. Markus, 1700 Lincoln, Suite 4550, Denver, Colorado 80203, (iv) Moye White LLP, Attn: Timothy M. Swanson, 16 Market Square, 6th Floor, 1400 16th Street, Denver, Colorado 80202, (v) all parties requesting notices pursuant to Bankruptcy Rule 2002, and (vi) the IRS and other relevant government agencies. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtors request that the Court enter an order approving this Motion and granting such other and further relief as is just and proper.

DATED: February 27, 2019.       Respectfully submitted,

                                          **BROWNSTEIN HYATT FARBER SCHRECK, LLP**

                                          *s/ Michael J. Pankow*
Michael J. Pankow, #21212
Joshua M. Hantman, #42010
Andrew J. Roth-Moore, DE Bar No. 5988
410 17th Street, Suite 2200
Denver, Colorado 80202
Telephone: (303) 223-1100
Facsimile: (303) 223-1111
mpankow@bhfs.com
jhantmant@bhfs.com
aroth-moore@bhfs.com

*Proposed Attorneys for the Debtors*