**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | |
| Willowood USA Holdings, LLC, *et al.* EIN: 81-0829193, | Case No. 19-11079-KHT |
| | Chapter 11 |
| Debtors.[1] | |

**MOTION FOR ENTRY OF AN ORDER (A) APPROVING BIDDING PROCEDURES
FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS,
(B) APPROVING STALKING HORSE BID PROTECTIONS, (C) APPROVING
PROCEDURES FOR THE ASSUMPTION, ASSIGNMENT, AND SALE OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) APPROVING THE
FORM AND MANNER OF NOTICE OF THE AUCTION AND SALE HEARING AND
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, (E) SCHEDULING AN AUCTION AND SALE HEARING,
AND (F) GRANTING RELATED RELIEF**

Willowood USA, LLC ("**Willowood USA**") and its affiliated debtors (the "**Debtors**"),

the debtors and debtors in possession in the above-captioned cases, hereby move (this "**Motion**")

pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy**

**Code**"); Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"); and Rule 6004-1 of the Local Bankruptcy rules for the United States

Bankruptcy Court for the District of Colorado ("**Local Rules**"), seeking entry of an order,

substantially in the form attached hereto (the "**Bidding Procedures Order**"):

    (A)    approving the proposed bidding procedures described herein and annexed to the

proposed Bidding Procedures Order (the "**Bidding Procedures**"), for the

proposed sale of any or substantially all of the Debtors' assets (the "**Assets**"),

including those Assets (the "**Covered Assets**") specified in the Asset Purchase

---

[1] The Debtors in these chapter 11 cases, and the last four digits of their employer identification numbers, where applicable, are: Willowood USA Holdings, LLC (9193), Willowood USA, LLC (7337), Willowood, LLC, RightLine LLC (1429), Greenfields Holdings, LLC (5326), Greenfields Marketing Ltd.  The Debtors' corporate headquarters is located at 1350 17th Street, Suite 206 Denver, Colorado 80202.

18043126

Agreement by and between the Debtors and AMVAC Chemical Corporation ("**Stalking Horse Bidder**"), (the "**APA**") attached hereto as **Exhibit 1**;[2]

(B)   approving the proposed breakup fee in the amount of $500,000 and expense reimbursement of up to $125,000 to be provided to the Stalking Horse Bidder pursuant to the APA (the "**Bid Protections**");

(C)   scheduling an auction (the "**Auction**") for the sale of any or all of the Assets (the "**Sale**") for no more than 43 days following the Petition Date and a hearing to consider approval of the Sale for no more than 45 days after the Petition Date; and

(D)   approving the form and manner of:

   ( i )   the notice (the "**Notice of Sale**") that will be filed with this Court and served on all creditors and parties-in-interest regarding the Sale and the related hearing at which this Court will consider approval of the Sale (the "**Sale Hearing**"); and

   ( ii )   the notice of potential assumption and assignment of certain executory contracts and unexpired leases.

In support of this Motion, the Debtors respectfully represent as follows:

## I.   JURISDICTION

1.   This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b).

2.   Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.   The bases for the relief sought herein are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1.

---

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the APA.

## II.   BACKGROUND

### A.   <u>General Background on Debtors' Business</u>

4.      On the date hereof (the "**Petition Date**"), each Debtor other than Willowood USA Holdings, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Willowood USA Holdings, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 15, 2019.

5.      The Debtors are operating their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.  No creditors' committee has been appointed in these cases.

6.      A detailed description of the Debtors' business operations, capital structure, events leading up the Petition Date, and other matters are set forth in the Affidavit of Thomas M. Kim in Support of Application Seeking Expedited Entry of First Day Orders, (the "**Kim Affidavit**") filed contemporaneously herewith.  Additional facts in support of the specific relief sought are set forth herein.

7.      The Debtors develop, formulate, register, and sell generic crop protection products primarily used in the United States agriculture industry.  The Debtors function as a sales intermediary and virtual manufacturer between manufacturers of chemicals in China and India and their customers.  The Debtors offer more than sixty products throughout the United States for use on many different crops.  Among the Debtors' most valuable assets are registrations issued form the Environmental Protection Agency ("**EPA Registrations**") that permit the Debtors to sell their products.

8.      As described further in the Kim Affidavit, several recent events created a liquidity shortage that forced the Debtors to file for bankruptcy.  Initially, the Debtors received two negative legal decisions in 2018 that permanently enjoined the Debtors from selling their most profitable product lines in the near-term and added millions of dollars more of liabilities than they projected for "data compensation" liabilities.  These events, in addition to increased competition, millions of dollars of legal bills, and an abnormal 2018 busy season, dramatically decreased the Debtors' earnings and put tremendous pressure on its ability to borrow sufficient funds under the Debtors' revolving facility to meet its growth targets for 2019.  As a result, the Debtors were severely restricted in their ability to draw down additional funds or obtain separate financing to help finance a lower margin, higher volume business model to offset the loss of its key products, meet its projected data compensation costs, and pay overdue amounts to a key supplier, Willowood Limited.  Without sufficient cash or access to additional lending above its borrowing base formulas, the Debtors were unable to pay for previously received inventory sourced by Willowood Limited.  As a result, Willowood Limited no longer supplied terms, for which the business required even when healthy, which further exacerbated the liquidity crunch. Additionally, Chinese suppliers faced mounting expense and regulatory pressures, with many key ingredients in short supply, which created a situation where suppliers were no longer providing credit.  This too hurt the ability of Willowood USA to source enough products to meet its growth plans.

**B.      Pre- and Postpetition Marketing Efforts and Events Leading to Filing of Chapter 11 Case**

9.      Based on these constraints, the Debtors could not fund a typical buying pattern to grow or maintain current earnings without additional capital infusions.  The Debtors attempted to obtain funding outside of bankruptcy from various sources, including their existing lenders, and

equity holders but were unsuccessful.  As a result, the Debtors concluded that a sale of their Assets would be the only means to preserve and maximize the value of their Assets for the benefit of their stakeholders.

10.    Initially, the Debtors utilized their industry contacts to initiate negotiations with a potential strategic buyer.  These negotiations progressed through the late fall and winter of 2018, but the parties were ultimately unable to reach a deal.

11.    After the Debtors entered into negotiations with the potential strategic buyer, the Debtors' management determined that a more robust marketing process was needed in order to maximize the value of the company.  To that end, in October 2018, the Debtors engaged the investment bank Piper Jaffray & Co. ("**PJC**") to market the business.  PJC utilized a phased marketing strategy that balanced the need for a robust sale process with the need for discrete marketing and management of customer relationships.  PJC contacted a broad list of parties in the industry and known distressed investors.  Forty-two parties signed nondisclosure agreements.

12.    Negotiations progressed with two potential purchasers for the whole business. These negotiations progressed through the late fall and winter of 2018, but the parties were ultimately unable to reach terms on sale of the entire business.  The potential purchasers eventually modified their offers, requesting only certain of the Debtors' EPA Registrations and associated inventory and executory contracts.

13.    Following lengthy negotiations, the Debtors entered into the APA with the Stalking Horse Bidder for the sale of a substantial portion of the Debtors' EPA Registrations and associated inventory and executory contracts (*i.e.*, the Covered Assets).[3]  However, in light of the

---

[3] Specifically, the Asset Purchase Agreement covers EPA Registrations, inventory, and certain contracts related to Abamectin, Chlorimuron, Clomazone, Cloransulam, Glufosinate, Imazethapyr, Lactofen, Metribuzin, Oxyflurofen, Paraquat, Pronamide, Propanil, Sulfentrazone, and Thiobencarb.

Debtors' current status of litigation matters and Assets and liabilities, the Stalking Horse

Bidder's offer was contingent upon the sale of the Debtors' Assets pursuant to section 363 of the

Bankruptcy Code.

14.     The Debtors are also involved in advanced negotiations with the second potential

purchaser.  However, as of the Petition Date, the parties had not executed an asset purchase

agreement.

15.     Pursuant to the APA, to the extent that the Debtors accept an offer that precludes

it from selling the Covered Assets to the Stalking Horse Bidder, the Stalking Horse Bidder is

entitled to a breakup fee equal to $500,000 plus reasonable out-of-pocket expenses incurred by

the Stalking Horse Bidder in an amount not to exceed $125,000.

16.     The APA does not prohibit the Debtors from marketing their Assets pending

approval of this Motion.  Accordingly, PJC has been actively marketing the business since the

date of its engagement.

### III.     THE PROPOSED BIDDING PROCEDURES

17.     The proposed Bidding Procedures are annexed to the proposed Bidding

Procedures Order attached hereto.  They set forth the proposed procedures that prospective

bidders must follow in order to bid on the Assets.  The Bidding Procedures are intended to

permit an expedited sale process to ensure that there is no disruption in the Debtors' operations

pending closing of the sale, while simultaneously fostering an orderly and fair sale process.  The

Debtors have determined that the Bidding Procedures establish a framework that is most likely to

maximize the value of the Assets for the benefit of the Debtors' estates and their creditors.

Those procedures are summarized in relevant part below.[4]

---

[4] The summary of the Bidding Procedures set forth herein is provided for the convenience of the Court and
interested parties and is qualified in its entirety by the Bidding Procedures, which are attached hereto as an attached

**A.      Participation Requirements**

18.      To be qualified to receive any confidential information from the Debtors, a potential bidder must submit to the Debtors, prior to the receipt of any such information, an executed confidentiality agreement, in a form and substance acceptable to the Debtors.

**B.      Bid Requirements**

19.      To constitute a Qualifying Bid and participate at the Auction, a potential bidder (each a "**Bidder**") must submit the following to the Debtors before the Bid Deadline (as defined below):

(a)      a proposed asset purchase agreement (the "**Competing Purchase Agreement**") executed by the Bidder that (i) provides for the purchase of some or all of the Assets along with a redlined, marked copy showing all changes between the Competing Purchase Agreement and the APA (the Debtors' counsel will provide a copy of the APA in Microsoft Word format to Bidders); (ii) identifies the Assets that the Bidder seeks to purchase and specifies the total consideration to be paid by such Bidder, and specifies how the total consideration is allocated among the applicable Assets; (iii) contains a list of the Debtors' executory contracts and unexpired leases with respect to which the Bidder seeks assignment from the Debtors (whether set forth in the APA or a Competing Purchase Agreement, the "**Proposed Assumed Contracts**"); (iv)  remains irrevocable until the earlier of the closing of a purchase of the Assets by the Successful Bidder and the Qualified Bidder Outside Date (as defined herein); (v) disclaims any right of the Bidder to receive any transaction or breakup fee, expense reimbursement or similar fee or payment, or to compensation under Bankruptcy Code Section 503(b) for making a substantial contribution; (vi) contains no financial or due diligence contingencies; (vii) provides for the Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Bidder's bid is the next highest and best bid (the "**Back-Up Bid**") after the Successful Bid (as defined herein) for the applicable Assets; and (viii) contains a proposed closing date that is not later than 10 Business Days following the date of the Sale Order, or on such other date or at such other location as Willowood USA and Buyer shall mutually agree, but in any event not later than 60 days following the date of the APA, in consultation with the Secured Lenders, and the Bidder in their sole discretion (the "**Qualified Bidder Outside Date**");

(b)      a cashier's check made payable to the order of the Debtors, or any other medium acceptable to the Debtors in their sole discretion, in the amount equal to ten percent (10%) of the purchase price set forth in such Competing Purchase Agreement (the

to the proposed Bidding Procedures Order.  In the event of any inconsistency between the Bidding Procedures and this summary, the Bidding Procedures shall control.  Capitalized terms used in this summary have the meaning ascribed to them in the Bidding Procedures.

"**Qualified Bidder's Deposit**"), which will be retained by the Debtors as a nonrefundable good faith deposit for application against the purchase price at the closing of the transaction or returned to the Bidder or otherwise applied as set forth in these Bidding Procedures;[5] and

(c)        admissible evidence, satisfactory to the Debtors, establishing that the Bidder has the financial ability to pay the purchase price and provide adequate assurance of future performance under all Proposed Assumed Contracts, in the form of (i) affidavits or declarations; and (ii) current audited financial statements and the latest unaudited financial statements of the Bidder or, if such Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements and the latest unaudited financial statements of the equity holders or sponsors of such Bidder who will guarantee the obligations of such potential bidder, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that will allow the Debtors to make a reasonable determination as to such Bidder's financial and other capabilities to consummate the Sale.

20.        A bid received from a Bidder (and any bid submitted at the Auction by a Bidder) that meets the requirements set forth above will be considered a "**Qualified Bid**" if, in the good faith opinion of the Debtors, after consulting with their financial and legal advisors and with their secured lenders, Key Bank, National Association and Tree Line Direct Lending, LP (together, the "**Secured Lenders**"), the Debtors reasonably believe that such bid would be consummated before the Qualified Bidder Outside Date if selected as a Successful Bid (as defined below). Each Qualified Bidder will be notified within 48 hours of receipt of its bid by the Debtors whether such Qualified Bidder's bid has been deemed a Qualified Bid.

21.        The Stalking Horse Bidder, and any entity that submits a timely Qualified Bid accompanied by all items required to be submitted along therewith in accordance with these Bidding Procedures (an "**Initial Qualifying Bid**"), shall each be deemed a "**Qualified Bidder**" and may bid at the Auction, if conducted, for the Assets specified in the APA or Competing Purchase Agreement, as applicable, and, at the Debtors' discretion, Assets not specified therein. Except as otherwise provided herein, any entity (other than the Stalking Horse Bidder) that fails

---

[5] The Stalking Horse Bidder's deposit is $1,300,000.00.

8

to submit a timely, conforming Initial Qualifying Bid, as set forth above, shall be disqualified from bidding for the Assets at the Auction.  The Debtors shall, promptly upon receipt of any Initial Qualifying Bid, provide copies of such Initial Qualifying Bid to the Stalking Horse Bidder and to counsel for the Secured Lenders.

**C.      Bid Deadline**

22.      The Debtors request that the deadline for submitting bids by a Qualified Bidder shall be at **5:00 p.m.** (prevailing Mountain Time) seven days prior to the Auction (the "**Bid Deadline**").[6]

23.      Before the Bid Deadline, a Qualified Bidder that desires to make a bid shall deliver written copies of its bid via overnight mail and email to (i) counsel for the Debtors, Brownstein Hyatt Farber Schreck LLP, 410 17th Street, Suite 2200, Denver CO 80202, Attn: Michael J. Pankow; mpankow@bhfs.com; (ii) Piper Jaffray & Co., 345 Park Avenue, Suite 1200, New York, NY 10154, Attn: Teri Stratton; Teri.L.Stratton@pjc.com and Michael Sutter; michael.d.sutter@pjc.com; (iii) counsel for Key Bank, National Association, Moye White, 1400 16th St., 6th Floor, Denver, CO 80202, Attn:  Timothy Swanson; tim.swanson@moyewhite.com; and (iv) counsel for Tree Line Direct Lending, LP, Latham & Watkins LLP, 330 North Wabash Ave., Suite 2800, Chicago, IL 60611, Attn: Matthew L. Warren; matthew.warren@lw.com; and Markus Williams & Young, 1700 Lincoln Street, Suite 4550, Denver, Colorado 80203, Attn: James T. Markus; jmarkus@maruswilliams.com.

**D.      Additional Stalking Horse Bidder**

24.      Following entry of the Bidding Procedures Order, the Debtors shall be authorized, but not obligated, in an exercise of their reasonable business judgment and after consulting with

---

[6] For the avoidance of doubt, all dates and deadlines set forth in this summary of the Bidding Procedures are subject to approval and/or modification by the Court.

9

the Secured Lenders, to select one or more potential bidders to act as a stalking horse bidder for any of the Assets other than the Covered Assets (an "**Additional Stalking Horse Bidder**"), and may agree to provide such Additional Stalking Horse Bidder(s) certain bid protections, including an expense reimbursement and/or a break-up fee; provided that any such bid protections shall be subject to approval by the Court, which the Debtors may seek on an expedited basis.

### E.    Right to Credit Bid

25.    For purposes hereof, should any Secured Lender submit a credit bid, such Secured Lender shall be deemed to be a Qualified Bidder, and any such credit bid shall be considered a Qualified Bid and may be submitted at any time prior to or at the Auction provided that it otherwise complies with the requirements for a Qualified Bid as set forth above, *provided, that*, notwithstanding anything to the contrary in these Bidding Procedures or the Bidding Procedures Order, from and after the submission of such credit bid, the Debtors are shall not be required to consult with the applicable Secured Lender or obtain the consent of such Secured Lender in connection with the Sale unless and until such credit bid is withdrawn in writing by such Secured Lender. A credit bid, if any, will not impair or otherwise affect the Stalking Horse Bidder's rights under the Bidding Procedures Order.

### F.    The Auction

26.    If no timely, conforming Initial Qualifying Bid is received, the Debtors shall not conduct an Auction and shall request at the Sale Hearing that the Court approve the APA, including the Sale of the Covered Assets (including the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder.

27.    If one or more conforming Initial Qualifying Bids are received, the Debtors may, in exercising their reasonable business judgment and in consultation with the Secured Lenders,

10

conduct an Auction for any or all of the Assets, in which the Stalking Horse Bidder and all other

Qualified Bidders may participate. The Debtors request that Auction be conducted at the offices

of Brownstein Hyatt Farber Schreck LLP, 410 17th Street, Suite 2200, Denver, Colorado 80202

on a date that is not more than 43 days after the Petition Date, or such other place and time as the

Debtors may determine, so long as such change is communicated reasonably in advance to all

Qualified Bidders and other invitees, if any.

28.      The following procedures will govern the Auction:

(a)      all Qualified Bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court, agreeing to abide by and honor the terms of these Bidding Procedures and not seek to reopen the Auction after the Auction, and to have waived any right to jury trial in connection with any disputes relating to the Auction or the Sale of the Assets;

(b)      all Qualified Bidders (other than the Stalking Horse Bidder) shall be deemed to consent to provide the Debtors with admissible evidence in the form of affidavits or declarations establishing (A) the Qualified Bidder's good faith, within the meaning of Section 363(m) of the Bankruptcy Code; and (B) that the Qualified Bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Purchase Agreement including such additional financial or other conditions made as part of any Overbids at the Auction;

(c)      each Qualified Bidder desiring to participate in the Auction must have at least one individual representative with authority to bind the Qualified Bidder in attendance at the Auction, and only Qualified Bidders may bid at the Auction;

(d)      prior to the commencement of the Auction, the Debtors, in consultation with the Secured Lenders, shall determine which Qualified Bid(s) constitute the highest or otherwise best Qualified Bids (the "**Baseline Bids**" and, each, a "**Baseline Bid**") for the applicable Assets;

(e)      bidding at the Auction will begin with the Baseline Bid(s) and continue, in one or more rounds of bidding, so long as, during each round, at least one subsequent bid is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (an "**Overbid**") and (ii) the Debtors determine, in consultation with the Secured Lenders, that such Overbid or combination of Overbids is (a) for the first round, a higher or otherwise better offer than the Baseline Bid(s) (taking into account, if applicable, the bid protections and Breakup Fee granted to the Stalking Horse Bidder by the APA (the "**Stalking Horse Bidder Fee**") and any bid protections granted to any Additional Stalking Horse Bidder) and (b) for subsequent rounds, a higher or otherwise better offer than the Leading Bid(s) (as defined below);

11

(f)      with respect to the Assets set forth in the APA, the initial Overbid must be valued at a value at least $650,000 above the value of the Stalking Horse Bid, *provided, however,* it being understood a bid for such Assets could occur at any time during the Auction.  If the Stalking Horse Bidder submits an Overbid, it will receive a credit equal to the Bidder Fee when bidding during the Auction.  Additional consideration in excess of the amount set forth  in the respective Starting Bid may include cash and/or noncash consideration, *provided*, *however*, that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment;

(g)      the Debtors, in their sole discretion and in consultation with the Secured Lenders, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, including, but not limited to, bidding increments and other requirements for each round of bidding, provided that such rules are (A) not inconsistent with the order entered by the Court approving these Bidding Procedures, the Bankruptcy Code or any other order of the Court entered in connection herewith and (B) disclosed to each Qualified Bidder;

(h)      during the course of the Auction, the Debtors shall, after the submission of each Overbid, inform each Qualified Bidder which Overbid(s) reflects, in the Debtors' view, the highest or otherwise best bid for the applicable Assets (the "**Leading Bid(s)**");

(i)      bidding on different Assets or sets of Assets may, at the Debtors' discretion, proceed separately or simultaneously;

(j)      the Debtors reserve the right, in their reasonable business judgment, to adjourn the Auction one or more times to, among other things: facilitate discussions between the Debtors and Qualified Bidders; allow Qualified Bidders to consider how they wish to proceed; and provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the Sale at the prevailing Overbid amount;

(k)      the Auction shall continue until there are Qualified Bid(s) that the Debtors determine, in consultation with the Secured Lenders, are the highest and/or best offer for the purchase of the applicable Assets (the "**Successful Bid(s)**") and the Qualified Bidder(s) (or the Stalking Horse Bidder) submitting such bid(s) (the "**Successful Bidder(s)**");

(l)      the Debtors may evaluate competing bids in a manner that will maximize the aggregate value to the estates, and in making the determination of which Qualified Bid(s) constitutes an Overbid, a Leading Bid or the Successful Bid(s), the Debtors may, in consultation with the Secured Lenders, take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, including, among other things: (a) the type and amount of the Assets sought and the liabilities of the Debtors to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the

12

proposed transaction, the conditions thereto, and the timing thereof; (d) any excluded Assets, executory contracts, or unexpired leases; (e) any purchase price adjustments; (f) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid; (g) whether the bid is a bid for only some of the Assets; (h) the tax consequences of such Qualified Bid; and (i) the impact, if any, of any bid protections or Stalking Horse Bidder Fee that might be required to be paid to the Stalking Horse Bidder or Additional Stalking Horse Bidder(s);

(m)      the Debtors may, in their sole discretion, designate Back-Up Bid(s) (and the corresponding Back-Up Bidder(s)) to purchase some or substantially all of the Assets in the event that the Successful Bidder(s) do not close their respective Sale;

(n)      if, at the Auction's conclusion and consistent with the Bidding Procedures' terms, the Stalking Horse Bidder's final bid for the Covered Assets is higher or better than the highest bid made by any Qualified Bidder for the same, such final bid shall be the Successful Bid with respect to the Covered Assets, the Stalking Horse Bidder shall be the Successful Bidder with respect to the Covered Assets and the Bankruptcy Court shall approve the APA, including the Sale of the Covered Assets (including the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder, and authorize the Debtors to sell the Covered Assets (including the assignment of the Assumed Contracts, if any) to the Stalking Horse Bidder, and the amount of the Stalking Horse Bidder's final bid shall constitute the Purchase Price under the APA; and

(o)      for the avoidance of doubt, the Debtors may elect to deem the Stalking Horse Bidder's final bid to be the Successful Bid, notwithstanding the receipt of an apparently higher bid from another Qualified Bidder, if the Debtors reasonably conclude, in consultation with the Secured Lenders, that the Qualified Bidder may not be able to close on a timely basis (based on antitrust or other regulatory issues, experience, or other considerations) acceptable to the Debtors.

## G.      **Sale Hearing**

29.      The Debtors request a hearing to consider approval of the Sale to the Successful Bidder(s) (or to approve the APA if no Auction is held or the Successful Bid is by the Stalking Horse Bidder) to occur by no later than 45 days following the Petition Date (prevailing Mountain Time) in the courtroom of the Honorable Kimberley H. Tyson in the United States Bankruptcy Court for the District of Colorado, 721 19th St., Denver, Colorado 80202 (the "**Sale Hearing**").

## H.      **Back-Up Bidder**

30.      Notwithstanding any of the foregoing, in the event that the Successful Bidder(s) fails to consummate the Sale by the date that is 14 days after the outside date of the applicable

13

asset purchase agreement (or such date as may be extended by the Debtors with the agreement of the Back-Up Bidder(s)), the Back-Up Bid(s) will be deemed to be the Successful Bid(s), the Back-Up Bidder(s) will be deemed to be the Successful Bidder(s), and the Debtors will be authorized, but not directed, to close the Sale to the Back-Up Bidder(s) subject to the terms of the Back-Up Bid(s) without the need for further order of the Court and without the need for further notice to any interested parties *provided, however*, in the event the Stalking Horse Bidder is designated a Back-Up Bidder and ultimately deemed a Successful Bidder, the Stalking Horse Bidder shall only be obligated to close the Sale on the terms and conditions set forth in the APA.

**I.      Return of Qualified Bidder's Deposit**

31.      Except with respect to a Successful Bidder and Back-Up Bidder, all Qualified Bidders' Deposits shall be returned within three business days after entry of the Sale Order, or an earlier date as the Debtors deems appropriate.

32.      The Debtors in their sole discretion, with the consent of the Secured Lenders, may reimburse any Qualified Bidder's expenses associated with the bidding process and the Auction up to $50,000.

**J.      Proposed Procedures for the Assumption and Assignment of Certain Executory Contracts[7]**

33.      The Debtors request that the following procedures (the "**Assumption and Assignment Procedures**") shall govern the assumption and assignment of executory contracts:

(a)      The Debtors shall, within two (2) business days after the date of this Bidding Procedures Order, serve on each Counterparty an Assignment Notice, substantially in the form attached hereto as **Exhibit 3** (the "**Assignment Notice**"), specifying the Cure Cost and the potential for the Debtors to assume and assign each of the Contracts to the Stalking Horse Bidder or other Successful Bidder(s).  If the Debtors identify additional executory contracts or unexpired leases that might be assumed by the Debtors and

---

[7] If a party other than the Stalking Horse Bidder is the Successful Bidder or if a transaction other than the Sale is consummated for the sale of the Purchased Assets, then these procedures may be modified if necessary by further order of the

assigned to the Stalking Horse Bidder (or other Successful Bidder(s)) not set forth in the original Assignment Notice, the Debtors shall promptly send a supplemental notice (a "**Supplemental Assignment Notice**") to the applicable counterparties, and such additional contracts or leases shall be deemed Contracts for purposes of the order approving this Motion.

(b)      Objections, if any, to the proposed Cure Costs, or to the proposed Assumption and Assignment, including, but not limited to, objections relating to adequate assurance of future performance by the Stalking Horse Bidder or objections relating to whether applicable law excuses the Counterparty from accepting performance by, or rendering performance to, a Successful Bidder for purposes of section 365(c)(l) of the Bankruptcy Code, must be in writing and filed with this Court and served on the Notice Parties so as to be received no later than five (5) business days prior to the Bid Deadline (the "**Designation and Cure Objection Deadline**"); provided, however, that in the event the Successful Bidder(s) is a bidder other than the Stalking Horse Bidder (which, if applicable, will be set forth in the Notice of Successful Bidder and Assumed Contracts), objections relating to adequate assurance of future performance may be raised at any time prior to or during the Sale Hearing; provided further, however, that for any counterparty that receives a Supplemental Assignment Notice, the Designation and Cure Objection Deadline shall be the earlier of (i) ten (10) days after the mailing of the Supplemental Assignment Notice, or (ii) two (2) business days prior to the Sale Hearing.

(c)      Within twenty-four (24) hours after the conclusion of the Auction, the Debtors shall file a notice (the "**Notice of Successful Bidder and Assumed Contracts**"), which shall state (i) the identity of the Successful Bidder(s), and (ii) the Contracts that the Debtors proposes to assume and assign to the Successful Bidder(s) (the "**Assumed Contracts**").

(d)      Where a Counterparty files an objection meeting the requirements set forth herein, objecting to the assumption by the Debtors and assignment to a Successful Bidder of such Contract (the "**Disputed Designation**") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "**Disputed Cure Costs**"), the Debtors, the Stalking Horse Bidder, or the other Successful Bidder(s) (as the case may be), and the Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the Debtors, the Counterparty, and the Stalking Horse Bidder (or the other Successful Bidder(s), as the case may be), determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by this Court at the Sale Hearing.  If this Court determines at the Sale Hearing that the Assumed Contract will not be assumed and assigned, then such executory contract shall no longer be considered an Assumed Contract, provided, however, that after such determination is made by this Court, the Debtors may propose a new Cure Cost in accordance with the procedures set forth herein, including providing the applicable Counterparty with the Assignment Notice setting forth the redesignation and proposed new Cure Cost of the Assumed Contract.  Notwithstanding the foregoing, the Debtors, in consultation with the Stalking Horse Bidder, or the other Successful

15

Bidder(s) (as the case may be), may at any time withdraw its application to this Court for authorization to assume and assign any Assumed Contract that is the subject of a Disputed Designation.

(e)      Other than with respect to the ability to raise objections relating to adequate assurance of future performance of a Successful Bidder other than the Stalking Horse Bidder at any time prior to or during the Sale Hearing, any Counterparty to a Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a Contract by the Designation and Cure Objection Deadline is deemed to have consented to such Cure Costs and the assumption and assignment of such Contract, and such party shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates, or the Stalking Horse Bidder (or the other Successful Bidder(s), as the case may be).

(f)      If the Counterparty to a Contract fails to timely object to the assumption and assignment of a Contract or the proposed Cure Cost relating thereto by the Designation and Cure Objection Deadline, or upon the resolution of any timely objection by agreement of the parties or order of this Court approving an assumption and assignment, such Contract may be assumed by the Debtors and assigned to the Successful Bidder, and the proposed Cure Cost related to such Contract shall be established and approved in all respects, subject to the conditions set forth directly below.

(g)      The Debtors' decision to assume and assign the Assumed Contracts is subject to Court approval and consummation of the Sale.  Accordingly, subject to the satisfaction of conditions in connection with the Sale, the Debtors shall be deemed to have assumed and assigned the Assumed Contracts as of the date of and effective only upon the Closing Date (as defined in the APA (or any other Successful Bid in accordance with the Bidding Procedures)), and absent such closing, each of the Assumed Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.  Additionally, inclusion of any document on the list of Contracts in the Assignment Notice shall not constitute or be deemed to be a determination or admission by the Debtors or the Stalking Horse Bidder (or a Successful Bidder, as the case may be) that such document is, in fact, an executory contract within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved.

(h)      Except as may otherwise be agreed to by the parties to an Assumed Contract, or as agreed to by the Debtor and the Successful Bidder(s), the defaults under the Assumed Contracts that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: the Successful Bidder shall pay all Cure Costs relating to an assumed executory contract that accrue on or after the Closing Date,  and the Debtors shall pay any remaining Cure Costs, within ten days after the later of (i) the Closing Date; (ii) the date on which such Assumed Contract is deemed assumed and assigned; or (iii) the date on which the Successful Bidder or Debtors (as applicable) and contract counterparty otherwise agree to in writing.

16

**K.**     **Notice Procedures**

34.     The Debtors shall, within two (2) business days of the entry of the Bidding Procedures Order, serve a copy of each of the Motion, the Bidding Procedures Order, and a copy of the Notice of Sale, substantially in the form annexed hereto as **Exhibit 2**, by first-class mail on the following parties (collectively, the "**Notice Parties**"): (i) all entities known to have expressed an interest in a financing or sale transaction with respect to the Debtors within two years prior to the date hereof, as evidenced by executing an non-disclosure agreement with the Debtors; (ii) any entities known to have asserted any Encumbrance in or upon the Assets; (iii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (iv) the Office of the United States Trustee; (v) the Internal Revenue Service; (vi) all entities that have requested notice in accordance with Bankruptcy Rule 2002; and (vii) all other known creditors of the Debtors.

35.     The Debtors shall serve an Assignment Notice on each Counterparty in the manner described above.

## IV.     LEGAL ARGUMENT

**A.**     **The Proposed Bidding Procedures Constitute an Appropriate Process to Obtain the Highest or Best Bid**

36.     The Debtors request that the Court approves the Bidding Procedures.  As discussed above, the Debtors believe in their reasonable business judgment that the Bidding Procedures and the Sale, with Stalking Horse Bidder as the "stalking-horse" bidder, is the best strategy for maximizing the value of the Debtors' assets for the benefit of the various stakeholders.  *See In re Psychometric Sys., Inc.*, 367 B.R. at 675.  Moreover, the Bidding Procedures, the Qualified Bidder's Deposit and the other requirements for bids to be considered

17

Qualifying Bids will ensure a competitive and efficient bidding process which excludes disingenuous bidders while preserving the participation of the Stalking Horse Bidder.

37.     The proposed timeline set forth in the Bidding Procedures is reasonable in light of the circumstances.  Under the Debtors' proposed timeline, the Bid Deadline is April 4, 2019. This will add over a month to a marketing process that had already run for nearly five months prior to the Petition Date.  PJC has been actively marketing the assets since the date of engagement and will continue to do so.  PJC has already marketed the Debtors' assets to 127 parties and received 42 non-disclosure agreements from interested parties.  The Debtors submit that the prepetition process combined with the additional time provided before the Bid Deadline provides a more than sufficient opportunity to market the Debtors' assets.  Accordingly, extending the sales process is unlikely to have any utility and, instead, will serve only to increase the costs of the estates and create additional risk to the ability to close on the APA.

38.     In sum, the proposed Sale Notice and proposed Bidding Procedures are appropriate, reasonable, and designed to ensure the most robust bidding and auction process possible for the Assets.  In addition to providing appropriate notice, the Debtors, through PJC, will continue to contact various parties who have previously expressed an interest in acquiring assets of the Debtors to determine whether such parties are interested in submitting a bid.

**B.     The Bid Protections are Necessary and Appropriate**

39.     As a condition to the Sale Agreements, the Debtors are required to obtain approval of the Bid Protections in the Bidding Procedures Order.  Breakup and other termination fees and expense reimbursements are a normal, and in some cases necessary, component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  *See, e.g., In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Colo. 1992)*; In re Integrated Res., Inc.*, 147 B.R.

18

650, 660 (S.D.N.Y. 1992) (noting that breakup fees may be legitimately necessary to convince a single "white knight" to enter the bidding by providing some form of compensation for the risk it is undertaking); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (breakup fees in merger agreement approved); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28-9 (Bankr. S.D.N.Y. 1989) (payment of $500,000 breakup fee to outbid contract vendee following sale of Debtors' property was not unreasonable absent evidence that fee chilled bidding).

40.     In considering whether to approve a breakup fee, courts generally consider the following three factors: (i) the relationship between the initial bidder and the seller; (ii) whether the fee is designed to encourage bidding; and (iii) the size of the fee in relation to the purchase price. *See In re Integrated Resources*, 147 B.R. at 657–63.  Here, each of the factors militates in favor of approving the breakup fee.

41.     *First*, the Stalking Horse Bidder is not an insider of the Debtors.  The APA, including the Bid Protections set forth therein, was negotiated extensively and at arms' length. The Stalking Horse Bidder was not in a position to and did not exert undue influence or pressure in negotiating the Bid Protections.  Moreover, despite contacting 127 parties, the Stalking Horse Bidder was the only party willing and ready to serve in such capacity and the Bid Protections are a critical aspect of that willingness.

42.     *Second*, obtaining approval and authority to honor the Bid Protections is designed to facilitate the Debtors' efforts to assure a sale to a contractually committed bidder at a price the Debtors believes is fair, while at the same time providing the Debtors with the potential of even greater benefit to the estates through a competitive bidding process.

43.     *Third*, a breakup fee that constitutes a fair and reasonable percentage of the proposed purchase price and that is reasonably related to the risk, effort, and expenses of the prospective purchaser is generally permissible.  *See, e.g., In re 995 Fifth Ave. Assoc.*, 96 B.R. 25, 28 (Bankr. S.D.NY. 1989); *In re Integrated Resources, Inc.*, 147 B.R. at 662 (breakup fee was a reasonable percentage of proposed purchase price and in accord with industry averages).

44.     Here, the breakup fee is approximately 3% of the purchase price.  This percentage is well within the order of magnitude of breakup fees approved in other cases.  *See, e.g.*, *In re Coupounas,* Case No. 14-23906-EEB (Bankr. D. Colo. Oct. 31, 2014) (approving breakup fee equal to roughly 3% of transaction price); *Twenver*, 149 B.R. at 957; *Consumer News & Bus. Channel P'ship v. Fin. News Network, Inc. (In re Fin. News Network, Inc.)*, 980 F.2d 165, 167 (2d Cir.1992) (noting without discussion $8.2 million breakup fee on $149.3 million transaction (5.5% of consideration offered)); *see also LTV Aerospace & Defense Co. v. Thomson-CSF, S.A. (In re Chateugay Corp.)*, 1998 B.R. 848, 861 (S.D.N.Y. 1996) (enforcing $20 million "reverse breakup fee" payable to debtor on $450 million offer (4.4% of consideration)).

45.     The Bid Protections are beneficial to the Debtors' estates and their creditors, as the APA establishes a floor for further bidding on the Assets.  Moreover, the Stalking Horse Bidder is unwilling to commit to holding open its offer to purchase the Covered Assets unless the Bidding Procedures Order includes approval of the Bid Protections.  Thus, absent entry of the Bidding Procedures Order and approval of the Bid Protections, the Debtors may lose the opportunity to obtain the highest and best offer it has received to date.  Accordingly, the Bid Protections should be approved.

C.      **Adequate and Reasonable Notice Has Been Provided**

46.     Section 363 of the Bankruptcy Code requires that interested parties receive adequate notice of the sale.  Full disclosure of the terms of the sale will be provided pursuant to the Notice of Sale as described above.  Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these cases, and those parties potentially interested in bidding on the Assets.

47.     The Debtors also submits that the notice to be provided via the Assignment Notice is reasonably calculated to provide all Counterparties with proper notice of the potential assumption and assignment of their executory contracts, any Cure Costs relating thereto, and procedures relating thereto, including, but not limited to, the Designation and Cure Objection Deadline. As such, the proposed Assignment Notice is appropriate and sufficient under the circumstances.

**WHEREFORE**, the Debtors requests that the Court enter orders granting the relief requested in this Motion and such other relief as is just and proper.

Dated:  February 27, 2019.

Respectfully submitted,

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

*/s/ Joshua M. Hantman*
Michael J. Pankow, #21212
Joshua M. Hantman, #42010
Andrew J. Roth-Moore, DE Bar No. 5988
410 17th Street, Suite 2200
Denver, Colorado 80202
Telephone:  (303) 223-1100
Facsimile:  (303) 223-1111
mpankow@bhfs.com
jhantman@bhfs.com
aroth-moore@bhfs.com

*Proposed Attorneys for the Debtors*