**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

In re:

Willowood USA, LLC, *et al.*,
EIN: 271307337,

               Debtors.

Case No. 19-11079-KHT

Chapter 11

**ORDER (A) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY
ALL ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (B) WAIVING THE 14-
DAY STAY OF FED. R. BANKR. P. 6004(h) AND 6006(d)**

This matter having come before this Court on the motion of the above captioned debtors

and debtors in possession (the "**Debtors**")[1] for Orders Pursuant to §§ 105(a), 363(b), and 365 of

Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.* (the "**Bankruptcy**

**Code**"); Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"); and Rule 6004-1 of the Local Rules for the United States Bankruptcy

Court of the District of Colorado (the "**Local Rules**") (A) Authorizing and Approving the Sale of

Substantially All Assets Free and Clear of Liens, Claims, and Encumbrances and the Assumption

and Assignment of Certain Executory Contracts and Unexpired Leases, and (B) Waiving the 14-

Day Stay of Fed. R. Bankr. P. 6004(h) and 6006(d) (the "**Sale Motion**") (Docket No. 32); and

this Court having entered an order dated March 22, 2019, approving, *inter alia*, the Bidding

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Motion, the Bidding Procedures, or the Asset Purchase Agreement (the "**Prevailing APA**"), attached as **Exhibit A**, by and between Debtors Willowood USA, LLC, Willowood, LLC, RightLine, LLC and Greenfields Marketing, Ltd., on the one hand, and Generic Crop Science, LLC, on the other hand, providing for the sale of the Debtors' Assets specified therein (the "**Purchased Assets**") for a purchase price that the Debtors estimate to be $19,908,000, consisting of $10,000,000 for the acquired registrations, and $9,908,000 for the associated inventory, inerts and packaging (purchased at book value), as appropriate.

1

Procedures and the form and manner of the Notice of Sale and the Assignment Notice (Docket No. 150) (the "**Bidding Procedures Order**"); and, pursuant to the Bidding Procedures Order, an Auction having been held for the Assets on April 9, 2019, at which the Debtors, in consultation with their secured lenders, Key Bank, National Association ("**Key Bank**") and Tree Line Direct Lending, LP ("**Tree Line**") and the Official Committee of Unsecured Creditors (the "**Committee**," and together with Key Bank and Tree Line, the "**Consultation Parties**"), identified Generic Crop Science, LLC  as the Successful Bidder ("**GCS**" or the "**Successful Bidder**"); and the Sale Hearing having been held on April 16, 2019, at which time this Court considered the Debtors' request for the entry of an order approving the Sale (this "**Sale Order**"); and reasonable opportunity to object or be heard regarding the relief granted herein having been afforded to all parties-in-interest; and this Court having reviewed and considered (i) the Sale Motion and the exhibits thereto; (ii) the arguments of counsel in support of the entry of this Sale Order; (iii) the opposition thereto, if any; and (iv) the evidence proffered or adduced at the Sale Hearing; and it appearing that granting the relief requested in the Sale Motion, approval of the Sale, and the entry of this Sale Order are necessary and in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and it appearing that the Notice of Sale and the Assignment Notice have been given as set forth in the Sale Motion and that no other or further notice need be given regarding the entry of this Sale Order; and upon the record of the Sale Hearing, and this Case; and after due deliberation thereon; and good cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**[2]

A.      This Court has jurisdiction over the Sale Motion and the transactions contemplated by the Sale Motion pursuant to 28 U.S.C §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C § 157(b)(2)(N). Venue of this Case and the Sale Motion is proper pursuant to 28 U.S.C §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Sale Motion are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.

C.      As evidenced by the certificates of service previously filed with this Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Sale Motion, the Auction, the Sale, the Sale Hearing and the assumption and assignment of the Assumed Contracts has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rule 6004-1 and in compliance with the Bidding Procedures Order; (ii) such notice was good and sufficient and appropriate under the particular circumstances; and (iii) no other or further notice of the Sale Motion, the Auction, the Sale and the Sale Hearing, the assumption and assignment of the Assumed Contracts or of the entry of this Sale Order is necessary or shall be required.

D.      Reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested in the Sale Motion, including, but not limited to, the assumption and assignment of the Assumed Contracts to the Successful Bidder and the cure amounts related

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

thereto, has been afforded to all interested persons and entities, including without limitation: (i) all entities known to the Debtors to have expressed an interest in a transaction with respect to the Debtors and the Purchased Assets; (ii) any entities known to have asserted any liens, claims, security interests, encumbrances, or interests in or upon the Purchased Assets (collectively, the "**Encumbrances**"); (iii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (iv) all parties to the APA and all related agreements; (v) the Office of the United States Trustee; (vi) the Internal Revenue Service; (vii) all entities that have requested notice in accordance with Bankruptcy Rule 2002; (viii) all non-debtor counterparties to the Assumed Contracts; and (ix) all other known creditors of the Debtor.

E.      The Debtors and the Successful Bidder (i) have full corporate power and authority to execute and deliver the Prevailing APA and all other documents contemplated thereby and by the Sale Motion; (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the Sale Motion and the Prevailing APA; and (iii) have taken all corporate action necessary to authorize and approve the Prevailing APA and the consummation by the Debtors and the Successful Bidder, respectively, of the Sale and the other transactions contemplated thereby.  The Debtors are the sole and lawful owner of the Purchased Assets to be sold pursuant to the Prevailing APA.  No consents or approvals, other than as expressly provided for in the Prevailing APA and the entry of this Sale Order, are required to consummate the transactions contemplated by the Sale Motion and the Prevailing APA.

F.      The Purchased Assets are property of the Debtor's estate and title thereto is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.

4

G.      The Debtors have demonstrated a sufficient basis and compelling circumstances requiring them to sell the Purchased Assets and assume and assign the Assumed Contracts under sections 363(b) and 365 of the Bankruptcy Code on the timeline set forth in the Sale Motion and the Prevailing APA, and such actions are an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, their creditors and other parties-in-interest therein.

H.      The requirements of sections 363(b), 363(f) and 365 of the Bankruptcy Code and any other applicable law relating to the Sale and all other transactions contemplated under the Sale Motion have been satisfied.

I.      The Debtors have articulated sound business reasons for performing the Prevailing APA, consummating the Sale and assuming and assigning the Assumed Contracts as set forth therein and in the Sale Motion outside of a plan of reorganization, and it is a reasonable exercise of the Debtor's business judgment to execute, deliver and consummate the Prevailing APA.

J.      The Debtors and their professionals marketed the Purchased Assets and conducted the marketing and sale process as set forth in the Sale Motion and in accordance with the Bidding Procedures Order.  The Auction process set forth in the Bidding Procedures Order and the Bidding Procedures afforded a full and fair opportunity for any entity to make a higher or otherwise better offer to purchase the Purchased Assets.  Based upon the record of these proceedings, all creditors and other parties-in-interest and all prospective purchasers have been afforded a reasonable and fair opportunity to make a higher or better offer to purchase the Purchased Assets.

K.      The total consideration provided by the Successful Bidder for the Purchased Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Purchased Assets; (iii) constitutes fair consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia; and (iv) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.

L.      The terms and conditions of the Sale as set forth in the Prevailing APA were negotiated, proposed, and agreed to by the Debtors and the Successful Bidder as parties thereto without collusion, in good faith, and at arm's-length.

M.      Neither the Debtors nor the Successful Bidder have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code to the Sale. Specifically, the Successful Bidder has not acted in a collusive manner with any person and the consideration provided by the Successful Bidder for the Purchased Assets was not controlled by any agreement among the Successful Bidder and the other potential bidders.  The Successful Bidder is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code. The Successful Bidder complied with the provisions of the Bidding Procedures Order.  The Successful Bidder is a "good faith purchaser" entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code with respect to the Sale and assignment of the Purchased Assets.

N.      Neither the Successful Bidder nor the Debtors have engaged in any conduct that would cause or permit the Prevailing APA to be voided under section 363(n) of the Bankruptcy Code.

O.      The transfer of the Purchased Assets to the Successful Bidder pursuant to the Sale and the Prevailing APA will be a legal, valid, and effective transfer of the Purchased Assets and will, upon the occurrence of the Closing, vest in the Successful Bidder all rights, title, and interest of the Debtors in the Purchased Assets, free and clear of any and all Encumbrances in accordance with section 363 of the Bankruptcy Code, except for those expressly assumed by the Successful Bidder in the Prevailing APA.  As a condition to purchasing the Purchased Assets, the Successful Bidder requires that: (a) the Purchased Assets be sold free and clear of all Encumbrances, except as expressly set forth in the Prevailing APA; and (b) the Successful Bidder shall have no liability whatsoever for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors, except with respect to the Liabilities expressly assumed in the Prevailing APA or pursuant to which the Successful Bidder is purchasing the Purchased Assets subject to (including, without limitation, data compensation liability associated with the registrations purchased by the Successful Bidder, as set forth in the Prevailing APA) or this Sale Order (if any) (the "**Assumed Liabilities**").  The Successful Bidder would not enter into the Prevailing APA to acquire the Purchased Assets and consummate the Sale, thus adversely affecting the Debtors' estates, if the Sale to the Successful Bidder was not free and clear of Encumbrances or if the Successful Bidder was or would be liable for any obligations of, or claims (including without limitation as defined in section 101(5) of the Bankruptcy Code) against, the Debtors, except with respect to Assumed Liabilities

expressly assumed in the Prevailing APA or this Sale Order (if any).  A sale of the Purchased Assets other than one free and clear of all Encumbrances and that ensures the Successful Bidder will have no liability for obligations of or claims against the Debtors as set forth above, would adversely impact the Debtors' estates, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale.  Therefore, the Sale contemplated by the Prevailing APA is in the best interests of the Debtors, their estates and creditors, and all other parties-in-interest.

P.     The Debtors may sell the Purchased Assets free and clear of all Encumbrances in accordance with section 363 of the Bankruptcy Code because one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.

Q.     The Purchased Assets shall be sold free and clear of the Encumbrances of Key Bank and Tree Line pursuant to section 363(f)(2) because such entities consent to the sale free and clear of their Encumbrances, subject to the terms and conditions of this Order.

R.     The Successful Bidder shall not assume or become liable for any interests in or relating to the Purchased Assets being sold by the Debtors, except with respect to Assumed Liabilities or other obligations or liabilities expressly assumed in the Prevailing APA or this Sale Order.

S.     The terms and conditions of the Sale and the Prevailing APA, including the total consideration to be realized by the Debtors pursuant to the Prevailing APA, are fair and reasonable, and the Sale in the best interests of the Debtors, their creditors, their estates and other parties-in-interest therein.  A valid business purpose exists for the approval of the Sale and other transactions contemplated by the Sale Motion.

8

T.      The Successful Bidder has the financial capability to fulfill the obligations contemplated under the Prevailing APA and has the financial wherewithal to meet all of its future financial obligations pursuant to the terms of the Assumed Contracts.

U.      The Successful Bidder shall not be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets, to: (1) be a successor (or other such similarly situated party) to the Debtors (other than as expressly stated in the Prevailing APA); (2) have, *de facto* or otherwise, merged with or into the Debtors; (3) be a mere continuation of the Debtors or their estates (and there is no continuity of enterprise between the Successful Bidder and the Debtors); or (4) be holding itself out to the public as a continuation of the Debtors.  The Successful Bidder is not acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Prevailing APA.

V.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

W.      The consummation of the Prevailing APA, the Sale and all other transactions contemplated under the Sale Motion is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including without limitation Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m) and 365 and all of the applicable requirements of such sections have been or will be complied with in respect of the Sale.

X.      Pursuant to the Bidding Procedures Order, Amvac Chemical Corporation served as the Stalking Horse Bidder ("**Amvac**") for the sale of certain of the Purchased Assets and its Breakup Fee of $500,000 and Expense Reimbursement up to $125,000 were approved. Pursuant to a separate Order of this Court, AgBiome Innovations, Inc. served as an additional

Stalking Horse Bidder ("**AgBiome**") for the sale of certain of the Purchased Assets and its Breakup Fee of $200,000 and Expense Reimbursement up to $75,000 were approved. (Docket No. 151). Pursuant to such Orders, Amvac and AgBiome shall receive their respective Breakup Fee and Expense Reimbursement from the proceeds of the Sale.

Y.    Time is of the essence. In order to maximize the value of the Debtors' assets, and to meet the deadlines set forth in the Prevailing APA, it is essential that the Sale occur within the time constraints set forth in the Prevailing APA. The Debtors have articulated good cause for waiver of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure under the circumstances. Accordingly, there is cause to waive the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d).

**NOW THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, EFFECTIVE IMMEDIATELY, THAT:**

1.    The relief requested in the Sale Motion is granted as set forth herein.

2.    Any objections or responses to the relief granted herein that have not been overruled, withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled in all respects on the merits.

3.    The Court's findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference.

4.    The Prevailing APA (including all exhibits, schedules and annexes thereto), and all of the terms and conditions thereof, are hereby approved. The Debtors are authorized and directed to execute and deliver, perform under, consummate and implement the Prevailing APA

10

pursuant to and in accordance with the terms and conditions thereof, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Prevailing APA, and to take all further actions as may be requested by the Successful Bidder for the purpose of assigning, transferring, granting, conveying, and conferring to the Successful Bidder the Purchased Assets, as identified in the Prevailing APA, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Prevailing APA, without any further corporate authorization.

5.      The Successful Bidder is authorized to consummate the Sale pursuant to and in accordance with the terms and conditions of the Prevailing APA.

6.      Proceeds from the Sale shall be paid in cash at Closing as follows: *first*, to Amvac for its Breakup Fee in the amount of $500,000 and its Expense Reimbursements up to $125,000; *second*, to AgBiome for its Breakup Fee in the amount of $200,000 and its Expense Reimbursements up to $75,000; and *third*, to Tree Line[3] subject to and in accordance with Global Settlement attached hereto as **Exhibit B**.  Notwithstanding the foregoing, the Debtors' estates shall retain sufficient funds to pay quarterly fees to the United States Trustee's office pursuant to 28 U.S.C. § 1930(a)(6).

7.      Pursuant to Bankruptcy Code sections 105 and 363, title to the Purchased Assets shall pass to the Successful Bidder at Closing, free and clear of all Encumbrances, with all Encumbrances to be unconditionally released, discharged, and terminated as to the Purchased Assets at such time; *provided, however,* with respect to the Purchased Assets consisting of the

---

[3] Nothing in this Sale Order shall alter, impair or otherwise affect KeyBank and Tree Line's rights and obligations under that certain Intercreditor Agreement dated April 20, 2016.

Debtors' equity interests in wholly-owned subsidiaries, such equity interests are being sold free and clear of Encumbrances, not such subsidiaries' assets (including registrations); *provided further*, *however*, for the avoidance of any doubt, the Successful Bidder is purchasing the Purchased Assets subject to the data compensation liability attributable to such Purchased Assets, as set forth in the Prevailing APA.  Notwithstanding anything to the contrary in the Prevailing APA or this Sale Order, including, but not limited to any "free and clear provisions,"  the Successful Bidder shall assume all of Debtors' and non-Debtor subsidiaries' duties and obligations associated with the EPA registrations it is purchasing, including compliance with all requirements set forth by the EPA and FIFRA regarding the transfer of and data compensation for any such registrations, and also including but not limited to the obligation to pay in full any and all data-compensation claims or obligations in the case of existing data compensation agreements or settled claims in accordance with the terms of such agreements or settlements, and including the obligation to comply with FIFRA requirements to settle and pay data compensation claims and obligations in the case of claims or obligations that are unsettled or otherwise subject to reconciliation or a final determination in accordance with FIFRA (and, when liquidated, pay in full).  Under no circumstance shall the Successful Bidder acquire, whether directly or indirectly, EPA registrations without the obligation to pay, at the appropriate time, any and all data compensation liability claims related to any such registrations. Notwithstanding anything to the contrary in the Prevailing APA or this Sale Order (with the exception of Paragraph 33 of this Sale Order, which supersedes this sentence and is controlling with respect to its subject-matter), Successful Bidder agrees that it is assuming all duties and obligations (including data-compensation liabilities) associated with and arising from the EPA

12

registrations owned by those non-Debtor subsidiaries whose equity interests are included within the Purchased Assets.

8.     Notwithstanding anything to the contrary in the Prevailing APA or this Sale Order, the transfer and assignment of any of the EPA registrations specified in the Prevailing APA includes the transfer of all of the Debtors' and non-Debtor subsidiaries' EPA registrations and inventory for pesticide products containing the active ingredient that is the subject of the EPA registrations transferred, including all end use registrations and the inventory for pesticide products relating to such end use registrations and, in the instance of a transfer of sole ownership of non-Debtor subsidiaries, immediately following such transfer, each non-Debtor subsidiary will hold all of such non-Debtor's EPA registrations and inventory for pesticide products containing the active ingredient that is the subject of the EPA registrations that it held prior to the transfer.

9.     The transfer of the Purchased Assets to the Successful Bidder pursuant to, and subject to the terms of, the Prevailing APA shall constitute a legal, valid, and effective transfer of the Purchased Assets, and shall, upon the consummation of the Closing, vest in the Successful Bidder all right, title, and interest of the Debtors in and to the Purchased Assets, free and clear of any and all Encumbrances.

10.    Except as expressly permitted or otherwise specifically provided for in the Prevailing APA or this Sale Order, effective upon the Closing (i) all persons and entities, including, but not limited to, all debt security holders, equity security holders, members, officers and directors, employees, governmental, tax and other regulatory authorities, lenders, trade and other creditors asserting or holding Encumbrances of any kind or nature whatsoever against or in

the Debtors or any of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, any of the Purchased Assets, the Sale, or the transfer of the Purchased Assets to the Successful Bidder, hereby are forever barred and estopped from asserting against the Successful Bidder, its successors or assigns (to the extent allowed by law), its property, its officers, directors and shareholders, or the Purchased Assets any actions, including but not limited to, such persons' or entities' Encumbrances; and (ii) all such Encumbrances shall be unconditionally released and terminated as to the Purchased Assets.  Except as otherwise expressly provided herein, all such Encumbrances released, terminated and discharged as to the Purchased Assets shall attach to the Sale proceeds with the same validity, priority, force and effect which they now have as against the Debtors, the estates, or the Purchased Assets.  The sole and exclusive right and remedy available to holders of any Encumbrances shall be a right to assert the Encumbrance against the Debtor's estate.

11.     The Sale Motion shall be deemed to provide sufficient notice as to the Sale and assignment of the Purchased Assets free and clear of all Encumbrances in accordance with Rule 6004-1 of the Local Bankruptcy Rules.

12.     Following the Closing, no holder of any Encumbrance on any of the Purchased Assets may interfere with the Successful Bidder's use and enjoyment of the Purchased Assets based on or related to such Encumbrance or any actions that the Debtors may take in these Cases and no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the transactions contemplated under the Prevailing APA.

13.     The provisions of this Sale Order authorizing the Sale and assignment of the Purchased Assets free and clear of Encumbrances shall be self-executing, and neither the Debtors nor the Successful Bidder shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.

14.     Each of the Debtors' creditors is hereby authorized and directed to, on the Closing Date (as defined in the Prevailing APA), and at the Successful Bidder's sole cost and expense (including any legal fees and expenses incurred by the Debtors' creditors) execute such documents and take all other actions as may be necessary, as determined by the Successful Bidder in its sole discretion, to release its interests against or in the Purchased Assets, if any, as such interests may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements or other documents or agreements evidencing Encumbrances against or in any of the Purchased Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances that the person or entity has with respect to any of the Purchased Assets or otherwise, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to any of the Purchased Assets.

15.     This Sale Order shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.  A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded to act to cancel any Encumbrances.  Each and every federal, state and local governmental agency, department, or unit is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Prevailing APA and this Sale Order.

16.     Except with respect to Assumed Liabilities, the Successful Bidder shall have no liability or responsibility for any liability or other obligation of, or claim against, the Debtors arising under or related to any of the Purchased Assets or otherwise and, to the extent allowed by law, the Successful Bidder (and its officers, managers, and members) shall not be liable for any other claims against the Debtors or any of their predecessors or affiliates, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date. Consequently, all persons, governmental units (as defined in sections 101(41) and 101(27) of the Bankruptcy Code, respectively) and all holders of Encumbrances, based upon or arising out of liabilities retained by the Debtors are hereby enjoined from taking any action against the Successful Bidder, the Purchased Assets, including asserting against the Successful Bidder any setoff, right of subrogation or recoupment of any kind, to assert against the Successful Bidder any Encumbrance or to recover from the Successful Bidder on account of any liabilities of the Debtors other than Assumed Liabilities expressly assumed in the Prevailing APA or this Sale

16

Order (if any). The Debtors are deemed to release and forever discharge the Successful Bidder and any of its successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the Purchased Assets or the Sale, except with respect to Assumed Liabilities and the Successful Bidder's obligations under the Prevailing APA.

17. The Successful Bidder is not and shall not be deemed a "successor" to the Debtors or their estates as a result of the consummation of the Sale or this Sale Order or any other event occurring in this Case under any theory of law or equity, and, except for obligations or liabilities expressly assumed in the Prevailing APA or this Sale Order (if any), the Successful Bidder shall not assume, nor be deemed to assume, or in any way be responsible for any obligation or liability of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability and the Sale Motion contains sufficient notice of such limitation in accordance with Rule 6004-1 of the Local Bankruptcy Rules. The purchase of the Purchased Assets by the Successful Bidder and the transactions approved hereby will not cause the Successful Bidder to be deemed a successor in any respect to the Debtors. In the event that the Successful Bidder is treated as a successor employer under section 3121(a)(1) of the Internal Revenue Code, the Successful Bidder shall not by reason of any such treatment be deemed to have assumed any liabilities or to be a successor for any other purpose.

18. The Successful Bidder shall have no obligation to proceed with the Closing until and unless all conditions precedent to its obligation to do so, set forth in the Prevailing APA,

17

incorporated herein by reference, have been met, satisfied or waived in accordance with the terms of the Prevailing APA.

19.     The Debtors and the Successful Bidder are hereby authorized and directed to comply with all provisions of the Prevailing APA.  The Debtors are hereby authorized and directed to assume and assign to the Successful Bidder the Assumed Contracts.

20.     Any provision in any Assumed Contract that purports to declare a breach or default as a result of a change of control in respect of the Debtors, an assignment of such contract, the Debtors' financial condition, bankruptcy, or failure to perform any of its obligations under such contracts is unenforceable and no counterparty to any Assumed Contract shall be permitted to declare a default by or against the Debtors or the Successful Bidder under such contract or otherwise take any action against the Debtors or the Successful Bidder in connection with any of the foregoing.

21.     The Debtors and the Successful Bidder have provided adequate assurance of future performance under the Assumed Contracts, and the proposed assumption and assignment of the Assumed Contracts satisfies the requirements of the Bankruptcy Code.  The Assumed Contracts, upon assumption by the Debtors and assignment to the Successful Bidder, shall be deemed valid and binding and in full force and effect and enforceable in accordance with their terms, subject only to the provisions of this Sale Order.  Upon assignment of the Assumed Contracts to the Successful Bidder at or subsequent to the Closing, no default shall exist under any of the Assumed Contracts, the Debtors shall be deemed in compliance with all terms and provisions of the assigned Assumed Contracts and, pursuant to section 365(k) of the Bankruptcy

18

Code, the Debtors shall be relieved from any further liability, except as provided herein and in the Prevailing APA.

22.     Notwithstanding anything to the contrary in this Sale Order, no Assumed Contract will be assumed and assigned to the Successful Bidder until the Closing.

23.     Notwithstanding anything herein to the contrary, nothing herein shall in any way affect or diminish any rights of the Debtors or any successor thereto (including any chapter 11 or chapter 7 trustee) with respect to obligations of the Successful Bidder arising under the Prevailing APA or this Sale Order.

24.     This Sale Order and the Prevailing APA shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors, the Successful Bidder, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estate or any trustee appointed in a chapter 7 case if this Case is converted from chapter 11, the Debtor's estate (including following any conversion or dismissal of this Case), any successor chapter 7 estate, all creditors of the Debtors (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets.

25.     This Court retains and shall have exclusive jurisdiction over any matter or dispute arising from or related to this Sale Order and the Prevailing APA and to interpret, implement, enforce and endorse the terms and provisions thereof and any amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all

19

respects, including, but not limited to, retaining jurisdiction to (a) decide any disputes concerning (i) this Sale Order and the Prevailing APA, the rights and duties of the parties hereunder or thereunder or any issues relating to the Prevailing APA and this Sale Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, (ii) the status, nature and extent of the Purchased Assets and the Assumed Contracts, and (iii) all issues and disputes arising in connection with the relief authorized herein; and (b) compel (i) delivery of the Purchased Assets to the Successful Bidder; or (ii) delivery of the Purchase Price or performance of other obligations owed to the Debtor.

26.     The Sale is undertaken by the Successful Bidder in good faith, as that term is used in section 363(m) of the Bankruptcy Code.  The Successful Bidder is hereby granted and is entitled to all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.  Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Sale Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of any sale, transfer or assignment under the Prevailing APA or obligation or right granted pursuant to the terms of this Sale Order (unless stayed pending appeal), and notwithstanding any reversal, modification or vacatur shall be governed in all respects by the original provisions of this Sale Order or the Prevailing APA, as the case may be.

27.     The Sale approved by this Sale Order is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

28.     The terms and provisions of the Prevailing APA and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, their

20

creditors, the Successful Bidder, successors and permitted assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

29.     Non-substantive changes to the Prevailing APA and any related agreements, documents, or other instruments may be made, including modifications, amendments, or supplements agreed upon by the parties in accordance with the terms thereof, without further order of this Court.

30.     The failure specifically to include any particular provisions of the Prevailing APA or any related agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court, the Debtors, and the Successful Bidder that the Prevailing APA and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Sale Order.

31.     All of the Debtors' interests in the Purchased Assets to be acquired by the Successful Bidder under the Prevailing APA shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Successful Bidder.  Upon the occurrence of the Closing, this Sale Order shall be considered, and constitute for any and all purposes, a full and complete general assignment, conveyance, and transfer of the Purchased Assets acquired by the Successful Bidder under the Prevailing APA and/or a bill of sale or assignment transferring good and marketable, indefeasible title, and interest in the Purchased Assets to the Successful Bidder.

32.     Pursuant to the Bidding Procedures Order and the Bidding Procedures, the following parties are collectively deemed the Backup Bidders: (i) Albaugh, LLC for the purchase

21

of those registrations set forth in the Amvac Asset Purchase Agreement for $8,400,000 for such registrations, an estimated $3,600,000 for inventory (at book value), plus packaging and inerts at book value; (ii) AgBiome for the purchase of those registrations set forth in its Asset Purchase Agreement for $1,700,000 for such registrations and an estimated $2,475,000 for inventory; (iii) UPL NA, Inc. for the purchase of Bifenazate for $100,000 for the registration, an estimated $350,000 for inventory, plus packaging and inerts at book value; (iv) Atticus, LLC for the purchase of Ethofumesate for $25,000 for the registration, an estimated $50,000 for inventory (at book value), plus packaging and inerts at book value; and (v) MEY Corporation for the purchase of Clethodim for $123,000 for the registration, an estimated $220,000 for inventory (at book value), plus packaging and inerts at book value.

33. Nothing in the Prevailing APA or this Sale Order, including, for the avoidance of doubt, Paragraph 7 of this Sale Order, shall be construed as authorizing Willowood Propanil, LLC ("**Willowood Propanil**") to transfer, assign, or convey to any person, including any affiliate of Willowood Propanil, any asset or liability, including, without limitation, (i) the Propanil Technical registration, EPA Registration No. 87829-1 (the "Propanil Technical Registration"), (ii) any inventory of pesticide products containing the Propanil Technical Registration, and (iii) any liability, whether settled or unsettled, asserted or unasserted, in connection with developing or relying on data to maintain in effect the Propanil Technical Registration. Nothing in the Prevailing APA or this Sale Order shall be construed as authorizing Willowood Propanil to assume any liability.

34. Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the effectiveness of this Sale Order shall not be stayed for 14 days after entry on the docket. This Sale Order shall be

22

effective and enforceable immediately upon entry. The Successful Bidder and the Debtors are authorized to consummate the Sale and cause the Closing to occur as promptly as is practicable following the entry of this Sale Order.

Dated: April 17, 2019.

BY THE COURT

United States Bankruptcy Judge

# EXHIBIT A

ASSET PURCHASE AGREEMENT


by and among


GENERIC CROP SCIENCE LLC,


WILLOWOOD USA, LLC,


WILLOWOOD, LLC,


RIGHTLINE LLC,


and


GREENFIELDS MARKETING LTD.


Dated as of April ___, 2019

19093263

## TABLE OF CONTENTS

                                                                                     Page

1.    Construction; Definitions................................................................................ 2

2.    Purchase and Sale ...................................................................................... 11

3.    Purchase Price/Deposit ............................................................................... 16

4.    Liabilities and Obligations.......................................................................... 18

5.    Obtaining of Procedures and Sale Order; Closing........................................... 19

6.    Deliveries at Closing.................................................................................. 19

7.    Representations and Warranties of the Seller Parties ...................................... 20

8.    Representations and Warranties of Buyer...................................................... 23

9.    Additional Agreements of the Parties ........................................................... 24

10.   Conditions to Buyer's Obligation to Effect Closing......................................... 26

11.   Conditions to the Seller Parties' Obligation to Effect Closing.......................... 27

12.   Termination; Effect of Termination.............................................................. 28

13.   Tax Allocations......................................................................................... 29

14.   Transfer Taxes .......................................................................................... 30

15.   Jurisdiction............................................................................................... 30

16.   Employees................................................................................................ 30

17.   Miscellaneous ........................................................................................... 30

19093263

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), is dated as of April ___, 2019 by and among (**i**) Willowood USA, LLC, an Oregon limited liability company ("Willowood USA"), (**ii**) Willowood, LLC, an Oregon limited liability company ("Willowood"), (**iii**) RightLine LLC, an Oregon limited liability company ("RightLine"), and (**iv**) Greenfields Marketing Ltd., a private company organized under the laws of the United Arab Emirates ("Greenfields", and collectively with Willowood USA, Willowood and RightLine, the "Seller Parties" and each a "Seller"), and (**v**) Generic Crop Science LLC, a Delaware limited liability company (and, except as otherwise provided herein, any assignee to whom Buyer's rights and obligations are transferred pursuant to Section 17(h), "Buyer").

### W I T N E S E T H :

A.       Willowood USA, directly and through its Subsidiaries (as defined below) (including through Willowood; RightLine; Greenfields; Willowood Abamectin, LLC; Willowood Ethofumesate, LLC; Willowood Fomesafen, LLC; Willowood Glufosinate Ammonium, LLC; Willowood Glyphosate, LLC; Willowood Imidacloprid, LLC; Willowood Lambda-Cyhalothrin, LLC; Willowood Mepiquat Chloride, LLC; Willowood Oxyfluorfen, LLC; Willowood Paraquat, LLC; Willowood Pronamide, LLC; Willowood Propanil, LLC; Willowood Propiconazole, LLC; Willowood Sulfentrazone, LLC; and Willowood Tebuconazole, LLC), is engaged in the business of developing, formulating and marketing generic crop protection products for the agriculture industry in the United States and Canada, including the Transferred Products (as defined below) (the "Business").

B.       On February 27, 2019 (the "Petition Date"), the Seller Parties filed a voluntary petition for relief commencing a case (the "Chapter 11 Case") under Chapter 11 of the Bankruptcy Code (as defined below) with the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court") (collectively, the "Petition").

C.       The Seller Parties desire to sell, convey, assign, transfer and deliver to Buyer certain assets used in the Business and to assign to Buyer certain executory contracts (but only to the extent specifically designated by Buyer) relating to the Business, and unexpired leases relating to the Business, and Buyer desires to purchase from the Seller Parties such assets and assume such contracts and unexpired leases upon the terms and subject to the conditions of this Agreement all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code, subject to Buyer's right to assign its rights hereunder to one of more of its Affiliates in accordance with Section 17(h) (such sale and purchase of the Acquired Assets (as defined below) and such assignment and assumption of the Assumed Obligations (as defined below), the "Acquisition").

D.       The parties acknowledge and agree that the purchase by Buyer of the Acquired Assets and the assumption by Buyer of the Assumed Obligations, are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of the Seller Parties or any of their respective Affiliates.

19093263

E.       The execution and delivery of this Agreement and the Seller Parties' respective ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, inter alia, Sections 363 and 365 of the Bankruptcy Code.

F.       The parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the foregoing Recitals, which are a substantive part of this Agreement, and the mutual covenants set forth herein, the parties agree as follows:

1.       **Construction; Definitions**.

(a)       Construction.  For all purposes of this Agreement, except as otherwise expressly provided herein:

(i)       the terms defined in this Agreement include the plural as well as the singular;

(ii)       references to an "Article," "Section," "Schedule," "preamble," "recital," or any other subdivision are to an article, section, schedule, preamble, recital, or subdivision of this Agreement;

(iii)       all accounting terms not otherwise defined herein have the meanings assigned to them under GAAP (as defined below);

(iv)       pronouns of either gender or neuter shall include, as appropriate, the other pronoun forms;

(v)       the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular article, section, paragraph or other subdivision;

(vi)       the words "include," "including" and other words of similar import mean "include, without limitation" or "including, without limitation," regardless of whether any reference to "without limitation" or words of similar import is made; and

(vii)       The word "or" is not exclusive.

(b)       Definitions.  The following terms will, when used in this Agreement, have the following respective meanings:

"Acquired Assets" has the meaning assigned to that term in Section 2(a).

"Acquisition" has the meaning assigned to that term in the preamble to this Agreement.

2

19093263

"Action" means any legal or administrative action, suit, hearing, litigation, proceeding (whether civil, criminal, administrative or judicial) or any arbitration commenced, brought, conducted or heard, including any Action by or before any Governmental Authority, arbitrator, mediator or other alternative dispute resolution provided pursuant to any collective bargaining agreement or Law, including any audit or examination, or other administrative or court action or other proceeding with respect to Taxes or Tax Returns.

"Affiliate" of a specified Person means a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.  The term "control" (including derivations thereof) means (a) the possession directly or indirectly, of the power to vote 50% or more of the Equity Securities of a Person having ordinary voting power, (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of Equity Securities, by Contract or otherwise, or (c) being a director, officer, executor, trustee or fiduciary (or their equivalents) or a Person or a Person that controls such Person.

"Agent" means Tree Line Direct Lending, LP, as the Administrative and Collateral Agent together with any successor agent.

"Agreement" means this Asset Purchase Agreement, including all schedules hereto, as the same may be amended or supplemented from time to time in accordance with its terms.

"Alternative Transaction" means a transaction where the Seller Parties seek approval of, or the Bankruptcy Court approves, any agreement or transaction with a third party for the sale or transfer of all or any portion of the Acquired Assets, directly or indirectly, whether pursuant to a Chapter 11 plan for the Seller Parties or under Section 363(b) of the Bankruptcy Code, or otherwise enters into any transaction that is materially inconsistent with the sale of the Transferred Products or Transferred Registrations set forth in this Agreement.

"Ancillary Documents" means a bill of sale, assignment and assumption agreement, intellectual property assignment agreements, escrow agreement and each other agreement, document or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"Assigned Contracts" means those Contracts relating to the Transferred Products or the Transferred Registrations that Buyer desires to assume and to have the Seller Parties assign, as applicable, to Buyer that are designated as "Assigned Contracts" on Schedule 1(b)(i).

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in the form attached hereto as Exhibit A to be entered into by Buyer and the applicable Seller Parties as of the Closing.

3

19093263

"Assumed Data Compensation Liability" has the meaning assigned to that term in Section 4(b)(vi).

"Assumed Obligations" has the meaning assigned to that term in Section 4(b).

"Auction" means an auction under Section 363 of the Bankruptcy Code scheduled by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Available Cash" means all cash and cash equivalents of any of the Seller Parties and their respective Affiliates and Subsidiaries.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. Section 101 et seq., commonly known as the Bankruptcy Code, as it may be amended from time to time.

"Bankruptcy Court" has the meaning assigned to that term in the preamble to this Agreement.

"Bid Procedures Order" means an Order of the Bankruptcy Court, pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, that has not been stayed, vacated or stayed pending appeal: (a) authorizing and scheduling the Auction, (b) approving procedures for the submission of Qualified Bids (as defined in the Bidding Procedures), (c) approving the Breakup Fee and Expense Reimbursement, (d) authorizing payment of the Breakup Fee in the event of an Alternative Transaction, (e) scheduling a hearing to consider approval of such sale, and (f) approving the form and manner of notice of the Auction procedures and Sale Hearing, which Order shall be substantially in the form attached hereto as Exhibit B.

"Bidding Procedures" means the bidding procedures substantially in the form attached as Exhibit 1 to the Bid Procedures Order with such changes as Buyer and the Seller Parties find reasonably acceptable, to be approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Breakup Fee" has the meaning assigned to that term in Section 12(b).

"Business" has the meaning assigned to that term in the preamble to this Agreement.

"Business Day" means any day other than a Saturday, Sunday or other day on which the Bankruptcy Court is closed.

"Buyer" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Cash Purchase Price" means an aggregate amount in cash equal to $10,000,000.00.

4

19093263

"Chapter 11 Case" has the meaning assigned to that term in the preamble to this Agreement.

"Closing" means the closing of the purchase and sale of the Acquired Assets pursuant to this Agreement.

"Closing Date" means the time and date of the Closing determined pursuant to Section 5.

"Contract" means any executory contract (as such term is used in Section 365 of the Bankruptcy Code) to which any of the Seller Parties is a party (i) as of the date hereof or (ii) which is entered into by such Seller between the date hereof and the Closing Date in accordance with Section 9(b) hereof that concerns or is related to the Business, including real and personal property leases, license agreements and agreements with employees, consultants, customers or agents.

"Credit Agreement" means that certain Credit Agreement dated as of April 20, 2016 between Willowood USA and certain of its Affiliates and Subsidiaries, the financial institutions party thereto as "Lenders" and Agent.

"Cure Amounts" has the meaning assigned to that term in Section 2(c).

"Deposit Funds" has the meaning assigned to that term in Section 3(a).

"Disclosure Schedule" means the disclosure schedule delivered by the Seller Parties to Buyer (as modified, amended and supplemented, the "Disclosure Schedule").

"Employees" has the meaning assigned to that term in Section 16.

"Equity Security" means (i) any common, preferred, or other capital stock, limited liability company interest or unit, partnership, limited partnership or general partnership interest, or similar security; (ii) any warrants, options, or other rights to, directly or indirectly, acquire any security described in clause (i); (iii) any other security containing equity features or profit participation features; (iv) any security or instrument convertible or exchangeable directly or indirectly, with or without consideration, into or for any security described in clauses (i) through (iii) above or another similar security (including convertible notes); and (v) any security carrying any warrant or right to subscribe for or purchase any security described in clauses (i) through (iv) above or any similar security.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning assigned to that term in Section 3(a).

"Escrow Agreement" has the meaning assigned to that term in Section 3(a).

"Estimated Closing Transferred Inventory Value" has the meaning assigned to that term in Section 3(b)(ii).

19093263

"Excluded Assets" has the meaning assigned to that term in Section 2(b).

"Excluded Contracts" has the meaning assigned to that term in Section 2(b)(xiii).

"Excluded Inventory" has the meaning assigned to that term in Section 2(d)(iii).

"Excluded Registrations" has the meaning assigned to that term in Section 1(b)(iv).

"Expense Reimbursement" has the meaning assigned to that term in Section 12(b).

"Final Post-Closing Transferred Inventory Value" means the Post-Closing Transferred Inventory Value as deemed final, binding and conclusive in accordance with Section 3(b)(ii).

"Final Transferred Inventory Count" means the Final Transferred Inventory Count as deemed final, binding and conclusive in accordance with Section 3(b)(ii).

"GAAP" means generally accepted accounting principles in the United States, consistently applied, including the use of the principle that inventory shall be valued at the lower of cost or market.

"Governmental Authority" means any government or any agency, bureau, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"Greenfields" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Intellectual Property" means all of the following as they exist in any jurisdictions throughout the world:

    (i)    patents, patent applications, industrial property rights and the inventions, conceptions, designs, reductions to practice, and improvements described and claimed therein, patentable inventions, and other patent rights (including any divisionals, continuations, continuations-in-part, renewals, substitutions or reissues thereof), whether or not patents are issued thereon and whether or not any such applications are amended modified, withdrawn or refiled;

    (ii)    trademarks, service marks, trade dress, trade names, brand names, fictitious business names, designs, logos, corporate names, or general intangibles of a similar nature (including, in each case, the goodwill associated therewith), whether registered or unregistered, and all registrations and applications for registration thereof;

6

(iii)    copyrights in both published and unpublished works, all sui generis rights in data and databases, and any other rights of authorship in any other published and unpublished works, including all moral rights therein, as well as all copyright registrations and applications for registration thereof, including all renewals and extensions thereof, and non-registered or common law copyrights;

(iv)    trade secrets, know-how, confidential information, proprietary information, and any other information that derives economic value from not being generally known to other Persons, including ideas, inventions, processes, documentation, information, data, customer lists, products, processes, technology, plans, drawings, designs, systems, specifications and other proprietary rights (whether or not patentable or subject to copyright, mask work, or trade secret protection);

(v)    all Uniform Resource Locators ("URLs"), domain names, IP or Internet names or addresses, keywords or purchased search terms, web sites or web pages and related rights and items;

(vi)    computer software programs and software systems, and all versions, forms and embodiments thereof, including all source code, object code, executable code, binary code, files, objects, comments, screens, user interfaces, report formats, templates, menus, buttons and icons and all data, materials, manuals, design notes and other items and documentation related thereto or associated with the foregoing; and

(vii)    to the extent within the reasonable possession or control of any of the Seller Parties, any manufacturing instructions, confidential statements of formula, development data, and other know-how (including complete data matrices for all products identifying studies supporting registrations) in any of the Seller Parties' possession and legal control, if any, that will enable Buyer to make, have made, formulate, have formulated, manufacture, have manufactured, and sell any and all Transferred Products, including (a) the composition listing for all Transferred Products including all components by Chemical Abstracts Service (CAS) Registry Number, (b) copies of Registration Data owned by any of the Seller Parties relating to the Transferred Registrations, (c) formulation process descriptions for all Transferred Products, including with respect to order of addition of, and amount of, components, mixing instructions, holding times, and temperatures, and including, without limitation, all Confidential Statement of Formula (CSF) documentation and correspondence with USEPA or state regulatory agencies, and (d) other records required by the Laws of the U.S. or individual states to be maintained by any of the Seller Parties or their respective Subsidiaries in connection with the manufacture, formulation, marketing, distribution or sales of the Transferred Products.

7

"Knowledge of Seller" and other phrases of like substance mean, with respect to a particular fact or other matter, the actual knowledge of Jason Urband and Joe Middione after undertaking a reasonable inquiry of the employees of the Seller Parties who would reasonably be expected to have knowledge of such matter represented.

"Laws" means all applicable laws (including common law), statutes, rules, regulations, codes, ordinances, decrees, proclamations or any requirement of any Governmental Authority.

"Liability" has the meaning assigned to that term in Section 4(a).

"Liens" means any mortgage, lien, pledge, covenant restriction, security interest, claim, charge, title defect, interest and other encumbrance.

"Material Adverse Change" means any effects, changes, events, conditions or circumstances that, individually or in the aggregate, result in or would reasonably be expected to result in, a material adverse effect on the operations, assets, or condition (financial or otherwise), of the Acquired Assets, taken as a whole, or the ability of the Seller Parties to consummate the transactions contemplated hereby and does not include the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code by the Seller Parties; *provided*, *however*, that in determining whether there has been a Material Adverse Change, any effects, changes, events, conditions or circumstances to the extent attributable to any of the following shall be disregarded: (a) any change in the general condition of the national or global economy; (b) the announcement of this Agreement or the transactions contemplated hereby in accordance with the terms hereof; (c) the Petition and related proceedings; (d) the sale of Transferred Inventory in the Ordinary Course of Business; and (e) the sale process of the Acquired Assets to the extent in accordance with the terms of the Bid Procedures Order, except with respect to the foregoing clause (a), to the extent such effect, change, event, condition or circumstance has or would reasonably be expected to have a disproportionate effect on the Acquired Assets (taken as a whole) relative to other businesses operating in the industry in which the Seller Parties operate.

"Objection Notice" has the meaning assigned to that term in Section 3(b)(ii).

"Order" means any decree, injunction, judgment, order, ruling or writ of any Governmental Authority.

"Ordinary Course of Business" means an action taken by a Person will be deemed to have been taken in the Ordinary Course of Business only if that action: (i) is consistent in nature, scope and magnitude with the recent practices of the applicable Seller given such Seller's current financial constraints and is taken in the ordinary course of the normal, day-to-day operations of such Seller, and (ii) is not required to be authorized by the members, managers, partners, shareholders or board of directors, as applicable, of such Person, and does not require any other separate or special authorization of any nature.

"Outside Date" has the meaning assigned to that term in Section 12(a)(i).

"Permits" means licenses, permits, franchises, approvals, authorizations, registrations, certificates of authority, and orders, or any waiver of the foregoing, issued or issuable by any Governmental Authority.

"Permitted Liens" means liens on personalty not yet due and payable that are Assumed Obligations.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, association, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"Petition" has the meaning assigned to that term in the preamble to this Agreement.

"Petition Date" has the meaning assigned to that term in the preamble to this Agreement.

"Post-Closing Transferred Inventory Value" has the meaning assigned to that term in Section 3(b)(ii).

"Purchase Price" means (i) the Cash Purchase Price *plus* (ii) the Transferred Inventory Value (as finally determined pursuant to Section 3(b)(ii)).

"Registration" means a permission, authorization, registration or approval from an applicable Governmental Authority that is necessary for the sale, formulation or distribution of (i) a pesticidal product containing a particular active ingredient or (ii) a technical grade active ingredient which is subsequently used in the manufacture of a formulated end-use pesticidal product, in each case, including any permission, authorization, registration or approval from an applicable Governmental Authority necessary for the sale of such product for the uses identified on the product's label.

"Registration Data" means the data, information, reports and studies relating to a particular active ingredient or its formulations which are required by a Governmental Authority to support an application for a granted or pending Registration.

"Retained Obligations" has the meaning assigned to that term in Section 4(a).

"RightLine" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Sale Hearing" means a hearing conducted by the Bankruptcy Court to consider the approval of this Agreement and the transactions contemplated hereby.

"Sale Order" means an Order from the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, which, among other things: (i) approves the sale to Buyer of the Acquired Assets and the transactions contemplated in this Agreement under Sections 363(b) and 363(f) of the Bankruptcy Code, free and clear of all Liens other than the Permitted Liens; (ii) waives the stays set forth in Bankruptcy Rules 6004(h) and

9

6006(d); (iii) provides that Buyer is not a successor-in-interest of the Seller Parties for any purpose other than as provided for in this Agreement and thus shall not be subject to any successor liability, and shall have no liabilities of the Seller Parties, whether known or unknown, accrued, fixed, contingent, liquidated or unliquidated, choate or inchoate, due or to become due or suffer any liabilities of the Seller Parties for any Liens (other than Permitted Liens) existing prior to the Closing Date, which may be asserted against the Seller Parties, or the Seller Parties' bankruptcy estate; and (iv) contains findings and conclusions that (A) Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms'-length purchaser, (B) the Purchase Price is fair and constitutes reasonably equivalent value and fair consideration, (C) this Agreement was negotiated at arms'-length, (D) the Seller Parties do not have any interest in Buyer or in any party affiliated with Buyer, (E) the Auction was conducted in a "non-collusive manner" within the meaning of section 363(n) of the Bankruptcy Code, (F) due and proper notice and opportunity to be heard was given to all creditors and parties in interest, and (G) specifically authorizing and approving the payment and provisions of Section 2(c) of this Agreement.

"Seller" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Seller IP" means any Intellectual Property owned or licensed by any Seller and used exclusively in connection with the Transferred Products or the Transferred Registrations.

"Seller Parties" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Straddle Period" has the meaning assigned to that term in Section 13(b).

"Subsidiary" of any Person means another Person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body, or, if there are no such voting interests, 50% or more of the equity interests of which is owned directly or indirectly by such first Person or by another subsidiary of such first Person.

"Tax" and "Taxes" means income, gross receipts, property, sales, use, license, excise, franchise, employment, social security, governmental pension or insurance, withholding or similar Taxes or contributions, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Tax Return" means any return, filing, report, claim, refund request, questionnaire, information statement or other document required to be filed, including any amendments that may be filed, for any taxable period with any Governmental Authority (whether or not a payment is required to be made with respect to such filing) relating primarily to Taxes.

10

19093263

"Transfer Taxes" means all excise, sales, use, value added, registration stamp, recording, documentary, conveyancing, franchise, property, transfer and similar Taxes, levies, charges and fees.

"Transferred Data" shall have the meaning set forth in Section 2(a)(ii).

"Transferred Inventory" has the meaning assigned to that term in Section 2(a)(iv).

"Transferred Inventory Book Value" has the meaning assigned to that term in Section 3(b)(ii).

"Transferred Inventory Count" has the meaning assigned to that term in Section 3(b)(ii).

"Transferred Orders" shall have the meaning set forth in Section 2(a)(v).

"Transferred Products" shall mean those products listed on Schedule 1(b)(ii).

"Transferred Products Lists and Numbers" has the meaning assigned to that term in Section 2(a)(x).

"Transferred Registrations" shall have the meaning set forth in Section 2(a)(i).

"Transferred Subsidiaries" shall have the meaning set forth in Section 2(a)(viii).

"Transferred Trademarks" shall have the meaning set forth in Section 2(a)(iii).

"Willowood" has the meaning assigned to that term in the introductory paragraph to this Agreement.

"Willowood USA" has the meaning assigned to that term in the introductory paragraph to this Agreement.

2.    **Purchase and Sale**.

(a)    Acquired Assets.  Subject to the terms and conditions of this Agreement, to the extent not prohibited by Law, and except as provided in Section 2(b), on the Closing Date, the Seller Parties shall sell, transfer, assign and deliver to Buyer, and Buyer shall purchase and acquire from the applicable Seller, all right, title and interest of the Seller Parties in and to the Transferred Products and the following assets (collectively, the "Acquired Assets"), free and clear of Liens other than the Permitted Liens:

(i)    The Registrations expressly set forth and identified on Schedule 2(a)(i) (the "Transferred Registrations");

(ii)    All Registration Data related to the Transferred Products owned by any Seller Party or to which a Seller Party has acquired transferrable citation rights, including, but not limited to, the Registration Data expressly set forth and identified on Schedule 2(a)(ii) (the "Transferred Data");

11

19093263

(iii)     All Seller IP, including, without limitation, the trademarks expressly set forth and identified on Schedule 2(a)(iii) (the "Transferred Trademarks");

(iv)     All inventories of the Business relating to the Transferred Products and the Transferred Subsidiaries, including raw materials, work-in-progress, finished goods and packaging for the Transferred Products, and all inerts of the Business (collectively, the "Transferred Inventory");

(v)     All outstanding orders for the purchase of Transferred Products from the Seller Parties (the "Transferred Orders");

(vi)     All rights of the applicable Seller Parties under the Assigned Contracts;

(vii)     All rights of the Seller Parties under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to the Transferred Inventory or Transferred Products;

(viii)     The Equity Securities of Willowood USA in the Subsidiaries listed on Schedule 2(a)(viii) (the "Transferred Subsidiaries"), together with corporate seals, minute books, stock record books and other corporate records having exclusively to do with the corporate organization and capitalization of each of the Transferred Subsidiaries;

(ix)     Sales records and customer lists relating solely to the Transferred Products for the two-year period immediately preceding the Closing;

(x)     Vendor and mailing lists of the Seller Parties and existing telecopier numbers and telex numbers used by any of the Seller Parties, in each case to the extent relating solely to the Transferred Products (the "Transferred Products Lists and Numbers"); and

(xi)     To the extent within the reasonable possession or control of any of the Seller Parties, all reports, memoranda, documents and records that pertain to market studies, commercial assessments, technical evaluations, new product development pipeline reports, and Intellectual Property due diligence completed in the two-year period immediately preceding the Closing.

(b)     Excluded Assets.  Notwithstanding anything to the contrary contained in this Agreement, the Acquired Assets do not include the following assets (collectively, the "Excluded Assets"):

(i)     All Available Cash;

(ii)     All bank accounts of the Seller Parties and their respective Affiliates and Subsidiaries;

12

19093263

(iii)    The corporate seals, minute books, stock record books and other corporate records having exclusively to do with the corporate organization and capitalization of each Seller;

(iv)    All Registrations that are not Transferred Registrations (the "Excluded Registrations"), including the Registrations set forth on Schedule 1(b)(iv);

(v)    All Registration Data that is not Transferred Data;

(vi)    All Intellectual Property that is not Seller IP;

(vii)    All accounts receivable, notes receivable, security deposits, and other debts or payables due or accruing to any of the Seller Parties ("Excluded Accounts Receivable");

(viii)    All machinery, equipment, vehicles, furniture, furnishings, fixtures, operating equipment, supplies and tools, computer hardware and all parts, spares and accessories thereof and accessions thereto;

(ix)    All inventories of the Business, including raw materials, work-in-progress, finished goods, and packaging, other than the Transferred Inventory;

(x)    Except for the Transferred Products Lists and Numbers, all customer, vendor and mailing lists of the Seller Parties, and existing telephone numbers, telecopier numbers and telex numbers used by any of the Seller Parties;

(xi)    All data processing systems, computer software, books, records, files, data bases, specifications, manuals and other papers and information of the Seller Parties (including any and all accounting books and records);

(xii)    All stationery and other imprinted material and office supplies, and packaging and shipping materials of the Seller Parties;

(xiii)    Contracts not constituting Assigned Contracts (the "Excluded Contracts");

(xiv)    All Tax records of the Seller Parties and all Tax refunds to which any of the Seller Parties is or may be entitled;

(xv)    All rights of the Seller Parties in respect of any insurance policies;

(xvi)    Any "employee benefit plans" (within the meaning of Section 3(3) of ERISA);

13

19093263

(xvii)  The goodwill and other intangible assets associated with the Business;

(xviii)  All rights of recovery, rights of set-off, recoupment, claims and causes of action of the Seller Parties relating to the Business, whether known or unknown, including all causes of action (x) arising under Chapter 5 of the Bankruptcy Code or (y) against Willowood Ltd., Vijay Mundhra, Brian Heinze, Joseph Middione and Andy King; and

(xix)  All other assets of the Seller Parties and the Business other than as set forth in Section 2(a).

(c)  Assigned Contracts.  At the Closing, Buyer shall acquire all right, title and interest of the applicable Seller Parties in and to all of the Assigned Contracts.  Upon the written request of Buyer, the Seller Parties shall provide Buyer with a list of all amounts required, to the Knowledge of Seller, to cure all defaults under each of the Assigned Contracts designated by Buyer in such request, so as to permit the assumption and assignment of each such Assigned Contract pursuant to Section 365 of the Bankruptcy Code (the "Cure Amounts"); *provided* that, for the avoidance of doubt, (i) the Cure Amounts shall be in the amount agreed to by Buyer and the applicable counterparty to such Contract or as determined by the Bankruptcy Court, and (ii) the Cure Amounts will not include the Assumed Data Compensation Liability, and, for clarity, the amount of such Assumed Data Compensation Liability will not be determined by the Bankruptcy Court.  Schedule 2(c) hereto sets forth the Seller Parties' good faith estimate of the Cure Amounts for the Assigned Contracts as of April 15, 2019.

(d)  Product Registrations.

(i)  The Seller Parties and Buyer shall use commercially reasonable efforts to cause the Transferred Registrations to be transferred to Buyer in its, its Affiliates' or its designees' name(s) as soon as is reasonably practicable after the Closing Date in the following manner, including delivery by the applicable Seller to Buyer of transfer paperwork utilizing forms published by EPA and executed by the applicable Seller within fifteen (15) days after Closing.  As promptly as practicable but in any event not later than fifteen (15) days following receipt of the executed transfer paperwork, Buyer shall, or shall cause its Affiliates' or its designees' to, execute and file, or cause to be filed with the appropriate Governmental Authorities, any necessary documents to effectuate the transfer of each of the Transferred Registrations to Buyer's, its Affiliates' or its designees' name(s).  Any and all fees, expenses and other costs associated with effectuating such transfers (whether internal or external, and including such fees, expenses and other costs of the Seller Parties and their respective Subsidiaries) shall be borne by Buyer, its Affiliates or its designees, and none of the Seller Parties nor their respective Affiliates shall be responsible for the payment of such fees, expenses or costs.

14

19093263

(ii)     Upon receipt of approvals from the appropriate Governmental Authorities regarding a transfer of a Transferred Registration, Buyer, its Affiliates and its designees shall comply with this Agreement and, in all material respects, with all Laws for changeover of all formulated Transferred Product packaging, labeling, and package inserts associated with the formulated Transferred Products that are the subject of such Transferred Registration.

(iii)     Buyer agrees to grant to the Seller Parties a fully paid up, non-exclusive, sublicensable limited license to use the trademark "Willowood" solely for the purposes of the marketing, distribution and sale of existing inventory (other than the Transferred Inventory) relating to Excluded Registrations (collectively, the "Excluded Inventory") either (x) packaged by Seller in its original packaging or (y) new product packaged by any purchaser of the Excluded Inventory post-Closing.  All use by any purchaser of Excluded Inventory of the trademark "Willowood" in connection with new product packaged by any purchaser of Excluded Inventory post-Closing shall be limited to the extent necessary to use the trademark "Willowood" in a manner consistent with labeling requirements under FIFRA.  In connection with the rights conferred to the Seller Parties under this Section 2(d)(iii), the Seller Parties (or the purchaser of any Excluded Inventory) shall cease using the "Willowood" trademark and name in the production of new labels and packaging on the earlier to occur of either (x) sixty (60) days after the date of transfer of the applicable Transferred Registration or (y) one year after the Closing, it being understood that, in any event, any purchaser of Excluded Inventory shall be permitted to sell out its inventory of product with labels bearing Seller's name into the channels of distribution for a maximum period of eighteen (18) months after the earlier date of either (x) or (y) described in this sentence.

(iv)     In connection with the actions contemplated by this Section 2(d), each party shall, and shall cause its Affiliates or Subsidiaries, as applicable, to, (A) provide reasonably necessary assistance to the other party, its Affiliates and its designees in seeking to have the Transferred Registrations transferred to Buyer, its Affiliates or its designees in accordance with Section 2(d)(i), (B) provide to the other party an appropriate registration manager for purposes of liaising with respect to the transfer of each Transferred Registration and (C) appoint one employee as the primary point of escalation contact for the other party with respect to such party's obligations pursuant to this Section 2(d).  The Parties shall notify each other of the name and relevant contact information for such employees as soon as reasonably practicable following the Closing.

(v)     During the period of time commencing on the Closing Date and continuing until the completion of the transfer of each of the Transferred Registrations to Buyer, the Seller Parties shall, and shall cause their respective applicable Subsidiaries to, continue to be responsible for the maintenance of each of the Transferred Registrations and related state-level Registrations at Buyer's expense.  Upon completion of transfer of each such Transferred

15

19093263

Registration, none of the Seller Parties nor any of their respective Subsidiaries shall have any obligation to support or maintain such Transferred Registration or any related state-level Registrations.

3.      **Purchase Price/Deposit**

(a)      Deposit Funds.  Within three (3) Business Days of the entry of the Bid Procedures Order, subject to the execution of an escrow agreement reasonably acceptable to the Seller Parties and Buyer (the "Escrow Agreement"), with U.S. Bank National Association (the "Escrow Agent"), the Buyer shall deposit into escrow account with the Escrow Agent an amount equal to $1,990,896.00 (the "Deposit Funds"), by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement.  The Deposit Funds shall be released by the Escrow Agent and delivered to either (x) Buyer or (y) the Seller Parties, as follows:

(i)      if the Closing shall occur, the Deposit Funds shall be released directly to the Seller Parties and credited towards the Purchase Price payable by Buyer;

(ii)      if this Agreement is terminated by the Seller Parties pursuant to Section 12(a)(ii)(C) in any circumstance where Buyer is not entitled to terminate this Agreement pursuant to Section 12(a)(i) or Section 12(a)(iii), then the Deposit Funds shall be released directly to the Seller Parties; or

(iii)      if this Agreement is terminated by Buyer pursuant to Section 12(a)(i) or Section 12(a)(iii), or if this Agreement is terminated by the Seller Parties pursuant to Section 12(a)(ii)(A) or (B), or if this Agreement is terminated pursuant to Section 12(a)(iv), then the Deposit Funds shall be released directly to Buyer.

(b)      Closing Payment.  The aggregate purchase price for the Acquired Assets and the Assumed Obligations shall be the Purchase Price, which Buyer shall pay to the Seller Parties at the Closing by wire transfer of immediately available funds to such bank accounts and in such proportions as designated in writing by Willowood USA as follows:

(i)      an amount equal to the Cash Purchase Price *less* the Deposit Funds (which will be released directly to the Seller Parties by the Escrow Agent pursuant to Section 3(a)(i) and the Escrow Agreement).  At the Closing, Buyer and the Seller Parties shall deliver a joint instruction to the Escrow Agent to distribute to Seller the Deposit Funds from the escrow account.  At the Closing, Buyer shall execute any documents required to release any Lien as reasonably requested by the Seller Parties;

(ii)      an amount (the "Transferred Inventory Value") equal to the value of the Transferred Inventory to be calculated as the applicable Seller's book value (as determined pursuant to GAAP) of the Transferred Inventory.  As of the effective date hereof, the Seller Parties have provided Buyer with a list setting forth each Transferred Product (by SKU), the most recent selling price

16

19093263

for each such Transferred Product and such Seller's book value of each such Transferred Product.  At Closing, the Seller Parties shall provide Buyer with a written statement that describes the Transferred Inventory by location, amount, type of Transferred Inventory and the Seller Parties' calculation of the Transferred Inventory Value (the "Estimated Closing Transferred Inventory Value"), which such Estimated Closing Transferred Inventory Value shall be paid to the Seller Parties at the Closing as the estimated Transferred Inventory Value.  Within thirty (30) calendar days after the Closing, Buyer shall conduct a physical inventory count of the Transferred Inventory and provide a written inventory count to the Seller Parties (the "Transferred Inventory Count") and Buyer's calculation of the Transferred Inventory Value (the "Post-Closing Transferred Inventory Value").  The Seller Parties shall have ten (10) Business Days after receipt of the Transferred Inventory Count and the Post-Closing Transferred Inventory Value to review the same.  If the Seller Parties disagree with Buyer's determination of the Transferred Inventory Count or calculation of all or any portion of the Post-Closing Transferred Inventory Value, the Seller Parties may, within such ten (10) Business Day period, deliver a notice to Buyer setting forth the Seller Parties' objection to such Transferred Inventory Count or Post-Closing Transferred Inventory Value (an "Objection Notice").  If the Seller Parties timely deliver to Buyer an Objection Notice, then the parties hereto shall negotiate in good faith to reach agreement on the disputed items or amounts in order to determine a mutually-agreeable Final Transferred Inventory Count and Final Post-Closing Transferred Inventory Value, which such amounts shall be deemed final, binding, and conclusive for purposes of this Agreement.  If the Seller Parties fail to deliver an Objection Notice during such ten (10) Business Day period, then the Transferred Inventory Count and Post-Closing Transferred Inventory Value as determined by Buyer and delivered to the Seller Parties in accordance with this Section 3(b)(ii) shall be deemed final, binding, and conclusive for purposes of this Agreement and shall constitute the Final Transferred Inventory Count and the Final Post-Closing Transferred Inventory Value.  Within ten (10) days after the Transferred Inventory Count and Post-Closing Transferred Inventory Value becoming final, binding, and conclusive for purposes of this Agreement, the Seller Parties shall either (A) remit the difference between the Estimated Closing Transferred Inventory Value and the Final Post-Closing Transferred Inventory Value (to the extent that the former exceeds the latter) or (B) bill Buyer for the difference between the Estimated Closing Transferred Inventory Value and the Final Post-Closing Transferred Inventory Value (to the extent that the latter exceeds the former), in which case Buyer shall pay such difference to Seller within twenty (20) days of such notice.

(c)     Allocation of Purchase Price.  Willowood USA and Buyer shall allocate the aggregate Purchase Price, the Assumed Liabilities (to the extent taxable consideration for income Tax purposes), and all other taxable consideration for U.S. federal income Tax purposes to be paid for the Acquired Assets in accordance with Section 1060 of the Tax Code.  Willowood USA and Buyer shall use reasonable best efforts to agree upon such allocation and reduce it to writing as soon as practicable following the execution of this Agreement, and in any event shall agree on such allocation prior to the Closing Date,

17

and such allocation shall be attached to this Agreement as Schedule 3(c). In addition, Willowood USA and Buyer hereby undertake and agree to file timely any information that may be required to be filed pursuant to Treasury Regulations promulgated under Section 1060(b) of the Tax Code. Neither Willowood USA nor Buyer shall file any Tax Return or other document or otherwise take any position which is inconsistent with any allocation agreed upon by them; *provided*, *however*, that in the event the parties have not agreed upon an allocation, neither party shall have any obligation to treat or report the allocation of Purchase Price, the Assumed Liabilities (to the extent taxable consideration for income Tax purposes) and other taxable consideration among the Acquired Assets consistently for Tax or other reporting purposes. If any Governmental Authority disputes the allocation reflected by Willowood USA or Buyer on their respective Tax Returns, Willowood USA or Buyer, as the case may be, shall promptly notify the other party in writing of the items in dispute.

4.      **Liabilities and Obligations**.

(a)      Non-Assumption of Liabilities. Notwithstanding anything to the contrary contained herein and except as expressly set forth in Section 4(b), Buyer does not assume and shall not be liable or have any responsibility or obligation whatsoever for any liabilities, commitments or obligations of the Seller Parties of any kind or nature whatsoever, known or unknown, accrued, fixed, contingent or otherwise, liquidated or unliquidated, choate or inchoate, due or to become due (collectively, "Liabilities"), including any liabilities or obligations in respect of any liabilities associated with any Excluded Assets (collectively, the "Retained Obligations").

(b)      Assumed Obligations. At the Closing, subject to the limitation set forth in Section 4(c), Buyer shall assume only the following Liabilities and obligations (the "Assumed Obligations") of the Seller Parties:

(i)      post-Petition trade payables and Liabilities incurred in the Ordinary Course of Business consistent with present practice in the Seller Parties' Chapter 11 case (excluding any and all professionals' fees and reimbursement of the Seller Parties for court-approved amounts already paid), relating solely to the Acquired Assets in an amount not to exceed $250,000.00, it being understood that such payables and Liabilities shall not be duplicative with amounts reflected in the calculation of Transferred Inventory Value;

(ii)      (x) the Liabilities and obligations of the Seller Parties under the Assigned Contracts that have accrued from and after the Closing Date, and (y) any and all Cure Amounts pursuant to Section 2(c) above;

(iii)      the Liabilities under any Transferred Orders; and ;

(iv)      all data compensation Liability of the Seller Parties or their respective Subsidiaries with respect to any Transferred Registration issued to or applied for by the Seller Parties or any of their respective Subsidiaries pursuant to FIFRA (or any similar state or local laws regulating pesticides), as further

18

19093263

summarized on Schedule 4(b)(iv) (the "Assumed Data Compensation Liability").  In no event will Buyer have any obligation to pay data compensation Liability other than the Assumed Data Compensation Liability.

(c)     Excluded Contracts.  Buyer shall not acquire, or assume any liability for, any claims arising from any Excluded Contracts.

**5.      Obtaining of Procedures and Sale Order; Closing.**

(a)     Obtaining Sale Order and Bid Procedures.  The Seller Parties shall use their reasonable best efforts to obtain entry of the Bid Procedures Order and the Sale Order, subject to its obligations under the Bankruptcy Code.

(b)     Closing.  If the Sale Order is entered, then, subject to the satisfaction or waiver by the parties of the conditions to their respective obligations to effect the Closing set forth in Sections 10 and 11, the Closing shall take place at the offices selected by Buyer not later than 10 Business Days following the date that the Sale Order is entered, or on such other date or at such other location as Willowood USA and Buyer shall mutually agree, but in any event not later than 60 days following the date of this Agreement.

**6.      Deliveries at Closing.**

(a)     Deliveries by the Seller Parties.  At the Closing, the Seller Parties shall deliver, or cause to be delivered (in addition to any other instruments required by Section 10 or otherwise by this Agreement to be delivered by the Seller Parties at the Closing), to Buyer the following (in form and substance reasonably satisfactory to Buyer):

(i)     a duly executed bill or bills of sale and assignment or other appropriate instruments transferring all right, title and interest in and to all of the Acquired Assets to Buyer purchasing such Acquired Assets as set forth herein;

(ii)     the certificates representing the Equity Securities of each of the Transferred Subsidiaries, duly endorsed in blank, and if no such certificates exist, an assignment of such Equity Securities, duly executed by Willowood USA;

(iii)     a certified copy of the Sale Order;

(iv)     the Transferred Data;

(v)     Seller IP;

(vi)     subject to Section 2(d), possession of all of the Acquired Assets;

19

19093263

(vii)   the Assignment and Assumption Agreement, duly executed by the applicable Seller Parties;

(viii)   evidence reasonably satisfactory to Buyer of compliance with the notice provisions set forth in the Bid Procedures Order and in the Sale Order;

(ix)   evidence reasonably satisfactory to Buyer of a release of all Liens of KeyBank National Association, Tree Line Direct Lending, LP, and any other of the Seller Parties' secured lenders against both (a) the Equity Securities of, and (b) the assets of, the Transferred Subsidiaries;

(x)   copies of the resolutions of the board of directors or similar authorizing Person of the Seller Parties authorizing the execution and performance by the Seller Parties of this Agreement and authorizing the officers of the applicable Seller Parties to carry out and perform the terms and provisions hereof, certified by an appropriate officer of each such Seller;

(xi)   resignations, effective as of the Closing Date, of each of Jason Urband and Jeffrey Thayer as an officer of each Transferred Subsidiary; and

(xii)   such other instruments or documents as Buyer may reasonably request to fully effect the transfer of the Acquired Assets and to confer upon Buyer the benefits contemplated by this Agreement.

(b)   <u>Deliveries by Buyer</u>.   At the Closing, Buyer shall deliver, or cause to be delivered (in addition to any other instruments required by <u>Section 11</u> or otherwise by this Agreement to be delivered by Buyer at the Closing), to the Seller Parties, the following:

(i)   the Purchase Price payable in the manner described in <u>Section 3</u>;

(ii)   the Assignment and Assumption Agreement, duly executed by Buyer.

**7.   Representations and Warranties of the Seller Parties**.   Each Seller hereby represents and warrants to Buyer as follows:

(a)   <u>Organization; Authorization</u>.   Such Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of incorporation or formation of such Seller and, subject to entry of the Sale Order, has the requisite organizational power and authority to execute and deliver this Agreement and the Ancillary Documents to which such Seller will be a party and to perform its obligations hereunder and thereunder.   Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and the Ancillary Documents to which such Seller will be a party has been duly authorized by all necessary organizational action of such Seller. This Agreement has been duly and validly executed by such Seller and, subject to the entry of the Sale Order and the due authorization, execution and delivery of this Agreement by Buyer and the other parties hereto, constitutes a legal, valid and binding

20

obligation of such Seller, enforceable against it in accordance with its terms.  The Ancillary Documents to which such Seller will be a party will be duly and validly executed and delivered by such Seller and, assuming the due authorization, execution and delivery of such Ancillary Documents by the other parties thereto, will constitute a legal, valid and binding obligation of such Seller, enforceable against it in accordance with its terms.

(b)     No Conflict; Consents.  Subject to the entry of the Sale Order and except as otherwise set forth on Section 7(b) of the Disclosure Schedule, neither the execution and delivery of this Agreement or the Ancillary Documents to which such Seller will be a party, nor the consummation of any or all of the transactions contemplated hereby or thereby, will (i) violate the certificate of incorporation or bylaws (or other governing instrument, in each case as amended, modified or supplemented) of such Seller; (ii) violate, be in conflict with or constitute a default under, or require the consent of any third party to, any Assigned Contract; or (iii) violate any Laws or Orders applicable to the Business or the Acquired Assets.

(c)     Consents and Approvals of Governmental Authorities.  Other than the entry of the Sale Order by the Bankruptcy Court, no consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority is required in connection with the execution, delivery and performance of this Agreement or the Ancillary Documents, or the consummation of the transactions contemplated hereby or thereby.

(d)     Contracts.  Section 7(d) of the Disclosure Schedule sets forth a list of all Contracts relating to the Transferred Products or the Transferred Registrations.  In the event Buyer identifies any Contracts relating to the Transferred Products or the Transferred Registrations that are not listed on Section 7(d) of the Disclosure Schedule as executory contracts (as such term is used in Section 365 of the Bankruptcy Code), then the Seller Parties shall amend Section 7(d) of the Disclosure Schedule to include such Contracts.

(e)     Brokers; Agents.  Except as set forth on Section 7(e) of the Disclosure Schedule, no investment banker, broker, finder or similar agent has been employed by or on behalf of such Seller in connection with this Agreement, and such Seller has not entered into any agreement, arrangement or understanding of any kind with any Person for the payment of any brokerage commission, finder's fee or any similar compensation in connection with this Agreement.

(f)     Litigation.  Except as set forth on Section 7(f) of the Disclosure Schedule or claims made in connection with such Seller's Chapter 11 case, there are no Actions, claims, causes of action, proceedings, suits or investigations pending or, to the Knowledge of Seller, threatened, against (i) such Seller or (ii) any of the Acquired Assets, in each case that relate to the Transferred Registrations and in each case before any Governmental Authority.  Such Seller is not subject to any Order entered in any lawsuit or proceeding that relate to the Transferred Registrations.

21

19093263

(g)     Equity Securities.  Section 7(g) of the Disclosure Schedule sets forth for each of the Transferred Subsidiaries an accurate and complete list of (i) each class and series of Equity Securities of such entities; (ii) the aggregate number of shares, units, membership interests or other denomination of Equity Securities of each class and series that are authorized for issuance; (iii) the aggregate number of shares, units, membership interests or other denomination of issued and outstanding Equity Securities of each such class and series; and (iv) a list of the names of each record and beneficial owner of such Equity Securities, and opposite the name of each such owner, the number, class, and series of Equity Securities owned by each such owner.  There are no Equity Securities of any Transferred Subsidiary other than the Equity Securities set forth on Section 7(g) of the Disclosure Schedule.

(h)     Product Registrations.

(i)     Such Seller and the Transferred Subsidiaries have obtained all product Registrations required to conduct the Business with respect to the Transferred Products as currently conducted in the United States, except for such failures as would not reasonably be expected to result in a Material Adverse Change.   All such product Registrations are identified on Section 7(h)(i) of the Disclosure Schedule.  All product Registrations relating to the Transferred Products are in full force and effect and are in material compliance with all Laws to maintain and support such Seller's operation of the Business with respect to the Transferred Products, including the marketing, sale and distribution of such Transferred Products.

(ii)     Except as otherwise set forth on Section 7(h)(ii) of the Disclosure Schedule, neither such Seller nor any of the Transferred Subsidiaries have received written notice from any Governmental Authority within the last twelve (12) months (x) indicating that any Transferred Registration (A) may be expiring, (B) will not be renewed or continued or (C) will be terminated or (y) requiring that additional Registration Data be provided in order to prevent the results in the immediately preceding clause (x) from occurring.

(i)     Transferred Trademarks.

(i)     Section 7(i) of the Disclosure Schedule sets forth for each registered Transferred Trademark for each Seller Party, if any, (w) title or identifier, (x) jurisdiction of registration or application, (y) registration or application number and (z) registration or application date.

(ii)     Such Seller and the Transferred Subsidiaries have full right, title and interest in and to the Transferred Trademarks, free and clear of Liens other than Permitted Liens.

(iii)     To the Knowledge of Seller, all of the Transferred Trademarks (x) are valid and enforceable under Laws, (y) have not been adjudged invalid or unenforceable under Laws in whole or in part, and (z) there are no claims either

22

19093263

pending or threatened that any of the Transferred Trademarks infringe against the trademark of any third party.

(j)     Transferred Inventory.   The Transferred Inventory conforms to such Seller's specifications, is salable in the Ordinary Course of Business and has been stored and maintained in the Ordinary Course of Business by such Seller or the applicable Transferred Subsidiaries.

(k)     Transferred Subsidiaries.  To the Knowledge of Seller (after a reasonable inquiry of the officers and employees of Willowood who would be reasonably expected to have knowledge of the matters), since April 20, 2016, none of the Transferred Subsidiaries have (i) conducted any operations (other than to hold the applicable Transferred Registrations), (ii) employed any employees or retained any independent consultants or advisors, (iii) opened any bank accounts, or (iv) entered into any Contracts (other than (x) the Credit Agreement and the ancillary agreements related thereto and (y) the applicable Contracts set forth on Section 7(d) of the Disclosure Schedule).

(l)     TERMS OF SALE.  EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE BEING SOLD TO BUYER ON AN "AS-IS, WHERE IS" BASIS, WITHOUT WARRANTY.  SUCH SELLER HEREBY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SUCH BUYER, AND ITS SUCCESSORS AND ASSIGNS, SHALL BEAR ALL RISKS OF INJURY OR DAMAGE TO PERSONS OR PROPERTY TO THE EXTENT RELATING TO THE OPERATION OF THE ACQUIRED ASSETS ON AND AFTER THE CLOSING DATE.

**8.     Representations and Warranties of Buyer**.  Buyer represents and warrants to the Seller Parties as follows:

(a)     Organization of Buyer; Authorization.   Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has the requisite organizational power and authority to execute and deliver this Agreement and the Ancillary Documents to which Buyer will be a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the Ancillary Documents to which Buyer is a party have been duly authorized by all necessary organizational action of Buyer.  This Agreement has been duly and validly executed by Buyer and, subject to the entering of the Sale Order by the Bankruptcy Court and the due authorization, execution and delivery of this Agreement by the Seller Parties, constitutes a legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms.  The Ancillary Documents to which Buyer will be a party will be duly and validly executed and delivered by Buyer and, assuming the due authorization, execution and delivery of such Ancillary Documents by the other parties thereto, will constitute a legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

23

19093263

(b)     <u>No Conflict as to Buyer</u>.  Neither the execution and delivery of this Agreement or the Ancillary Documents to which Buyer will be a party, nor the consummation of any or all of the transactions contemplated hereby or thereby, will (i) violate the articles of organization or operating agreement (or other governing instrument) of any Buyer; (ii) violate, be in conflict with, or constitute a default under, or require the consent of any third party to, any material contract or other agreement to which any Buyer is a party; or (iii) to the knowledge of any Buyer, violate any statute, law or regulation of any Governmental Authority applicable to any Buyer.

(c)     <u>Brokers; Agents</u>.  No investment banker, broker, finder or similar agent has been employed by or on behalf of Buyer in connection with this Agreement, and Buyer has not entered into any agreement, arrangement or understanding of any kind with any Person for the payment of any brokerage commission, finder's fee or any similar compensation in connection with this Agreement.

(d)     <u>Adequate Assurance Regarding Assumed Contracts</u>.  As of the Closing, Buyer shall be capable of satisfying Section 365(b)(1)(C) of the Bankruptcy Code with respect to the Assumed Contracts and shall supply reasonably sufficient information as required by the Bankruptcy Court or by agreement with the counterparties to such Assumed Contracts.  Buyer shall take actions reasonably required to assist in obtaining a finding by the Bankruptcy Court in the Sale Order that Section 365(b)(1)(C) of the Bankruptcy Code has been satisfied with respect to the Assumed Contracts.

(e)     <u>Sufficiency of Funds</u>.  Buyer has sufficient funds, and, on the Closing Date, Buyer will have sufficient funds, to make the payments required pursuant to <u>Section 3</u> and to perform its obligations with respect to the transactions contemplated by this Agreement.  Buyer acknowledges that its obligations set forth in this Agreement are not contingent or conditioned upon any Person's ability to obtain or have at the Closing sufficient funds necessary to make the payments required pursuant to <u>Section 3</u> or for Buyer to perform its obligations with respect to the transactions contemplated by this Agreement.

**9.     Additional Agreements of the Parties**.

(a)     <u>Access; Records; Bankruptcy Papers</u>.  From and after the date hereof, authorized representatives of Buyer (including their accountants, advisors, potential financing sources, consultants and legal counsel) shall have the right, upon reasonable notice and at reasonable times, to inspect the Acquired Assets and their condition and shall be provided reasonable access to the Seller Parties' respective officers, advisors, counsel, trade vendors, customers, properties and facilities to inspect the same; and, *provided*, that Buyer shall not take any action which unreasonably interferes with the Seller Parties' respective operation of the Business prior to the Closing Date in any material respect.  From and after the date hereof, and to the extent permitted by Law, the Seller Parties shall give Buyer and its authorized representatives, full access to their respective books and records relating to the Acquired Assets and the Assumed Obligations, as Buyer may reasonably request, permit Buyer to make inspections thereof, and cause the Seller Parties' respective officers and advisors to furnish Buyer with such

24

financial, Tax and other operating data and other information relating to the Acquired Assets and the Assumed Obligations as Buyer may reasonably request. The Seller Parties hereby agree that they will retain, until all appropriate statutes of limitations (including any extensions) expire, copies of all Tax Returns relating to the Acquired Assets and the Assumed Obligations and supporting work schedules and other records or information which may be relevant to such Tax Returns, except for such Tax Returns, supporting work schedules and other records which Buyer shall acquire as a consequence of this Agreement (*provided*, that the Seller Parties may elect not to retain any such copies if it gives such copies or make such copies available to Buyer), and that it will not destroy or otherwise dispose of such materials without first providing Buyer with a reasonable opportunity to review and copy such materials. Buyer hereby agrees that it will retain, until all appropriate statutes of limitations (including any extensions) expire, copies of all Tax Returns and supporting work schedules received from the Seller Parties pursuant to this Agreement and other records or information which may be relevant to such Tax Returns (*provided*, that Buyer may elect not to retain any such copies if Buyer gives such copies or makes such copies available to the Seller Parties), and that it will not destroy or otherwise dispose of such materials without first providing the Seller Parties with a reasonable opportunity to review and copy such materials. After the Closing Date, Buyer shall give the Seller Parties and their respective authorized representatives as well as any duly appointed Chapter 7 or Chapter 11 trustee or other duly appointed representative of the Seller Parties' bankruptcy estate pursuant to Section 323 of the Bankruptcy Code (the "Estate Representative") full access to the books and records acquired as a consequence of this Agreement for purposes of and relating to the prosecution of any claims and causes of action of the Seller Parties or which may be relevant to any claims objection process or which may otherwise be needed to enforce their remaining rights and defend their remaining obligations relating to the Acquired Assets and the Assumed Obligations or in connection with the Seller Parties' bankruptcy case, including any filings other than reporting required by the Bankruptcy Court, the Bankruptcy Code, or the United States Trustee. Buyer shall give no less than 30 days' notice to the Estate Representative if it intends to destroy any such documents so that the Estate Representative may take any actions reasonably necessary to preserve such documents. The Seller Parties will promptly deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in the Seller Parties' Chapter 11 case relating to this Agreement or the transactions contemplated hereby.

(b)     Operation in the Ordinary Course. During the period between the date of this Agreement and the Closing, the Seller Parties shall operate the Business relating to the Transferred Products in the Ordinary Course of Business, subject to changes resulting from its Chapter 11 case and the requirements of the Bankruptcy Code and the Bankruptcy Court, and in material compliance with all Laws. In furtherance of and without limiting the foregoing, the Seller Parties shall:

(i)     maintain and preserve all of the physical Acquired Assets (other than the Transferred Inventory) in the same condition as of the date hereof, ordinary wear and tear excepted;

25

19093263

(ii)     maintain the Transferred Inventory in the Ordinary Course of Business;

(iii)     perform all of its obligations under the Assigned Contracts, *provided*, that, except as otherwise required hereunder, the Seller Parties shall not be required to pay any Cure Amounts;

(iv)     maintain insurance at presently existing levels so long as such insurance is available on commercially reasonable terms; and

(v)     promptly notify Buyer of any condition which, in the reasonable judgment of the Seller Parties, would result in a Material Adverse Change.

In furtherance of and without limiting the foregoing, the Seller Parties shall not, without the prior written consent of Buyer, sell, transfer, mortgage, encumber or otherwise dispose of any of the Acquired Assets other than in the Ordinary Course of Business, execute any Contract relating to the Acquired Assets other than in the Ordinary Course of Business, or agree to or make any commitment to take any actions prohibited by this Section 9(b).

(c)     Collection of Excluded Accounts Receivable.  If, following the Closing, Buyer or any of its Affiliates receives or collects any funds relating to any Excluded Accounts Receivable, Buyer shall hold the same in trust for the benefit of the Seller Parties and shall remit such funds to the Seller Parties within five (5) Business Days after its receipt thereof (by wire transfer of immediately available funds to such bank accounts and in such proportions as designated in writing by Willowood USA).

(d)     Notification; Updates to Schedules.  During the period between the date of this Agreement and the Closing, the Seller Parties will promptly (and in any event within five Business Days) notify Buyer in writing of the discovery by any Seller of: (i) any event, condition, fact or circumstance that would result in any of the representations and warranties contained made by any Seller in Section 7 to no longer be true and correct in accordance with Section 10(a); and (ii) any material breach of any covenant or obligation of any Seller under this Agreement.  No such update shall be deemed to supplement or amend the Disclosure Schedule for the purpose of determining whether any of the conditions set forth in Section 10(a) have been satisfied.

**10.     Conditions to Buyer's Obligation to Effect Closing**.  The obligation of Buyer to effect the Closing shall be subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer:

(a)     Representations and Warranties and Covenants.  (i) The representations and warranties of the Seller Parties set forth in Section 7 shall be true and correct in all respects as of the Closing Date as then made (except to the extent such representations and warranties by their terms speak of an earlier date), except where the failure to be so true and correct, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Change, (ii) the Seller Parties shall have performed and complied in all material respects with the agreements contained in this Agreement required to be performed and complied with by the Seller Parties on or before the

26

19093263

Closing, and (iii) Willowood USA shall have delivered to Buyer at the Closing certificates, dated the Closing Date, signed by its Chief Executive Officer, President or any Vice President certifying as to compliance with clauses (i) and (ii) above.

(b)   Sale Hearing.  The Seller Parties shall cause the Sale Hearing to occur on or before April 16, 2019.

(c)   Effectiveness of Sale Order.  The Bankruptcy Court shall have entered the Sale Order by no later than April 20, 2019, and the effectiveness of such Sale Order shall not have been stayed or, if stayed, such stay shall no longer be in effect.

(d)   No Material Adverse Change.  From the date of this Agreement until the Closing Date, no Material Adverse Change shall have occurred.

(e)   No Litigation.  There shall not be any Order or Action pending or, to the Knowledge of Seller, threatened to be brought before any Governmental Authority relating to the Acquired Assets which, individually or in the aggregate, can reasonably be expected to result in a Material Adverse Change.

(f)   Transferred Subsidiaries.  All Liens (other than Permitted Liens) against the Transferred Subsidiaries (other than Assumed Liabilities directly against specific Transferred Subsidiaries) have been released.

(g)   Compliance With Bid Procedures Order; Notice.  The Seller Parties shall have complied with all requirements of the Bid Procedures Order, including the notice requirements provided therein.

(h)   Assumption and Rejection of Contracts.   The Contracts designated hereunder for assumption shall be so assumed by Order of the Bankruptcy Court satisfactory to Buyer.

(i)   Deliveries at Closing.  Buyer shall have received all documents and other items to be delivered by Seller pursuant to Section 6(a).

**11.   Conditions to the Seller Parties' Obligation to Effect Closing**.  The obligation of the Seller Parties to effect the Closing shall be subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Willowood USA:

(a)   Representations and Warranties.  (i) The representations and warranties of Buyer set forth in Section 8 shall be true and correct in all respects as of the Closing Date as then made (except to the extent such representations and warranties by their terms speak of an earlier date), except where the failure to be so true and correct, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Buyer, and (ii) Buyer shall have performed and complied in all material respects with the agreements contained in this Agreement required to be performed and complied with by Buyer on or before the Closing, and (iii) Buyer shall have delivered to the Seller Parties at the Closing certificates, dated the Closing Date, signed by its Chief Executive

27

Officer, President or any Vice President certifying as to compliance with clauses (i) and (ii) above.

(b)     Effectiveness of Sale Order.  The Bankruptcy Court shall have entered the Sale Order, two days shall have elapsed since the Sale Order was entered (*provided*, that if the second day after the Sale Order is entered is not a Business Day, such period shall be deemed to have elapsed on the first Business Day following such second day), and the effectiveness of the Sale Order shall not have been stayed or, if stayed, such stay shall no longer be in effect.

(c)     No Litigation.  There shall not be any Order or Action pending, to the Knowledge of Seller, or threatened to be brought before any Governmental Authority relating to the Acquired Assets which, individually or in the aggregate, can reasonably be expected to result in a Material Adverse Change.

(d)     Deliveries at Closing.  Seller shall have received all documents and other items to be delivered by Buyer pursuant to Section 6(b).

**12.     Termination; Effect of Termination**.

(a)     Termination.  This Agreement may be terminated before the Closing occurs only as follows:

(i)     by Buyer, if (A) the conditions set forth in Section 10 shall not have been satisfied or waived on or before the date that is 60 days following the date of this Agreement (the "Outside Date"), (B) Buyer reasonably determines that the timely satisfaction of any condition set forth in Section 10 has become impossible or impractical, or (C) if any Seller has breached any material covenant or obligation contained in this Agreement and such breach shall not have been cured within 10 days after the delivery of written notice thereof to the Seller Parties (in each case, other than as a result of any failure on the part of Buyer to comply with or perform its covenants and obligations set forth in this Agreement);

(ii)     by the Seller Parties, if (A) the conditions set forth in Section 11 shall not have been satisfied or waived on or before the Outside Date, or (B) if Willowood USA reasonably determines that the timely satisfaction of any condition set forth in Section 11 has become impossible or impractical, or (C) if Buyer has breached any material covenant or obligation contained in this Agreement and such breach shall not have been cured within 10 days after the delivery of written notice thereof to Buyer (other than as a result of any failure on the part of the Seller Parties to comply with or perform their covenants and obligations set forth in this Agreement);

(iii)     by Buyer, if the Sale Order has not been entered by April 20, 2019, or if, prior to such date, the Bankruptcy Court approves another transaction involving the sale or other transfer of any of the Acquired Assets to a third party; or

28

19093263

(iv)    by the mutual written agreement of Buyer and the Seller Parties.

(b)    No Further Liability.  If this Agreement is terminated by the Seller Parties or Buyer pursuant to this Section 12, neither party shall have any further obligation or liability under this Agreement, except that the provisions of Sections 12 and 16 shall survive and any party that has materially breached this Agreement shall not be relieved of any liability hereunder.

**13.    Tax Allocations**.  Except as set forth in Section 14 (with respect to Transfer Taxes):

(a)    The Seller Parties shall prepare and file all income Tax Returns of the Seller Parties for all Tax periods, and, for any Tax period or the portion of any Tax period ending on or before the Closing Date, the Seller Parties shall be responsible for preparing and timely filing all Tax Returns required by Law to be filed with respect to the Acquired Assets prior to the Closing Date, and for the payment of all Taxes shown as due and payable on such Tax Returns.

(b)    Buyer shall prepare and timely file all Tax Returns with respect to the Acquired Assets other than those Tax Returns described in Section 13(a), including Tax Returns for any Tax period beginning before the Closing Date and ending after the Closing Date (or portion thereof) (a "Straddle Period"), other than income Tax Returns of the Seller Parties, and in each case relating solely to the ownership of the Acquired Assets.

(c)    With respect to Tax Returns prepared and filed by Buyer pursuant to Section 13(b) pertaining to any Straddle Period, (i) Buyer shall prepare and submit such Tax Returns to the Seller Parties for the Seller Parties' review, comment, and consent (such consent not to be unreasonably withheld, conditioned or delayed) at least fifteen Business Days prior to the due date thereof and make all changes reasonably requested by the Seller Parties that could reasonably be expected to affect the Tax liability of any Seller Party, and (ii) the Seller Parties shall, no later than three Business Days prior to the due date of such Tax Returns, pay Buyer the amount of Taxes that are due and payable with such Tax Returns and which are attributable to that portion of such Straddle Period ending on the Closing Date.

(d)    The Seller Parties shall have the right to control the conduct of any Action with respect to Tax Returns filed or to be filed by the Seller Parties pursuant to Section 13(a).  Buyer shall have the right to control the conduct of any Action with respect to Tax Returns to be filed by Buyer pursuant to Section 13(b).

(e)    Any refunds attributable to (i) Tax Returns described in Section 13(a), and (ii) Tax Returns for a Straddle Period that pertain to the portion of such Straddle Period ending on the Closing Date, shall be for the account of the Seller Parties.  Any refunds attributable to (i) Tax Returns described in Section 13(b) other than Tax Returns for Straddle Periods and (ii) Tax Returns for a Straddle Period that pertain to the portion of

29

such Straddle Period beginning on the Closing Date after the Closing, shall be for the account of Buyer.

(f)    Buyer and the Seller Parties shall each cooperate with the reasonable requests of the other in the preparation and filing of Tax Returns pursuant to this Section 13 and in the conduct of any audit or other Action relating to Taxes involving the Acquired Assets.  Buyer and the Seller Parties agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for the audit by any Governmental Authority, and the prosecution or defense of any Action relating to any Tax.

14.    **Transfer Taxes**.  Transfer Taxes arising out of the transactions effected pursuant to this Agreement shall be paid by Buyer.  Buyer shall prepare and timely file all Tax Returns with respect to such Transfer Taxes and provide copies of each such Tax Returns within five Business Days after filing.

15.    **Jurisdiction**.  The parties agree that the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or breach hereof.

16.    **Employees**.  On or after the Closing Date, Buyer shall have the right to interview employees and independent contractors of the Seller Parties (collectively, "Employees") to determine whether Buyer will offer employment to any of the Employees.  Any Employees hired by Buyer will be new hires of Buyer and the Seller Parties will be solely responsible, and Buyer will have no obligations whatsoever for, any compensation or other amounts payable to any Employee (or former Employee) of the Seller Parties, including hourly pay, commission, bonus, salary, accrued vacations, fringe, pension or profit sharing benefits, or severance pay payable to any Employee (or former Employee) of the Seller Parties for any period relating to the service with any of the Seller Parties at any time prior to the Closing Date.

17.    **Miscellaneous**.

(a)    Notices.    All notices and other communications pursuant to this Agreement shall be in writing and shall be deemed given if delivered personally, sent by electronic mail or other customary means of electronic communication, sent by nationally-recognized overnight courier or mailed by certified mail (return receipt requested), postage prepaid, to the parties at the addresses set forth below or to such other address as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith.  Any such notice or communication shall be deemed to have been delivered and received (i) in the case of personal delivery, on the date of such delivery, (ii) in the case of electronic mail or other customary means of electronic communication, on the date sent if either (A) confirmation of receipt is received or (B) such notice is promptly mailed by certified mail (return receipt requested), (iii) in the case of a nationally recognized overnight courier in circumstances under which such courier guarantees next Business Day delivery, on the next Business Day after the date sent, and (iv) in the case of mailing, on the third Business Day following that on which the piece of mail containing such communication is posted.

30

19093263

If to Buyer, to:

> Generic Crop Science LLC
> c/o 1801 California Street, Suite 3000
> Denver, CO  80202
> Attention:  Robert C. Roth, Jr.
> E-mail:  robert.roth@kutakrock.com

with a copy (which shall not constitute notice) to:

> Kutak Rock LLP
> The Omaha Building
> 1650 Farnam Street
> Omaha, NE  68102
> Attention:  Jeffrey Wegner, Esq.
> E-mail:  jeffrey.wegner@kutakrock.com

If to the Seller Parties to:

> Willowood USA LLC
> c/o R2 Advisors, LLC
> 1350 17th Street, Suite 206
> Denver, CO  80202
> Attention:  Kevin Mitchell, Chairman
> E-mail:  kjm@lariatpartners.net

with a copy (which shall not constitute notice) to:

> Brownstein Hyatt Farber Schreck, LLP
> 410 Seventeenth Street, Suite 2200
> Denver, CO 80202-0947
> Attention:  Michael Pankow
>                    Matthew Nyberg
> E-mail:     mpankow@bhfs.com
>                    mnyberg@bhfs.com

If to Agent to:

> Tree Line Direct Lending, LP
> 101 California Street, Suite 1700
> San Francisco, CA 94111
> Attention:  Frank Cupido
> E-mail:  fcupido@treelinecp.com

31

19093263

with a copy (which shall not constitute notice) to:

> Latham & Watkins LLC
> 330 North Wabash Avenue, Suite 2800
> Chicago, IL  60611
> Attention:  Matthew L. Warren
> E-mail:  matthew.warren@lw.com

(b)     Press Releases; Disclosure.  The parties hereto will cooperate in the issuance of any press releases or otherwise in making any public statements with respect to this Agreement and the transactions contemplated hereby.  Neither Buyer nor any Seller shall issue any press release regarding this Agreement or the transactions contemplated hereby without the other party's prior written consent, which consent shall not be unreasonably withheld.  Buyer acknowledges and agrees that the Seller Parties may provide copies of this Agreement and the schedules and exhibits attached hereto to the parties in interest in the Seller Parties' Chapter 11 case, and those parties the Seller Parties determine it is necessary to provide copies to in connection with the Seller Parties' Chapter 11 case.  The Seller Parties also shall be entitled to file copies of this Agreement and the schedules and exhibits attached hereto with the Bankruptcy Court or as otherwise required by law.

(c)     Entire Agreement.  This Agreement and the instruments, agreements, and other documents contemplated hereby supersede all prior discussions and agreements between the parties with respect to the matters contained herein (excluding the confidentiality letter agreement, dated as of March 29, 2019, by and between Buyer and Piper Jaffray & Co. on behalf of Willowood USA and its Affiliates, which shall remain in full force and effect), and this Agreement and the instruments, agreements and other documents contemplated hereby contain the entire agreement between the parties hereto with respect to the transactions contemplated hereby.

(d)     Further Assurances.  After the Closing, each of the parties hereto shall, at the reasonable request of the other party hereto, execute and deliver such other instruments of transfer or assumption and further documents and agreements, and do such further acts and things as may be necessary to carry out the provisions of this Agreement.

(e)     Waiver.  Any term or condition of this Agreement may be waived at any time by the party thereto which is entitled to the benefit thereof, but such waiver shall only be effective if evidenced by a writing signed by such party.  A waiver on one occasion shall not be deemed to be a waiver of the same of any other breach on a future occasion.

(f)     Amendment.  Except as otherwise expressly provided herein, this Agreement may be amended only by a writing signed by all the parties hereto.

(g)     Counterparts; Execution.  This Agreement may be executed in one or more counterparts, all of which taken together shall be deemed and considered one and the same Agreement, and same shall become effective when counterparts have been

32

signed by each party and each party has delivered its signed counterpart to the other party.  A digital reproduction, portable document format (".pdf") or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by electronic signature (including signature via DocuSign or similar services), electronic mail or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen.  Such execution and delivery shall be considered valid, binding and effective for all purposes.

(h) Binding Agreement; Assignment; No Third Party Beneficiaries.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement may not be assigned by any party hereto without the prior written consent of the other party, and any purported assignment without such consent shall be void; *provided*, *however* that notwithstanding the above, Buyer may, by written notice delivered to the Seller Parties not less than three (3) Business Days prior to the Closing Date, designate one or more of its Affiliates to assume all of the obligations and rights of Buyer hereunder effective as of the Closing Date, *provided* that no such assignment shall relieve Buyer of its obligations under this Agreement.  This Agreement is not made for the benefit of any third party (including any non-Seller parties to the Assigned Contracts), and no third party shall be deemed to be a beneficiary hereof.  No provision of this Agreement shall create any third-party beneficiary or other rights in any current or former employee, consultant or contractor (including any beneficiary or dependent thereof) of the Seller Parties in respect of continued employment or affiliation or resumed employment or affiliation with Buyer.

(i) Governing Law.  This Agreement shall be governed by the Laws of the State of Colorado, without regard to the conflict of laws principles thereof.

(j) Headings.  The headings in this Agreement are for convenience of reference only and should not be deemed a part of this Agreement.

(k) Expenses.  Except as otherwise expressly provided herein, each of the parties hereto shall pay their own fees and expenses in connection with the negotiation, preparation, execution and delivery of this Agreement and the other instruments and agreements entered into pursuant to this Agreement, and any amendments to the same.

(l) Records.  The Seller Parties may copy and maintain any records that it believes are necessary.  In the event that any Seller does not retain copies of such records and insofar as such Seller reasonably believes the records may be needed or useful in connection with federal, state or local regulatory or Tax matters, resolution of disputes, litigation, or contract compliance issues, to the extent that Buyer has maintained such records, Buyer will give such Seller access to such records, and such Seller shall have the right to copy and review at its own expense those records that Buyer has available upon reasonable request from such Seller to Buyer.

(m) Agent.

33

19093263

(i)      Notwithstanding anything to the contrary herein, the Agent (for itself and the Lenders (as defined in the Credit Agreement)) will be deemed a third party beneficiary hereunder entitled to exercise and enforce any and all rights, powers, privileges and remedies of the Seller Parties pursuant to this Agreement or any other agreement, instrument or document executed in connection herewith and, as provided in the applicable Credit Documents (as defined in the Credit Agreement), the Agent, for the benefit of itself and Lenders, will have a first priority Lien on the Seller Parties' respective right, title and interest in and to this Agreement and the other agreements, instruments and documents executed in connection herewith.   Without limiting the generality of the foregoing, and notwithstanding anything to the contrary in this Agreement or in any other agreement, instrument or document executed in connection herewith, the Seller Parties will not exercise any right to terminate, or execute and deliver or otherwise provide any waivers, consents or amendments under, this Agreement or any of the other agreements, instruments or documents executed in connection herewith, without the prior written consent of the Agent (which shall not be unreasonably withheld, conditioned or delayed).

(ii)      Notwithstanding anything to the contrary in this Agreement or any other agreement, instrument or document executed in connection herewith, none of the Agent or the Lenders (x) is making any representations or warranties to any or all of the Seller Parties, Buyer or any of their respective Affiliates in connection with this Agreement or any other agreement, instrument or document executed in connection herewith, or the transactions contemplated herein or therein, (y) will be liable to any Person for any breach by any or all of the Seller Parties, Buyer or any of their respective Affiliates of any of their respective representations, warranties, covenants or other agreements in connection with this Agreement or any other agreement, instrument or document executed in connection herewith or any of the transactions contemplated herein or therein, or (z) will have any obligations or liabilities under or in respect of any of this Agreement or any other agreement, instrument or document executed in connection herewith or any of the transactions contemplated herein or therein.   Without limiting the generality of the foregoing, under no circumstances will any or all of the Agent and the Lenders be obligated to return or otherwise disgorge to or for the benefit of Buyer or any Affiliate thereof any proceeds of the Purchase Price or other amounts remitted to any or all of the Agent and the Lenders.

(n)      Disclosure Schedule.  Each section of the Disclosure Schedule qualifies the correspondingly numbered representation and warranty or covenant and any other representation or warranty, if the disclosure is reasonably apparent to such other representation or warranty.   The Disclosure Schedule is qualified in its entirety by reference to specific provisions of the Agreement, and is not intended to constitute, and shall not be construed as constituting, any representation or warranty or covenant of the Seller Parties, except as and to the extent expressly provided in the Agreement.  Inclusion of information in the Disclosure Schedule shall not be construed as an admission that

34

such information is material to the Seller Parties or any of their respective Subsidiaries or their respective assets, liabilities, financial condition, results, business or operations.  The fact that any item of information is contained in the Disclosure Schedule shall not be construed to mean that such information is required to be disclosed by the Agreement. Such information shall not (i) be used as a basis for interpreting the term "material," "materially" or "materiality" in the Agreement or (ii) constitute an admission of liability or obligation to any third party.  References to any document in the Disclosure Schedule do not purport to be complete and are qualified in their entirety by the document itself. Capitalized terms used but not defined in the Disclosure Schedule shall have the same meanings given them in this Agreement.

[Signatures on Next Page]

35

19093263

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on the date first above written.

**BUYER**:

GENERIC CROP SCIENCE LLC,
a Delaware limited liability company


By:       _____
Name:     Robert C. Roth, Jr.
Title:    Authorized Representative

**[Signature Page to Asset Purchase Agreement]**

19093263

**SELLER PARTIES**:

WILLOWOOD USA, LLC


By: _____
Name:    Jason Urband
Title:    Chief Executive Officer


WILLOWOOD, LLC


By: _____
Name:    Jason Urband
Title:    Chief Executive Officer


RIGHTLINE LLC


By: _____
Name:    Jason Urband
Title:    Chief Executive Officer


GREENFIELDS MARKETING LTD.


By: _____
Name:    Jason Urband
Title:    Chief Executive Officer


**[Signature Page to Asset Purchase Agreement]**

19093263

## EXHIBIT A

### GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT

This General Assignment and Assumption Agreement (this "Assumption Agreement"), dated as of [●], 2019 (the "Effective Date"), is made by and among **(i)** Willowood USA, LLC, an Oregon limited liability company ("Willowood USA"), **(ii)** Willowood, LLC, an Oregon limited liability company ("Willowood"), **(iii)** RightLine LLC, an Oregon limited liability company ("RightLine"), and **(iv)** Greenfields Marketing Ltd., a private company organized under the laws of the United Arab Emirates ("Greenfields", and collectively with RightLine, Willowood USA and Willowood, the "Assignors" and each an "Assignor"), and **(v)** Generic Crop Science LLC, a Delaware limited liability company ("Assignee"). Assignors and Assignee are sometimes individually referred to herein as a "Party" and collectively as the "Parties."

A.        Assignors and Assignee are parties to that certain Asset Purchase Agreement, dated as of [●], 2019 (as may be amended, restated, modified or supplemented from time to time, the "Purchase Agreement"), pursuant to which, among other things, Assignors have agreed to contribute, assign, transfer, convey and deliver the Assigned Contracts (as defined below) to Assignee, and Assignee has agreed to acquire and assume the same from Assignors. The execution and delivery of this Assumption Agreement is a condition to the closing of the transactions contemplated by the Purchase Agreement.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.        Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

2.        Effective as of the Closing, subject to the terms and conditions of the Purchase Agreement, each Assignor hereby gives, grants, bargains, sells, transfers, sets over, assigns, conveys, releases, confirms and delivers to Assignee all of such Assignor's right, title and interest, both legal and equitable, in, to and under, and all of such Assignor's burdens, obligations and liabilities in connection with, the Contracts set forth on Schedule 1 hereto (the "Assigned Contracts") and the Assumed Obligations; *provided*, *however*, that to the extent that such Assignor's rights under any Assigned Contract constituting a Purchased Asset may not be assigned to or assumed by Assignee without the consent of another Person which has not been obtained, this Assumption Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful.

3.        Assignee hereby acquires and accepts the assignment of the Assigned Contracts and assumes and agrees to observe and perform all liabilities, obligations, burdens, duties, terms, provisions and covenants arising thereunder, in the manner and to the extent set forth in the Purchase Agreement.

4.        Notwithstanding anything herein to the contrary, Assignee does not, and will not by assumption of the Assigned Contracts, assume any of the Retained Obligations, and the Parties agree that all such Retained Obligations will remain the sole responsibility of such Assignor, as set forth in the Purchase Agreement.

5.        Each of the Parties covenants and agrees, at its own expense, to promptly execute and deliver, at the request of the other Party or Parties, such further instruments of transfer and assignment

19093263

and to take such other action as such other Party or Parties may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Assumption Agreement.

6.      Notwithstanding any other provision of this Assumption Agreement to the contrary, nothing contained in this Assumption Agreement shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including the warranties, covenants, agreements, conditions, representations or, in general, any of the rights and remedies, or any of the obligations of any Assignor or Assignee set forth in the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.  This Assumption Agreement is intended only to effect the transfer of certain property to be transferred pursuant to the Purchase Agreement and shall be governed entirely in accordance with the terms and conditions of the Purchase Agreement.

7.      This Assumption Agreement shall be governed by and construed in accordance with the internal laws of the State of Colorado without giving effect to any choice or conflict of law provision or rule (whether of the State of Colorado or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Colorado.

8.      This Assumption Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. This Assumption Agreement will become effective when duly executed and delivered by each Party. Counterparty signature pages to this Assumption Agreement may be delivered by facsimile or electronic delivery (e.g., by email of a PDF signature page) and each such counterpart signature page will constitute an original for all purposes.

* * * * *

19093263

39

IN WITNESS WHEREOF, the Parties have caused this Assumption Agreement to be executed and delivered on the Effective Date.

**ASSIGNORS:**

WILLOWOOD USA, LLC

By: _____
Name:     Jason Urband
Title:     Chief Executive Officer

WILLOWOOD, LLC

By: _____
Name:     Jason Urband
Title:     Chief Executive Officer

RIGHTLINE LLC

By: _____
Name:     Jason Urband
Title:     Chief Executive Officer

GREENFIELDS MARKETING LTD.

By: _____
Name:     Jason Urband
Title:     Chief Executive Officer

**ASSIGNEE:**

GENERIC CROP SCIENCE LLC,
a Delaware limited liability company

By: _____
Name:     Robert C. Roth, Jr.
Title:     Authorized Representative

**[Signature Page to General Assignment And Assumption Agreement]**

19093263

## SCHEDULE 1

## ASSIGNED CONTRACTS[1]

---

[1] **Note to Draft:** To be completed based on Schedule 1(b)(i) to the Purchase Agreement.

19093263

## SCHEDULE 1(b)(i)

## ASSIGNED CONTRACTS

Data Compensation Agreements

1. Abamectin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Abamectin, LLC*

2. Bifenazate Settlement Agreement between Arysta Lifescience Inc. and Greenfields Marketing, Inc.

3. Clethodim Settlement Agreement between Valent U.S.A. Corporation and Willowood, LLC and Willowood Clethodim, LLC

4. Ethofumesate Data Compensation Agreement between Bayer Cropscience LP and Willowood USA, LLC and Willowood Ethofumesate, LLC

5. Fomasafen Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Fomesafen, LLC*

6. Glufosinate Data Compensation Settlement Agreement between Bayer Cropscience LP and Willowood USA, LLC and Willowood, LLC and Willowood Glufosinate Ammonium, LLC

7. Imidacloprid Data Compensation Agreement between Bayer Cropsience LP and Willowood USA, LLC and Willowood Imidacloprid, LLC

8. Lambda-Cyhalothrin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Lambda Cyhalothrin, LLC*

9. Oxyfluorfen Data Compensation Agreement between Dow AgroSciences LLC and Willowood Oxyfluorfen LLC, as assigned by Dow AgroSciences LLC to Nutrichem Co., Ltd.*

10. Paraquat Data Compensation Agreement between Syngenta Crop Protection LLC and Willowood Paraquat, LLC*

11. Propicononazole Data Compensation Agreement between Syngenta Crop Protection, LLC and Willowood Propiconazole, LLC*

12. Propyzamide Data Compensation Agreement between Willowood Pronamide, LLC and Dow AgroSciences LLC*

13. Sulfentrazone Data Compensation Settlement Agreement between FMC Corporation and Willowood Sulfentrazone LLC and Willowood LLC

14. Tebuconazole Data Compensation Settlement Agreement between Bayer Cropscience LP and Willowood Tebuconazole, LLC*

19093263

15. Generic Tebuconazole DCI Task Force Agreement between Willowood USA, LLC and Members

16. The Propanil Task Force and the Propanil Task Force II and Willowood Propanil, LLC, FIFRA Case No. 16171 Y 00587 11/16 20 110 0587 (American Arbitration Association)*

17. Endangered Species Task Force data compensation agreement

18. Spray Drift Task Force Unlimited Use Data Agreement

19. Data Compensation Settlement and Participating Company Agreement between Agricultural Handler Exposure Task Force, LLC and Willowood USA, LLC

20. Pyrethroid Working Group data compensation agreement

21. Joint Glyphosate Task Force, LLC Joint Data Development and Limited Liability Company Agreement

22. Supply and Data Purchase Agreement, dated as of March 3, 2011, by and between FMC Corporation and Willowood Clomazone, LLC*

Purchase Orders and Supply Agreements

23. Purchase Order for Clomazone 3ME with Sulphur Mills

24. Purchase Order for Thiobencard Tech with India Pesticides, Ltd.

25. Supply Agreement for Propanil 80 DF with Source Dynamics LLC

26. Purchase Order for Propanil 4SC production with MicroChem Corp.

27. Crop Data Management Systems, Inc. enterprise database agreement

28. CHEMTREC Agreement – Worldwide Authorization

29. Trademark License and Supply Agreement between AMVAC Chemical Corporation and Willowood USA for Lock'N Load System

30. GS1 US, inc. UPC Barcodes Renewal

31. Master Processor Agreement and Exhibits between Willowood USA, LLC and Helena Industries, Inc.

32. Bulk Repackaging Agreement with Pinnacle Agriculture Distribution

Warehousing Agreements

33. American Warehouse

19093263

34. Helena Great Falls, MT Warehousing Agreement

35. Helena North Valley, Nelson, CA Warehousing Agreement

36. Helena Pasco, WA Warehousing Agreement

37. Inland Empire Distribution Systems, Inc. Warehousing Agreement

38. Inland Star Distribution Centers, Inc. Warehouse Agreement

39. Pinnacle Agriculture Distribution dba Intrepid Agriculture Warehousing Agreement

40. Lile International Co. Master Warehouse Agreement

41. Nickey Warehouses, Inc Warehousing Agreement

42. Outsource Logistics Warehousing Agreement

43. Pony Express Warehousing Agreement

44. Schirm Warehousing Agreement

45. Tri-Rinse Inc. Warehousing Agreement

Memberships and Subscriptions

46. Generic Residential Exposure Task Force Membership

47. Agricultural Reentry Task Force Membership


\* Contracts denoted with an "\*" indicate Contracts that are held by a Transferred Subsidiary and, accordingly, are not Assigned Contracts pursuant to Section 2(a)(vi).

19093263

## SCHEDULE 1(b)(ii)

## TRANSFERRED PRODUCTS

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Abamectin Technical* | Willowood Abamectin, LLC | 89349-1 |
| Willowood Abamectin 0.15EC | Willowood, LLC | 87290-58 |
| Willowood Abamectin 0.7SC | Willowood, LLC | 87290-36 |
| Willowood Abamectin EC | Willowood, LLC | 87290-57 |
| Willowood Abamectin 0.15LV | Willowood, LLC | 87290-68 |
| Willowood Nemamectin 0.7SC | Willowood, LLC | 87290-84 |
| RightLine Nemamectin 0.7 SC | RightLine LLC | 87290-84-93051 |
| Bifenazate Tehnical | Greenfields Marketing Ltd. | 89966-5 |
| Willowood Bifenazate 50WDG | Willowood, LLC | 87290-66 |
| Willowood Bifenazate 4SC | Willowood, LLC | 87290-71 |
| Chlorimuron Ethyl Technical | Greenfields Marketing Ltd. | 89966-11 |
| Willowood Chlorim 25WDG | Willowood, LLC | 87290-86 |
| Clethodim Technical* | Willowood Clethodim, LLC | 89966-12 |
| Willowood Clethodim 2EC | Willowood, LLC | 87290-11 |
| Willowood Clethodim 37% MUP* | Willowood Clethodim, LLC | 87812-1 |
| Willowood Clethodim 70% MUP* | Willowood Clethodim, LLC | 87812-2 |
| Clomazone Technical | Greenfields Marketing Ltd. | 89966-1 |
| Willowood Clomazone 3ME | Willowood, LLC | 87290-55 |
| Willowood Clornazone 5MEG | Willowood, LLC | 87290-46 |
| Willowood Clomazone ME | Willowood, LLC | 87290-47 |

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Cloransulam-methyl Technical | Greenfields Marketing Ltd. | 89966-9 |
| Willowood Cloransulam 84% | Willowood, LLC | 87290-87 |
| Ethofumesate Technical* | Willowood Ethofumesate, LLC | 87289-1 |
| Willowood Ethofumesate 4SC | Willowood, LLC | 87290-1 |
| Willowood Ethofumesate Turf | Willowood, LLC | 87290-2 |
| Rightline Etho 4SC | RightLine LLC | 87290-2-93051 |
| Fomesafen Technical* | Willowood Fomesafen, LLC | 88024-1 |
| Willowood Fomesafen 2 SL | Willowood, LLC | 87290-16 |
| Willowood Fomesafen 1.88 EC | Willowood, LLC | 87290-20 |
| Glufosinate-Ammonium Technical* | Willowood Glufosinate Ammonium, LLC | 89707-1 |
| Willowood Glufosinate 280SL | Willowood, LLC | 87290-41 |
| Glyphosate Technical* | Willowood Glyphosate, LLC | 92474-1 |
| Willowood Glyphosate 62% MUP* | Willowood Glyphosate, LLC | 92474-2 |
| Willowood Glyphosate 4 | Willowood, LLC | 87290-53 |
| Willowood Glyphosate 20% + Metolachlor 20% + Mesotrione 2% EC | Willowood, LLC | 87290-85 |
| Willowood Glypho 41% | Willowood, LLC | 87290-88 |
| Imidacloprid Technical* | Willowood Imidacloprid, LLC | 88544-2 |
| Willowood Imidacloprid 2SC | Willowood, LLC | 87290-33 |
| Willowood Imidacloprid 4SC | Willowood, LLC | 87290-26 |

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Imidacloprid PCO | Willowood, LLC | 87290-39 |
| Imazethapyr Technical | Greenfields Marketing Ltd. | 89966-7 |
| Willowood Imazethapyr 2SL | Willowood, LLC | 87290-69 |
| Lactofen Technical | Greenfields Marketing Ltd. | 89966-8 |
| Lactofen 60% MUP | Greenfields Marketing Ltd. | 89966-13 |
| Willowood Lactofen 2EC | Willowood, LLC | 87290-72 |
| Lambda Cyhalothrin Technical* | Willowood Lambda Cyhalothrin, LLC | 88541-1 |
| Willowood Cambda-Cy 1EC | Willowood, LLC | 87290-24 |
| Rightline Lambda 1EC | RightLine LLC | 87290-24-93051 |
| Mepiquat Chloride Technical* | Willowood Mepiquat Chloride, LLC | 88781-1 |
| Willowood Mepi Chlor 4.2% | Willowood, LLC | 87290-30 |
| Mesotrione Technical | Greenfields Marketing Ltd. | 89966-3 |
| Willowood Mesotrione 4SC | Willowood, LLC | 87290-61 |
| Willowood Mesotrione 480SC | Willowood, LLC | 87290-62 |
| RightLine Mesotrione 4SC | RightLine LLC | 87290-62-93051 |
| Metolachlor Technical | Greenfields Marketing Ltd. | 89966-10 |
| Willowood Metolachlor 86.4EC | Willowood, LLC | 87290-81 |
| Metribuzin Technical | Greenfields Marketing Ltd. | 89966-6 |
| Willowood Metribuzin 4SC | Willowood, LLC | 87290-80 |
| Willowood Metribuzin 75DF | Willowood, LLC | 87290-79 |
| Oxyfluorfen Technical* | Willowood Oxyfluorfen, | 87283-1 |

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
|  | LLC |  |
| Willowood Oxyflo 2 EC | Willowood, LLC | 87290-8 |
| Willowood Oxyflo 4 SC | Willowood, LLC | 87290-10 |
| Paraquat Technical* | Willowood Paraquat, LLC | 89275-1 |
| Willowood Paraquat Concentrate | Willowood, LLC | 87290-35 |
| Pronamide Technical* | Willowood Pronamide, LLC | 87285-1 |
| Willowood Pronamide 3.3SC | Willowood, LLC | 87290-22 |
| Willowood Pronamide 50WSP | Willowood, LLC | 87290-3 |
| RightLine Pronamide 3.3 SC | RightLine LLC | 87290-22-93051 |
| Propanil Technical* | Willowood Propanil, LLC | 87829-1 |
| Willowood Propanil 4EC | Willowood, LLC | 87290-32 |
| Willowood Propanil 4SC | Willowood, LLC | 87290-18 |
| Willowood Propanil 80DF | Willowood, LLC | 87290-17 |
| Willowood Thionil EC | Willowood, LLC | 87290-74 |
| Propiconazole Technical I* | Willowood Propiconazole, LLC | 87284-1 |
| Propiconazole Technical II* | Willowood Propiconazole, LLC | 87284-3 |
| Willowood Propicon 3.6 EC | Willowood, LLC | 87290-7 |
| Willowood Propicon Turf | Willowood, LLC | 87290-40 |
| RightLine Propi 1.3MEC | RightLine LLC | 87290-40-93051 |
| Sulfentrazone Technical Herbicide* | Willowood Sulfentrazone, LLC | 91459-1 |
| Willowood Sulfen MTZ DF | Willowood, LLC | 87290-70 |

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Sulfentrazone 62.1% + Cloransulam 7.9% DF | Willowood, LLC | 87290-82 |
| Willowood Sulfentrazone 4SC | Willowood, LLC | 87290-59 |
| Willowood Sulfentrazone 62.22%+Chlorimuron 7.78% WG | Willowood, LLC | 87290-83 |
| Willowood Sulfentrazone 33.3% + Imazethapyr 6.67% SC | Willowood, LLC | 87290-67 |
| RightLine Sulfen 4SC | RightLine LLC | 87290-59-93051 |
| Tebuconazole Technical* | Willowood Tebuconazole, LLC | 87811-1 |
| Willowood Tebucon 3.6SC | Willowood, LLC | 87290-13 |
| Willowood Tebucon 45 DF | Willowood, LLC | 87290-12 |
| Thiobencarb Technical | Greenfields Marketing Ltd. | 89966-14 |
| Willowood Thioben 8EC | Willowood, LLC | 87290-75 |
| Willowood Thionil EC | Willowood, LLC | 87290-74 |
| Willowood Thio UltraMax | Willowood, LLC | 87290-73 |
| End-use Registrations without associated technical registration | | |
| Willowood 2,4-D Amine | Willowood, LLC | 87290-45 |
| Willowood 2,4-D Ester 4 | Willowood, LLC | 87290-49 |
| Willowood 2,4-D Ester 6 | Willowood, LLC | 87290-50 |
| Willowood Bifenthrin 2EC | Willowood, LLC | 84290-54 |
| Willowood Bentazon 4 | Willowood, LLC | 87290-52 |
| Willowood Dicamba 4 | Willowood, LLC | 87290-51 |

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Mancozeb 75WDG | Willowood, LLC | 87290-48 |
| Willowood Oxamyl C-LV | Willowood, LLC | 87290-76 |
| Willowood Oxamyl L | Willowood, LLC | 87290-77 |
| Willowood Oxytet 17WP | Willowood, LLC | 87290-25 |

* Registrations denoted with an "*" indicate Registrations that are held by a Transferred Subsidiary and, accordingly, are not Transferred Registrations pursuant to Section 2(a)(i).

19093263

## SCHEDULE 1(b)(iv)

### EXCLUDED REGISTRATIONS

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Azoxystrobin Technical | Greenfields Marketing Ltd. | 89966-2 |
| RightLine Azoxy 2SC | RightLine LLC | 87290-44-93051 |
| Willowood Azoxyprop Xtra | Willowood, LLC | 87290-56 |
| Willowood Azoxystrobin 2.08SC | Willowood, LLC | 87290-44 |
| Willowood Tebustrobin SC | Willowood, LLC | 87290-60 |
| Pyraclostrobin Technical | Willowood USA, LLC | 93088-1 |
| Willowood Pyrac 2EC | Willowood, LLC | 87290-64 |
| Willowood Pyrac 2SC | Willowood, LLC | 87290-63 |
| RightLine CHILL Fungicide | RightLine LLC | 93051-1 |
| RightLine CHILLOUT fungicide | RightLine LLC | 93051-2 |
| RightLine CHILL LC | RightLine LLC | 93051-3 |

19093263

## SCHEDULE 2(a)(i)

## TRANSFERRED REGISTRATIONS

Technical and Related End-use registrations

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Abamectin Technical* | Willowood Abamectin, LLC | 89349-1 |
| Willowood Abamectin 0.15EC | Willowood, LLC | 87290-58 |
| Willowood Abamectin 0.7SC | Willowood, LLC | 87290-36 |
| Willowood Abamectin EC | Willowood, LLC | 87290-57 |
| Willowood Abamectin 0.15LV | Willowood, LLC | 87290-68 |
| Willowood Nemamectin 0.7SC | Willowood, LLC | 87290-84 |
| RightLine Nemamectin 0.7 SC | RightLine LLC | 87290-84-93051 |
| Bifenazate Tehnical | Greenfields Marketing Ltd. | 89966-5 |
| Willowood Bifenazate 50WDG | Willowood, LLC | 87290-66 |
| Willowood Bifenazate 4SC | Willowood, LLC | 87290-71 |
| Chlorimuron Ethyl Technical | Greenfields Marketing Ltd. | 89966-11 |
| Willowood Chlorim 25WDG | Willowood, LLC | 87290-86 |
| Clethodim Technical* | Willowood Clethodim, LLC | 89966-12 |
| Willowood Clethodim 2EC | Willowood, LLC | 87290-11 |
| Willowood Clethodim 37% MUP* | Willowood Clethodim, LLC | 87812-1 |
| Willowood Clethodim 70% MUP* | Willowood Clethodim, LLC | 87812-2 |
| Clomazone Technical | Greenfields Marketing Ltd. | 89966-1 |
| Willowood Clomazone 3ME | Willowood, LLC | 87290-55 |
| Willowood Clornazone 5MEG | Willowood, LLC | 87290-46 |

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Clomazone ME | Willowood, LLC | 87290-47 |
| Cloransulam-methyl Technical | Greenfields Marketing Ltd. | 89966-9 |
| Willowood Cloransulam 84% | Willowood, LLC | 87290-87 |
| Ethofumesate Technical* | Willowood Ethofumesate, LLC | 87289-1 |
| Willowood Ethofumesate 4SC | Willowood, LLC | 87290-1 |
| Willowood Ethofumesate Turf | Willowood, LLC | 87290-2 |
| Rightline Etho 4SC | RightLine LLC | 87290-2-93051 |
| Fomesafen Technical* | Willowood Fomesafen, LLC | 88024-1 |
| Willowood Fomesafen 2 SL | Willowood, LLC | 87290-16 |
| Willowood Fomesafen 1.88 EC | Willowood, LLC | 87290-20 |
| Glufosinate-Ammonium Technical* | Willowood Glufosinate Ammonium, LLC | 89707-1 |
| Willowood Glufosinate 280SL | Willowood, LLC | 87290-41 |
| Glyphosate Technical* | Willowood Glyphosate, LLC | 92474-1 |
| Willowood Glyphosate 62% MUP* | Willowood Glyphosate, LLC | 92474-2 |
| Willowood Glyphosate 4 | Willowood, LLC | 87290-53 |
| Willowood Glyphosate 20% + Metolachlor 20% + Mesotrione 2% EC | Willowood, LLC | 87290-85 |
| Willowood Glypho 41% | Willowood, LLC | 87290-88 |
| Imidacloprid Technical* | Willowood Imidacloprid, LLC | 88544-2 |
| Willowood Imidacloprid 2SC | Willowood, LLC | 87290-33 |

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Imidacloprid 4SC | Willowood, LLC | 87290-26 |
| Willowood Imidacloprid PCO | Willowood, LLC | 87290-39 |
| Imazethapyr Technical | Greenfields Marketing Ltd. | 89966-7 |
| Willowood Imazethapyr 2SL | Willowood, LLC | 87290-69 |
| Lactofen Technical | Greenfields Marketing Ltd. | 89966-8 |
| Lactofen 60% MUP | Greenfields Marketing Ltd. | 89966-13 |
| Willowood Lactofen 2EC | Willowood, LLC | 87290-72 |
| Lambda Cyhalothrin Technical* | Willowood Lambda Cyhalothrin, LLC | 88541-1 |
| Willowood Cambda-Cy 1EC | Willowood, LLC | 87290-24 |
| Rightline Lambda 1EC | RightLine LLC | 87290-24-93051 |
| Mepiquat Chloride Technical* | Willowood Mepiquat Chloride, LLC | 88781-1 |
| Willowood Mepi Chlor 4.2% | Willowood, LLC | 87290-30 |
| Mesotrione Technical | Greenfields Marketing Ltd. | 89966-3 |
| Willowood Mesotrione 4SC | Willowood, LLC | 87290-61 |
| Willowood Mesotrione 480SC | Willowood, LLC | 87290-62 |
| RightLine Mesotrione 4SC | RightLine LLC | 87290-62-93051 |
| Metolachlor Technical | Greenfields Marketing Ltd. | 89966-10 |
| Willowood Metolachlor 86.4EC | Willowood, LLC | 87290-81 |
| Metribuzin Technical | Greenfields Marketing Ltd. | 89966-6 |
| Willowood Metribuzin 4SC | Willowood, LLC | 87290-80 |
| Willowood Metribuzin 75DF | Willowood, LLC | 87290-79 |

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Oxyfluorfen Technical* | Willowood Oxyfluorfen, LLC | 87283-1 |
| Willowood Oxyflo 2 EC | Willowood, LLC | 87290-8 |
| Willowood Oxyflo 4 SC | Willowood, LLC | 87290-10 |
| Paraquat Technical* | Willowood Paraquat, LLC | 89275-1 |
| Willowood Paraquat Concentrate | Willowood, LLC | 87290-35 |
| Pronamide Technical* | Willowood Pronamide, LLC | 87285-1 |
| Willowood Pronamide 3.3SC | Willowood, LLC | 87290-22 |
| Willowood Pronamide 50WSP | Willowood, LLC | 87290-3 |
| RightLine Pronamide 3.3 SC | RightLine LLC | 87290-22-93051 |
| Propanil Technical* | Willowood Propanil, LLC | 87829-1 |
| Willowood Propanil 4EC | Willowood, LLC | 87290-32 |
| Willowood Propanil 4SC | Willowood, LLC | 87290-18 |
| Willowood Propanil 80DF | Willowood, LLC | 87290-17 |
| Willowood Thionil EC | Willowood, LLC | 87290-74 |
| Propiconazole Technical I* | Willowood Propiconazole, LLC | 87284-1 |
| Propiconazole Technical II* | Willowood Propiconazole, LLC | 87284-3 |
| Willowood Propicon 3.6 EC | Willowood, LLC | 87290-7 |
| Willowood Propicon Turf | Willowood, LLC | 87290-40 |
| RightLine Propi 1.3MEC | RightLine LLC | 87290-40-93051 |
| Sulfentrazone Technical Herbicide* | Willowood Sulfentrazone, LLC | 91459-1 |

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Sulfen MTZ DF | Willowood, LLC | 87290-70 |
| Willowood Sulfentrazone 62.1% + Cloransulam 7.9% DF | Willowood, LLC | 87290-82 |
| Willowood Sulfentrazone 4SC | Willowood, LLC | 87290-59 |
| Willowood Sulfentrazone 62.22%+Chlorimuron 7.78% WG | Willowood, LLC | 87290-83 |
| Willowood Sulfentrazone 33.3% + Imazethapyr 6.67% SC | Willowood, LLC | 87290-67 |
| RightLine Sulfen 4SC | RightLine LLC | 87290-59-93051 |
| Tebuconazole Technical* | Willowood Tebuconazole, LLC | 87811-1 |
| Willowood Tebucon 3.6SC | Willowood, LLC | 87290-13 |
| Willowood Tebucon 45 DF | Willowood, LLC | 87290-12 |
| Thiobencarb Technical | Greenfields Marketing Ltd. | 89966-14 |
| Willowood Thioben 8EC | Willowood, LLC | 87290-75 |
| Willowood Thionil EC | Willowood, LLC | 87290-74 |
| Willowood Thio UltraMax | Willowood, LLC | 87290-73 |

End-Use Registrations Without an Associated Technical Registration

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood 2,4-D Amine | Willowood, LLC | 87290-45 |
| Willowood 2,4-D Ester 4 | Willowood, LLC | 87290-49 |

19093263

| | | |
|---|---|---|
| Willowood 2,4-D Ester 6 | Willowood, LLC | 87290-50 |
| Willowood Bifenthrin 2EC | Willowood, LLC | 84290-54 |
| Willowood Bentazon 4 | Willowood, LLC | 87290-52 |
| Willowood Dicamba 4 | Willowood, LLC | 87290-51 |
| Willowood Mancozeb 75WDG | Willowood, LLC | 87290-48 |
| Willowood Oxamyl C-LV | Willowood, LLC | 87290-76 |
| Willowood Oxamyl L | Willowood, LLC | 87290-77 |
| Willowood Oxytet 17WP | Willowood, LLC | 87290-25 |

\* Registrations denoted with an "\*" indicate Registrations that are held by a Transferred Subsidiary and, accordingly, are not Transferred Registrations pursuant to Section 2(a)(i).

19093263

## SCHEDULE 2(a)(ii)

### TRANSFERRED DATA

Transferred Data is available in the data room maintained by Piper Jaffray & Co.

## SCHEDULE 2(a)(iii)

## TRANSFERRED TRADEMARKS

| Trademark | Serial No. / Registration No. | Filing Date / Registration Date | Jurisdiction of Registration or Application | Owner | Status |
|---|---|---|---|---|---|
| "Chill" | Serial No.: 87777026 | Filing Date: 01/30/2018 | USA | Willowood USA, LLC | Submitted |
| "Chill Out" | Serial No.: 87776817 | Filing Date: 01/30/2018 | USA | Willowood USA, LLC | Submitted |
| "Rightline" | Serial No.: 87451600 | Willowood USA, LLC | USA | Willowood USA, LLC | Submitted |
| "RightLine Plant Derived Nutrients" | Serial No.: 88057548 | Filing Date: 7/30/2018 | USA | Willowood USA, LLC | Submitted |
| "RightLine PD" | Serial No.: 87778071 | Filing Date: 7/30/2018 | USA | Willowood USA, LLC | Submitted |
| "Willowood Sulfentrazone MTZ" | Serial No.: 87457149 **Reg. No.:** 5,596,655 | Registration Date: 10/30/2018 | USA | Willowood USA, LLC | Registered |
| "Willowood USA" | Serial No.: 85-823,987 **Reg. No.: 4,438,935** | Filing Date: 01/15/2013 **Registration Date: 11/26/2013** | USA | Willowood USA, LLC | Registered |

19093263

## SCHEDULE 2(a)(viii)

### TRANSFERRED SUBSIDIARIES

1. Willowood Abamectin, LLC
2. Willowood Clethodim, LLC
3. Willowoos Clomazone, LLC
4. Willowood Ethofumesate, LLC
5. Willowood Fomesafen, LLC
6. Willowood Glufosinate Ammonium, LLC
7. Willowood Glyphosate, LLC
8. Willowood Imidacloprid, LLC
9. Willowood Lambda-Cyhalothrin, LLC
10. Willowood Mepiquat Chloride, LLC
11. Willowood Oxyfluorfen, LLC
12. Willowood Paraquat, LLC
13. Willowood Pronamide, LLC
14. Willowood Propanil, LLC
15. Willowood Propiconazole, LLC
16. Willowood Sulfentrazone, LLC
17. Willowood Tebuconazole, LLC

19093263

## SCHEDULE 2(c)

## CURE AMOUNTS

| | Party | Assigned Contract | Cure Amounts |
|---|---|---|---|
| 1. | Sulphur Mills | Purchase Order for Clomazone 3ME with Sulphur Mills | $871,291.00 |
| 2. | India Pesticides, Ltd. | Purchase Order for Thiobencard Tech with India Pesticides, Ltd. | $201,600.00 |
| 3. | Source Dynamics LLC | Supply Agreement for Propanil 80 DF with Source Dynamics LLC | $0.00 |
| 4. | MicroChem Corp. | Purchase Order for Propanil 4SC production with MicroChem Corp. | $0.00 |
| 5. | Crop Data Management Systems, Inc. | Crop Data Management Systems, Inc. enterprise database agreement | $0.00 |
| 6. | CHEMTREC | CHEMTREC Agreement – Worldwide Authorization | $0.00 |
| 7. | AMVAC Chemical Corporation | Trademark License and Supply Agreement between AMVAC Chemical Corporation and Willowood USA for Lock'N Load System | $0.00 |
| 8. | GS1 US, inc. | GS1 US, inc. UPC Barcodes Renewal | $0.00 |
| 9. | Helena Industries, Inc. | Master Processor Agreement and Exhibits between Willowood USA, LLC and Helena Industries, Inc. | $0.00 |
| 10. | American Warehouse | American Warehouse | $0.00 |
| 11. | Helena Industries, Inc. | Helena Great Falls, MT Warehousing Agreement | $0.00 |
| 12. | Helena Industries, Inc. | Helena North Valley, Nelson, CA Warehousing Agreement | $0.00 |
| 13. | Helena Industries, Inc. | Helena Pasco, WA Warehousing Agreement | $0.00 |
| 14. | Inland Empire Distribution Systems, Inc. | Inland Empire Distribution Systems, Inc. Warehousing Agreement | $0.00 |
| 15. | Inland Star Distribution Centers, Inc. | Inland Star Distribution Centers, Inc. Warehouse Agreement | $0.00 |
| 16. | Pinnacle Agriculture Distribution dba Intrepid Agriculture | Pinnacle Agriculture Distribution dba Intrepid Agriculture Warehousing Agreement | $0.00 |
| 17. | Lile International | Lile International Co. Master Warehouse Agreement | $0.00 |

19093263

| | | | |
|---|---|---|---|
| | Co. | | |
| 18. | Nickey Warehouses, Inc | Nickey Warehouses, Inc Warehousing Agreement | $0.00 |
| 19. | Outsource Logistics | Outsource Logistics Warehousing Agreement | $0.00 |
| 20. | Pony Express | Pony Express Warehousing Agreement | $0.00 |
| 21. | Schirm | Schirm Warehousing Agreement | $0.00 |
| 22. | Tri-Rinse Inc. | Tri-Rinse Inc. Warehousing Agreement | $0.00 |
| 23. | Generic Residential Exposure Task Force | Generic Residential Exposure Task Force Membership | $0.00 |
| 24. | Agricultural Reentry Task Force | Agricultural Reentry Task Force Membership | $0.00 |
| 25. | Pinnacle Agriculture Distribution | Bulk Repackaging Agreement with Pinnacle Agriculture Distribution | $0.00 |
| | | **TOTAL** | $1,072,891.00 |

19093263

# SCHEDULE 3(c)

## SCHEDULE OF ALLOCATION OF PURCHASE PRICE[1]

---

[1] **Note to Draft:** To be completed post-signing pursuant to Section 3(c).

19093263

## SCHEDULE 4(b)(iv)

### ASSUMED DATA COMPENSATION LIABILITY

The Seller Parties' or their respective Subsidiaries' known and unknown liabilities arising pursuant to FIFRA (or any similar state or local laws regulating pesticides) ("Data Compensation Lability") with respect to the Transferred Registrations issued to or applied for by the Seller Parties.  For the following Transferred Registrations, settled Data Compensation Liabilities as well as unknown Data Compensation Liabilities are governed by the agreements or arbitration award identified below:

1. Abamectin – Abamectin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Abamectin, LLC*

2. Bifenazate – Bifenazate Settlement Agreement between Arysta Lifescience Inc. and Greenfields Marketing, Inc.

3. Clethodim – Clethodim Settlement Agreement between Valent U.S.A. Corporation and Willowood, LLC and Willowood Clethodim, LLC

4. Ethofumesate – Ethofumesate Data Compensation Agreement between Bayer Cropscience LP and Willowood USA, LLC and Willowood Ethofumesate, LLC

5. Fomasafen – Fomasafen Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Fomesafen, LLC*

6. Glufosinate – Glufosinate Data Compensation Settlement Agreement between Bayer Cropscience LP and Willowood USA, LLC and Willowood, LLC and Willowood Glufosinate Ammonium, LLC

7. Imidacloprid – Imidacloprid Data Compensation Agreement between Bayer Cropsience LP and Willowood USA, LLC and Willowood Imidacloprid, LLC

8. Lambda Cyhalothrin – Lambda-Cyhalothrin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Lambda Cyhalothrin, LLC*

9. Oxyfluorfen – Oxyfluorfen Data Compensation Agreement between Dow AgroSciences LLC and Willowood Oxyfluorfen LLC (Dow AgroSciences assigned this agreement to Nutrichem Co., Ltd.)*

10. Paraquat – Paraquat Data Compensation Agreement between Syngenta Crop Protection LLC and Willowood Paraquat, LLC*

11. Propiconazole – Propiconazole Data Compensation Agreement between Syngenta Crop Protection, LLC and Willowood Propiconazole, LLC*

12. Propyzamide – Propyzamide Data Compensation Agreement between Willowood Pronamide, LLC and Dow AgroSciences LLC*

19093263

13. Sulfentrazone – Sulfentrazone Data Compensation Settlement Agreement between FMC Corporation and Willowood Sulfentrazone LLC and Willowood LLC

14. Tebuconazole – Tebuconazole Data Compensaton Settlement Agreement between Bayer Cropscience LP and Willowood Tebuconazole, LLC*

15. Tebuconazole – Generic Tebuconazole DCI Task Force Agreement between Willowood USA, LLC and Members

16. Propanil – The Propanil Task Force and the Propanil Task Force II and Willowood Propanil, LLC, FIFRA Case No. 16171 Y 00587 11/16 20 110 0587 (American Arbitration Association)*

17. Endangered Species Task Force data compensation agreement

18. Spray Drift Task Force Unlimited Use Data Agreement

19. Data Compensation Settlement and Participating Company Agreement between Agricultural Handler Exposure Task Force, LLC and Willowood USA, LLC

20. Joint Glyphosate Task Force, LLC Joint Data Development and Limited Liability Company Agreement

21. Clomazone – Supply and Data Purchase Agreement, dated as of March 3, 2011, by and between FMC Corporation and Willowood Clomazone, LLC*

22. Propyzamide Cost Share Agreement between Willowood Pronamide, LLC and Dow Agrosciences LLC*

Estimated Data Compensation Liability due for settled data compensation agreements:

| Product | Data Owner | Payment Obligations | Estimated Interest/Penalties At Closing | Estimated Total Data Compensation Liability Due |
|---|---|---|---|---|
| Bifenazate | Arysta Lifescience Inc. | $900,000.00 | $24,836.30 | $924,836.30 |
| Ethofumesate | Bayer Cropscience LP | $530,000.00 | $9,656.16 | $539,656.16 |
| Imidacloprid | Bayer Cropscience LP | $883,333.30 | $16,094.61 | $899,427.94 |
| Clomazone | FMC Corporation | Confidential | Confidential | Confidential |
| Propyzamide | Dow Agroscience LLC | $13,534.00 | $980.00 | $14,514.00 |

19093263

For the following Transferred Registrations, Data Compensation Liabilities are unsettled:

1.  Data Compensation Liability owed to the Pyrthroid Working Group for Lambda-Cyhalothrin

For the following Transferred Registrations, Data Compensation Liabilities are unsettled and not governed by any agreement:

1. Chlorimuron Ethyl
2. Cloransulam
3. Glyphosate
4. Imazethapyr
5. Lactofen
6. Mepiquat Chloride
7. Mesotrione
8. Metolachlor
9. Metribuzin
10. Thiobencarb

* Registrations denoted with an "*" indicate Registrations that are held by a Transferred Subsidiary and, accordingly, are not Transferred Registrations pursuant to Section 2(a)(i).

19093263

**DISCLOSURE SCHEDULE**

**to the**

**ASSET PURCHASE AGREEMENT**

**by and among**

**GENERIC CROP SCIENCE LLC**

**WILLOWOOD USA, LLC,**

**WILLOWOOD, LLC,**

**RIGHTLINE LLC**

**and**

**GREENFIELDS MARKETING LTD.**

**Dated April \_\_\_, 2019**


Each section of this disclosure schedule (the "Disclosure Schedule") qualifies the correspondingly numbered representation and warranty or covenant and any other representation or warranty of that certain Asset Purchase Agreement (the "Agreement"), dated as of April \_\_\_, 2019, by and among (**i**) Willowood USA, LLC, an Oregon limited liability company ("Willowood USA"), (**ii**) Willowood, LLC, an Oregon limited liability company ("Willowood"), (**iii**) RightLine LLC, an Oregon limited liability company ("RightLine"), and (**iv**) Greenfields Marketing Ltd., a private company organized under the laws of the United Arab Emirates ("Greenfields", and collectively with Willowood USA, Willowood and RightLine, the "Seller Parties" and each a "Seller"), and (**v**) Generic Crop Science LLC, a Delaware limited liability company, if the disclosure is reasonably apparent to such other representation or warranty. This Disclosure Schedule is qualified in its entirety by reference to specific provisions of the Agreement, and is not intended to constitute, and shall not be construed as constituting, any representation or warranty or covenant of the Seller Parties, except as and to the extent expressly provided in the Agreement. Inclusion of information in this Disclosure Schedule shall not be construed as an admission that such information is material to the Seller Parties or any of their respective Subsidiaries or their respective assets, liabilities, financial condition, results, business or operations. The fact that any item of information is contained in this Disclosure Schedule shall not be construed to mean that such information is required to be disclosed by the Agreement. Such information shall not (a) be used as a basis for interpreting the term "material," "materially" or "materiality" in the Agreement or (b) constitute an admission of liability or obligation to any third party. References to any document in this Disclosure Schedule do not purport to be complete and are qualified in their entirety by the document itself.

1

19093263

2

Capitalized terms used but not defined in this Disclosure Schedule shall have the same meanings given them in the Agreement.

2

19093263

**Section 7(b)**
**No Conflicts; Consent**

1. Tebuconazole Data Compensation Agreement among Bayer CropScience LP, Willowood, LLC and Willowood Tebuconazole, LLC dated March 9, 2016

2. Sulfentrazone Data Compensation Settlement Agreement among FMC Corporation,Willowood Sulfentrazone LLC and Willowood LLC, dated December 20, 2017

3. Confidential Settlement Agreement between Arysta Lifescience Inc. and Greenfields Marketing, Inc., dated March 16, 2018 (Bifenazate)

4. Ethofumesate Data Compensation Agreement among Bayer CropScience LP, Willowood USA, LLC, and Willowood Elhofumesate. LLC, dated December 30, 2016

5. Imidacloprid Data Compensation Agreement between Bayer CropScience LP and Willowood USA, LLC and Willowood Imidacloprid, LLC dated January 16, 2017

6. Clethodim Settlement Agreement between Valent U.S.A. Corporation, Willowood, LLC, and Willowood Clethodim, LLC, dated March 5, 2013

7. Glufosinate Data Compensation Settlement Agreement between Bayer Cropscience LP and Willowood USA, LLC, Willowood, LLC and Willowood Glufosinate Ammonium, LLC, dated March 9, 2016

8. Generic Tebuconazole DCI Task Force Agreement between Bayer CropScience LP and Willowood USA, LLC

9. Trademark License and Supply Agreement, dated as of February 28, 2013, by and between AMVAC Chemical Corporation and Willowood USA, LLC

10. Joint Glyphosate Task Force, LLC Joint Data Development and Limited Liability Company Agreement

11. Chemtrec Agreement, between Willowood USA, LLC and Chemtrec

3

19093263

**Section 7(d)**
**Contracts**

| Entity Engaged in Contract | Applicable Registrations | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|---|
| Willowood USA, LLC | All Registrations | CHEMTREC | CHEMTREC Agreement—Worldwide Authorization | Import Coverage for period 12/1/18-11/30/19 | 11/30/2019 |
| WW Abamectin, LLC; Willowood, LLC | Abamectin | Syngenta Crop Protection, LLC | Abamectin Data Compensation Settlement Agreement between Syngenta Crop Protection, LLC and Willowood Abamectin, LLC | Data Compensation Agreement-Abamectin | n/a |
| WW Glufosinate, LLC; Willowood, LLC; Willowood USA, LLC | Glufosinate | Bayer | Glufosinate Data Compensation Settlement Agreement between Bayer Cropscience LP and Willowood | Data Compensation Agreement-Glufosinate | n/a |
| WW Oxyfluorfen, LLC | Oxyfluorfen | Dow AgroSciences (subsequently assigned to Nutrichem Co., Ltd.) | Oxyfluorfen Data Compensation Agreement Between Willowood Oxyfluorfen LLC and Dow Agrosciences LLC | Data Compensation Agreement-Oxyflo | n/a |
| WW Paraquat, LLC | Paraquat | Syngenta | Paraquat Data Compensation Agreement Between Syngenta Crop | Data Compensation Agreement-Paraquat | n/a |

4

19093263

| Entity Engaged in Contract | Applicable Registrations | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|---|
| | | | Protection LLC and Willowood Paraquat LLC | | |
| WW Pronamide, LLC | Pronamide | Dow | Propyzamide Data Compensation Agreement Between Willowood Pronamide, LLC and Dow AgroSciences LLC | Data Compensation Agreement-Pronamide | n/a |
| WW Sulfentrazone, LLC; Willowood, LLC | Sulfentrazone | FMC | Sulfentrazone Data Compensation Settlement Agreement between FMC Corporation and Willowood Sulfentrazone LLC and Willowood LLC | Data Compensation Agreement-Sulfentrazone | n/a |
| Willowood USA, LLC | All Registrations | GS1 US, Inc. | | UPC Barcodes Renewal 7/1/18-6/30/19-Important | 6/30/2019 |
| Willowood USA, LLC | All Registrations | Meister Media | | Use of PureIntel Services-Software Subscription, Coverage Period 9/1/18 - 8/31/19 | 8/31/2019 |
| Willowood USA, LLC | All Registrations | Crop Data Management Systems, Inc. | Enterprise database agreement | Membership paid through 4/30/19 | 4/30/2019 |
| | All Registrations | Western Plant Health Association | | Membership | |

5

19093263

| Entity Engaged in Contract | Applicable Registrations | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|---|
| Willowood USA, LLC | All Registrations | American Warehousing | Rate Quotation Contract | Warehousing contract | n/a |
| Willowood USA, LLC | All Registrations | Helena Chemical Company - Great Fall, MT | Warehouse Agreement | Warehousing contract | 12/31/2021 or 30 days' notice |
| Willowood USA, LLC | All Registrations | Helena Chemical Company - Collierville, TN | Warehouse Agreement | Warehousing contract | 30 days' notice |
| Willowood USA, LLC | All Registrations | Helena Chemical Company - Pasco, WA | Warehouse Agreement | Warehousing contract | 12/31/2021 or 30 days' notice |
| Willowood USA, LLC | All Registrations | Helena Chemical Company – Kerman, CA | Warehouse Agreement | Warehousing contract | 12/31/2012, to continue until 30 days' notice |
| Willowood USA, LLC | All Registrations | Intrepid Ag | Pinnacle and Willowood USA LLC Integrated Supply Chain Plan | Warehousing contract | 30 days' notice |
| Willowood USA, LLC | All Registrations | Lile International Companies | Master Warehouse Agreement | Warehousing contract | 30 days' notice |
| Willowood USA, LLC | All Registrations | Nickey Warehouses, Inc. | | Warehousing contract | n/a |
| Willowood USA, LLC | All Registrations | Outsource Logistics | Contract | Warehousing contract | n/a |

6

19093263

| Entity Engaged in Contract | Applicable Registrations | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|---|
| Willowood USA, LLC | All Registrations | Pony Express Warehousing LLC | Contract and Rate Quotation | Warehousing contract | 30 days' notice |
| Willowood USA, LLC | All Registrations | Schirm USA Inc. | Rate Quotation/Contract | Warehousing contract | n/a |
| Willowood USA, LLC | All Registrations | Tri Rinse | | Warehousing contract | |
| Willowood USA, LLC | All Registrations | Agricultural Handler Exposure Task Force, LLC | Data Compensation Settlement and Participating Company Agreement | Task Force Agreement | n/a |
| Willowood USA, LLC | All Registrations | Generic Residential Exposure Task Force | | Task Force Agreement | |
| Willowood USA, LLC | All Registrations | Spray Drift Task Force | Confidential Unlimited-Use Data Agreement | Task Force Agreement | n/a |
| Willowood USA, LLC | Clomazone | Sulphur Mills | Purchase Order | Purchase order for Clomazone 3ME | n/a |
| Willowood USA, LLC | Thiobencarb Tech | India Pesticides, Ltd. | Purchase Order | Purchase order for Thiobencarb Tech | n/a |
| Willowood USA, LLC | Propanil | MicroChem Corp. | Purchase Order | Propanil 4SC production | n/a |
| Willowood USA, LLC | Clomazone | Helena Chemical Company | Purchase Order | Clomazone repack | n/a |
| Willowood USA, LLC | Thionil | MicroChem Corp. | Purchase Order | Thionil production | n/a |
| Willowood USA, LLC | Propanil | Source Dynamics LLC | Supply Agreement | Supply agreement for Willowood Propanil 80 DF | August 1, 2021 |

7

19093263

| Entity Engaged in Contract | Applicable Registrations | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|---|
| Willowood Imidacloprid, LLC; Willowood USA, LLC | Imidacloprid | Bayer | Imidacloprid Data Compensation Agreement | Data Compensation Agreement - Imidacloprid | n/a |
| Willowood Lambda Cyhalothrin, LLC | Lambda-Cyhalothrin | Syngenta | Lambda-Cyhalothrin Data Compensation Settlement Agreement | Data Compensation Agreement - Lambda-Cyhalothrin | n/a |
| Willowood Propiconazole, LLC | Propiconazole | Syngenta | Propiconazole Data Compensation Settlement Agreement | Data Compensation Agreement-Propiconazole | n/a |
| Willowood, LLC; Willowood Tebuconazole, LLC | Tebuconazole | Bayer Cropscience LP | Tebuconazole Data Compensation Agreement | Data Compensation Agreement-Tebuconazole | n/a |
| Willowood USA, LLC | Abamectin | Ensystex III, Inc. | Supply Agreement | Willowood USA to supply Ensystex with technical Abamectin. | 12/31/2019 (automatically renews for 1-year terms thereafter unless terminated by either party.) |
| Willowood, LLC and Willowood Clethodim, LLC | Clethodim | Valent U.S.A. Corporation | Clethodim Settlement Agreement between Valent U.S.A. Corporation, Willowood, LLC, and Willowood Clethodim, LLC, dated March 5, 2013 | Data Compensation Agreement- Clethodim | n/a |
| Greenfields Marketing, Inc. | Bifenazate | Arysta Lifescience Inc. | Confidential Settlement Agreement between Arysta Lifescience Inc. | Data Compensation Agreement- Bifenazate | n/a |

8

19093263

| Entity Engaged in Contract | Applicable Registrations | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|---|
| | | | and Greenfields Marketing, Inc., dated March 16, 2018 | | |
| Willowood Abamectin, LLC | Abamectin | Syngenta Crop Protection, LLC, Adama Celsius BV Amsterdam (NL), Ensystex III, Inc. , Nufarm Americas Inc., Zhejiang Tide CropScience Co., Ltd., Rotam Ltd. | Cost Sharing Agreement Abamectin DCI | Cost sharing agreement for Abamectin DCI | 2/15/2031 |
| Willowood USA, LLC | Azoxystrobin, Lambda-Cyhalothrin, Ethofumesate, Fomesafen, Glufosinate | Titan Pro SCI, LLC | Willowood Bulk Repackaging Agreement | Repacking Willowood AzoxyProp, Willowood Lambda-Cy, Willowood Ethofumesate, Willowood Fomesafen, and Willowood Glufosinate | 12/31/2019 (automatically renews for 1-year terms thereafter unless terminated by either party.) 12/31/2019 (automatically renews for 1-year terms thereafter unless terminated by |

9

| Entity Engaged in Contract | Applicable Registrations | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|---|
| | | | | | either party.) |
| Willowood USA, LLC | Glufosinate | Ottawa Plant Food, Inc. | Certificate of Authorization for Repacking Bulk Pesticides | Repacking Willowood Glufosinate 280SL | Remains in effect until cancelled. |
| Willowood USA, LLC | Clomazone | Oil-Dri Corporation | Purchase Order | Verge Granule for Clomazone 5G | N/A |
| Willowood USA, LLC | Clomazone | Oil-Dri Corporation | Purchase Order | Verge Granule for Clomazone 5G | N/A |
| Willowood USA, LLC | Clomazone | Oil-Dri Corporation | Purchase Order | Verge Granule for Clomazone 5G | N/A |
| Willowood USA, LLC | Clomazone | Univar USA, Inc. | Purchase Order | Surfactant used in Clomazone 5G | N/A |
| Willowood USA, LLC | Thiobencarb | Stepan Co. | Purchase Order | Surfactant used in Thionil EC | N/A |
| Willowood USA, LLC | Sulfentrazone | The Box Maker | Purchase Order | Cartons; Sulfentrazone | N/A |
| Willowood USA, LLC | Sulfentrazone | The Box Maker | Purchase Order | Cartons; Sulfentrazone | N/A |
| Willowood USA, LLC | Propanil | Mauser USA LLC | Purchase Order | 30-gal drums for Propanil 4SC CA | N/A |
| Willowood USA, LLC | Clomazone | TKI | Purchase Order | Purchase order for Clomazone 5G production | N/A |
| Willowood LLC | Propiconazole, Tebuconazole | Repackager Pinnacle Agriculture Distribution, Inc. | Bulk Repackaging Agreement | Repacking Willowood Propicon 3.6EC 87290-7 and Willowood Tebucon 3.6 SC 87290-13 | December 31, 2019, subject to automatic renewal |
| Willowood USA, | Ethofumesate | Bayer | Ethofumesate Data | Data compensation | N/A |

10

| Entity Engaged in Contract | Applicable Registrations | Vendor | Title of Contract | Description of Service | Contract Expiration |
|---|---|---|---|---|---|
| LLC, and Willowood Elhofumesate. LLC | | CropScience LP | Compensation Agreement | agreement - Ethofumesate | |
| Willowood USA, LLC, Willowood Clethodim, LLC, Willowood Clomazone, LLC, Willowood Ethofumesate, LLC, Willowood Fomasefen, LLC, Willowood Propiconazole, LLC, Willowood Tebuconazole, LLC and Willowood, LLC | Oxyflurofen, Propiconazole, Pronamide, Ethofumesate, | Outdoor Residential Exposure Task Force, LLC Agricultural Re-Entry Task Force, LLC | Data Compensation Settlement Agreement | Data compensation agreement | N/A |
| | All Registrations | | Federal Endangered Species Task Force | | |
| Willowood | Glyphosate | Joint Glyphosate Task Force, LLC | Joint Data Development and Limited Liability Company Agreement | Data call in liability agreement for Glyphosate | |
| Willowood USA, LLC | Propanil | AMVAC Chemical Corporation | Trademark License and Supply Agreement | Agreement to supply Lock'N Load Systems in connection with storing Propanil and license to use related intellectual property. | February 28, 2020, subject to automatic 1-year renewals |

11

19093263

## Section 7(e)
### Brokers; Agents

- Piper Jaffray & Co.

19093263

**Section 7(f)**
**Litigation**

| Title of Litigation | Description |
|---|---|
| *Demand for Payment*, Vijay Mundhra to Willowood USA, LLC, dated December 19, 2018. | Demanding payment for products delivered to Willowood USA, LLC. |
| *Heinze v. Mitchell, Coughlon, Simpson, and Willowood USA Holdings, LLC* , Case No. 2019-0018, in the Court of Chancery of the State of Delaware; *related Heinze v. Coughlon, Simpson, and Willowood USA Holdings, LLC*, Arbitration with the American Arbitration Association (No. 011900000890). | Plaintiff seeks a temporary restraining order and an injunction against the formation of a transaction committee.  Plaintiff Brian Heinze filed a notice of dismissal of the action on April 4, 2019. |
| *BASF Corp. v. Willowood LLC, Willowood USA, LLC, Willowood Ltd., Greenfields Marketing Ltd.*, Case No. 1:18-cv-268 in U.S. District Court for the District of Colorado. | BASF asserted claims against the defendants for patent infringement, and the defendants filed counterclaims against BASF for inequitable conduct, non-infringement, and patent invalidity. This matter remains pending. |
| *Syngenta Corp Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Ltd.*, Case No. 1:15-cv-274 in the U.S. District Court for the Middle District of North Carolina and Appeal Nos. 18-1614 and 18-0244 in the U.S. Court of Appeals for the Federal Circuit. | Syngenta asserted claims against the defendants for copyright infringement, patent infringement, and unfair and deceptive trade practices under North Carolina. This appeal remains pending. |
| *In the Matter of the Arbitration Between BASF Corp. and Willowood USA, LLC, and Greenfields Marketing, Ltd.*, FIFRA Arbitration with the American Arbitration Association (No. 01-16-0000-7029) | Action to resolve amount of data compensation owed to BASF for the Pyraclostrobin technical registration. The arbitration panel entered a final judgment on or about July 6, 2018. No court has confirmed the award, and the liability remains outstanding. This matter remains pending. |

13

19093263

| Title of Litigation | Description |
|---|---|
| *Vijay Mundhra and Brian Heinze v. Willowood USA Holdings, LLC* , Case No. 18-CV-23323 in the Circuit Court of Multnomah County, Oregon. | Plaintiffs assert claims for reformation of the UPA and Declaratory Relief. Willowood USA, LLC is not a defendant but has asserted counterclaims against the plaintiffs along with Willowood USA Holdings, LLC. Those counterclaims include claims for breach of contract and declaratory judgment. This matter remains pending. |
| *Mundhra et al v. Willowood USA Holdings, LLC* , Case No. 18-cv-33725 in Denver County District Court. | This matter was initiated to issue a subpoena to Lariat Partners. Lariat has responded to the subpoena but the case remains open.   The Debtors do not anticipate any future action in this matter. |
| Petition to Cancel the Registration of Willowood, LLC's End-Use Product "Willowood Azoxystrobin 2.08SC" Containing the Active Ingredient Azoxystrobin, dated February 4, 2014, filed by Syngenta Crop Protection, LLC with the U.S. Environmental Protection Agency. | This matter remains pending and awaiting a ruling by the EPA. |

Between September 14, 2018 and February 1, 2019, Willowood USA received a series of invoices for liquidated claims (Form 6084) from the U.S. Customs and Border Protection ("USCG&BP") relating to customs duties (and associated interest) allegedly owed by Willowood USA on the following product orders:

- 9YU-10042752    Sulfentrazone 4SC    Customs Invoice Date: 09/14/2018
- 9YU-10042919    Propiconazole Tech    Customs Invoice Date: 09/14/2018
- 9YU-10042497    Propiconazole Tech    Customs Invoice Date: 01/25/2019
- 9YU-10043784    Sulfentrazone 4SC    Customs Invoice Date: 02/01/2019
- 9YU-10043966    Propicon 3.6EC    Customs Invoice Date: 02/01/2019
- 9YU-10043180    Propanil 4EC    Customs Invoice Date: 02/01/2019

Willowood USA has protested the liquidations of transactions 9YU-10042752 (Sulfentrazone 4SC) and 9YU-10042919 (Propiconazole Tech), and intends to protest the remaining 4 in the near future

Additionally, on January 25, 2019, Willowood USA received a letter from USCG&BP indicating that it has opened up an investigation on Willowood USA's import practices and alleges misclassification of Sulfentrazone and improper use of preferred duty treatment under the United States-Generalized System of Preferences (GSP) Trade Program.  Willowood USA disagrees

14

19093263

with the allegations and is in the process of preparing a response to such allegations and requesting that USCG&BP discontinue its investigation.

15

19093263

**Section 7(g)**
**Equity Securities**

| Transferred Subsidiary | Class and Series of Equity Securities of Transferred Subsidiary | Total Equity Securities Authorized for Issuance | Total Issued and Outstanding Equity Securities | Record and Beneficial Owners of Equity Securities and Amount of Equity Securities Owned |
|---|---|---|---|---|
| Willowood Abamectin, LLC | Units | N/A | 100 | Willowood USA – 100% |
| Willowood Glufosinate Ammonium, LLC | Units | N/A | 100 | Willowood USA– 100% |
| Willowood Oxyflurofen, LLC | Units | N/A | 100 | Willowood USA– 100% |
| Willowood Paraquat, LLC | Units | N/A | 100 | Willowood USA– 100% |
| Willowood Pronamide, LLC | Units | N/A | 100 | Willowood USA- 100% |
| Willowood Propanil, LLC | Units | N/A | 100 | Willowood USA– 100% |
| Willowood Sulfentrazone, LLC | Units | N/A | 100 | Willowood USA – 100% |
| Willowood Imidacloprid, LLC | Units | N/A | 100 | Willowood USA – 100% |
| Willowood Lambda-Cyhalothrin, LLC | Units | N/A | 100 | Willowood USA– 100% |
| Willowood Propiconazole, LLC | Units | N/A | 100 | Willowood USA – 100% |
| Willowood Tebuconazole, LLC | Units | N/A | 100 | Willowood USA – 100% |
| Willowood | Units | N/A | 100 | Willowood USA |

16

19093263

| Ethofumesate, LLC | | | | – 100% |
|---|---|---|---|---|
| Willowood Fomesafen, LLC | Units | N/A | 100 | Willowood USA – 100% |
| Willowood Mepiquat Chloride, LLC | Units | N/A | 100 | Willowood USA – 100% |
| Willowood Clethodim, LLC | Units | N/A | 100 | Willowood USA – 100% |
| Willowood Glyphosate, LLC | Units | N/A | 100 | Willowood USA – 100% |

17

**Section 7(h)(i)**
**Product Registrations**

Registrations issued from the Environmental Protection Agency:

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Abamectin Technical | Willowood Abamectin, LLC | 89349-1 |
| Willowood Abamectin 0.15EC | Willowood, LLC | 87290-58 |
| Willowood Abamectin 0.7SC | Willowood, LLC | 87290-36 |
| Willowood Abamectin EC | Willowood, LLC | 87290-57 |
| Willowood Abamectin 0.15LV | Willowood, LLC | 87290-68 |
| Willowood Nemamectin 0.7SC | Willowoood, LLC | 87290-84 |
| RighLine Nemamectin 0.7 SC | RightLine LLC | 87290-84-93051 |
| GM Bifenazate Technical | Greenfields Marketing Ltd. | 89966-5 |
| Willowood Bifenazate 4SC | Willowood, LLC | 87290-71 |
| Willowood Bifenazate 50WDG | Willowood, LLC | 87290-66 |
| Chlorimuron Ethyl Technical | Greenfields Marketing Ltd. | 89966-11 |
| Willowood Chlorim 25WDG | Willowood, LLC | 87290-86 |
| Clethodim TGAI | Greenfields Marketing Ltd. | 89966-12 |
| Willowood Clethodim 2 EC | Willowood, LLC | 87290-11 |
| Willowood Clethodim 70% MUP | Willowood Clethodim, LLC | 87812-2 |
| Willowood Clethodim 37% MUP | Willowood Clethodim, LLC | 87812-1 |
| Clomazone Technical | Greenfields Marketing Ltd. | 89966-1 |
| Willowood Clomazone 3ME | Willowood, LLC | 87290-55 |
| Willowood Clomazone 5MEG | Willowood, LLC | 87290-46 |

18

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Clomazone ME | Willowood, LLC | 87290-47 |
| Cloransulam-methyl Technical | Greenfields Marketing Ltd. | 89966-9 |
| Willowood Cloran DF | Willowood, LLC | 87290-87 |
| Willowood Ethofumesate Technical | Willowood Ethofumesate, LLC | 87289-1 |
| Willowood Ethofumesate 4SC | Willowood, LLC | 87290-1 |
| Willowood Ethofumesate Turf | Willowood, LLC | 87290-2 |
| RightLine Etho 4SC | RightLine LLC | 87290-2-93051 |
| Willowood Fomesafen Technical | Willowood Fomesafen, LLC | 88024-1 |
| Willowood Fomesafen 1.88 EC | Willowood, LLC | 87290-20 |
| Glufosinate-Ammonium Technical | Willowood Glufosinate Ammonium, LLC | 89707-1 |
| Willowood Glufosinate 280SL | Willowood, LLC | 87290-41 |
| Willowood Glyphosate Tech | Willowood Glyphosate, LLC | 92474-1 |
| Willowood Glyphosate 62% MUP | Willowood Glyphosate, LLC | 92474-2 |
| Willowood Glyphosate 4 | Willowood, LLC | 87290-53 |
| Willowood Metriosate GT | Willowood, LLC | 87290-85 |
| Willowood Glypho 41% | Willowood, LLC | 87290-88 |
| Imazethapyr Technical | Greenfields Marketing Ltd. | 89966-7 |
| Willowood Imazethapyr 2SL | Willowood, LLC | 87290-69 |
| Imidacloprid Technical | Willowood Imidacloprid, LLC | 88544-2 |
| Willowood Imidacloprid 2SC | Willowood, LLC | 87290-33 |
| Willowood Imidacloprid 4SC and also a separate label | Willowood, LLC | 87290-26 |

19

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Imidacloprid 4ST | | |
| Willowood Imidacloprid PCO | Willowood, LLC | 87290-39 |
| Lactofen Technical | Greenfields Marketing Ltd. | 89966-8 |
| Lactofen 60% MUP | Greenfields Marketing Ltd. | 89966-13 |
| Willowood Lactofen 2EC | Willowood, LLC | 87290-72 |
| Lambda Cyhalothrin Technical | Willowood Lambda-Cyhalothrin, LLC | 88541-1 |
| Willowood Lambda-Cy 1 EC | Willowood, LLC | 87290-24 |
| RightLine Lambda 1EC | RightLine LLC | 87290-24-93051 |
| Willowood Lambda 1EC | Willowood, LLC | 66222-104-87290 |
| Willowood Mepiquat Chloride Technical | Willowood Mepiquat Chloride, LLC | 88781-1 |
| Willowood Mepi Chlor 4.2% | Willowood, LLC | 87290-30 |
| Mesotrione Technical | Greenfields Marketing Ltd. | 89966-3 |
| Willowood Mesotrione 480SC | Willowood, LLC | 87290-62 |
| Willowood Mesotrione 4SC | Willowood, LLC | 87290-61 |
| RightLine Mesotrione 4 SC | RightLine LLC | 87290-62-93051 |
| Metolachlor Technical | Greenfields Marketing Ltd. | 89966-10 |
| Willowood Metola 8EC | Willowood, LLC | 87290-81 |
| Metribuzin Technical | Greenfields Marketing Ltd. | 89966-6 |
| Willowood Metribuzin 4SC | Willowood, LLC | 87290-80 |
| Willowood Metribuzin 75DF | Willowood, LLC | 87290-79 |

20

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Oxyfluorfen Technical | Willowood Oxyfluorfen, LLC | 87283-1 |
| Willowood Oxyflo 2 EC | Willowood, LLC | 87290-8 |
| Willowood Oxyflo 4 SC | Willowood, LLC | 87290-10 |
| Paraquat Technical | Willowood Paraquat, LLC | 89275-1 |
| Willowood Paraquat 3SL | Willowood, LLC | 87290-35 |
| Pronamide Technical | Willowood Pronamide, LLC | 87285-1 |
| Willowood Pronamide 3.3SC | Willowood, LLC | 87290-22 |
| Willowood Pronamide 50WSP | Willowood, LLC | 87290-3 |
| RightLine Pronamide 3.3 SC | RightLine LLC | 87290-22-93051 |
| Propanil Technical | Willowood Propanil, LLC | 87829-1 |
| Willowood Propanil 4EC | Willowood, LLC | 87290-32 |
| Willowood Propanil 4SC | Willowood, LLC | 87290-18 |
| Willowood Propanil 80DF/ 80CHS | Willowood, LLC | 87290-17 |
| Propiconazole Technical I | Willowood Propiconazole, LLC | 87284-1 |
| Propiconazole Technical II | Willowood Propiconazole, LLC | 87284-3 |
| RightLine Propi 1.3MEC | RightLine LLC | 87290-40-93051 |
| Willowood Propicon 3.6EC | Willowood, LLC | 87290-7 |
| Willowood Propicon Turf | Willowood, LLC | 87290-40 |
| Sulfentrazone Technical Herbicide | Willowood Sulfentrazone, LLC | 91459-1 |

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Sulfen MTZ DF | Willowood, LLC | 87290-70 |
| Willowood Sulfen Cloran | Willowood, LLC | 87290-82 |
| Willowood Sulfen 4SC | Willowood, LLC | 87290-59 |
| Willowood Sulfen Chlorim | Willowood, LLC | 87290-83 |
| Willowood Sulfen Imaz | Willowood, LLC | 87290-67 |
| RightLine Sulfen 4SC | RightLine LLC | 87290-59-93051 |
| Tebuconazole Technical | Willowood Tebuconazole, LLC | 87811-1 |
| Willowood Tebucon 3.6 SC /Teb 3.6SC | Willowood, LLC | 87290-13 |
| Willowood Tebucon 45 DF / Teb 45DF | Willowood, LLC | 87290-12 |
| Thiobencarb Technical | Greenfields Marketing Ltd. | 89966-14 |
| Willowood Thioben 8EC | Willowood, LLC | 87290-75 |
| Willowood Thionil EC | Willowood, LLC | 87290-74 |
| Willowood Thio UltraMax | Willowood, LLC | 87290-73 |
| **The Willowood group does not hold a technical registration for the following end-use registrations:** | | |
| Willowood 2,4-D Amine | Willowood, LLC | 87290-45 |
| Willowood 2,4-D Ester 4 | Willowood, LLC | 87290-49 |
| Willowood 2,4-D Ester 6 | Willowood, LLC | 87290-50 |
| Willowood Bentazon 4 | Willowood, LLC | 87290-52 |

22

19093263

| Registration | Holder of the Registration | EPA Registration Number |
|---|---|---|
| Willowood Bifenthrin 2EC | Willowood, LLC | 87290-54 |
| Willowood Dicamba 4 | Willowood, LLC | 87290-51 |
| Willowood Mancozeb 75WDG | Willowood, LLC | 87290-48 |
| Willowood Oxamyl C-LV | Willowood, LLC | 87290-76 |
| Willowood Oxamyl L | Willowood, LLC | 87290-77 |
| Willowood Oxytet 17WP | Willowood, LLC | 87290-25 |

See Exhibit A for table of state registrations or permits for sale of products marketed under the Willowood USA, LLC name.

See Exhibit B for table of state registrations or permits for sale of products marketed under the RightLine LLC name.

| Product | Unless Specified, Holder of Outstanding State Permits | In Georgia | In Mississippi | In New Jersey |
|---|---|---|---|---|
| Willowood 2,4-D Amine | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood 2,4-D Ester 4 | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood 2,4-D Ester 6 | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Bentazon 4 | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Bifenthrin 2EC | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Dicamba 4 | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Mancozeb 75WDG | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Oxamyl C-LV | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Oxamyl | Willowood, | Not Registered | Not Registered | Not Registered |

23

19093263

| Product | Unless Specified, Holder of Outstanding State Permits | In Georgia | In Mississippi | In New Jersey |
|---|---|---|---|---|
| L | LLC | | | |
| Willowood Oxytet 17WP | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Abamectin Technical | Willowood Abamectin, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Abamectin 0.15EC | Willowood Abamectin, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Product Name Mispelled "Abanectin 0.15EC" Registered to Co # 4257 - OR Address |
| Willowood Abamectin 0.7SC | Willowood, LLC | Willowood, L.L.C. (87290) | Not Registered | Not Registered |
| Willowood Abamectin EC | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Abamectin 0.15LV | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Willowood Nemamectin 0.7SC | Willowood, LLC | Not Registered | Not Registered | Co # 4257 Willowood LLC - OR Address |
| RighLine Nemamectin 0.7 SC | RightLine LLC | RightLine, LLC (93051) | Willowood, LLC (87290) | Not Registered |
| GM Bifenazate Technical | Willowood Bifenazate LLC | Not Registered | Not Registered | Not Registered |
| Willowood Bifenazate 4SC | Willowood LLC | Not Registered | Not Registered | Not Registered |
| Willowood Bifenazate 50WDG | Willowood LLC | Willowood, L.L.C. (87290) | Not Registered | Not Registered |
| Chlorimuron Ethyl Technical | Willowood Chlorimuron, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Chlorim 25WDG | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Clethodim TGAI | Willowood Clethodim LLC | Not Registered | Not Registered | Not Registered |
| Willowood Clethodim 2 EC | Willowood LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Co # 4257 Willowood LLC - |

24

19093263

| Product | Unless Specified, Holder of Outstanding State Permits | In Georgia | In Mississippi | In New Jersey |
|---|---|---|---|---|
| | | | | OR Address |
| Willowood Clethodim 70% MUP | Willowood LLC | Not Registered | Not Registered | Not Registered |
| Willowood Clethodim 37% MUP | Willowood LLC | Not Registered | Not Registered | Not Registered |
| Clomazone Technical | Willowood Clomazone LLC | Not Registered | Not Registered | Not Registered |
| Willowood Clomazone 3ME | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Willowood Clomazone 5MEG | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Clomazone ME | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Cloransulam-methyl Technical | Willowood Cloransulam, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Cloran DF | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Ethofumesate Technical | Willowood Ethofumesate, LLC | Willowood Ethofumesate Technical (87289) | Not Registered | Not Registered |
| Willowood Ethofumesate 4SC | Willowood LLC | Willowood, L.L.C. (87290) | Not Registered | Not Registered |
| Willowood Ethofumesate Turf | Willowood LLC | Not Registered | Not Registered | Not Registered |
| RightLine Etho 4SC | RightLine LLC | RightLine, LLC (93051) | Willowood, LLC (87290) | Not Registered |
| Willowood Fomesafen Technical | Willowood Fomesafen LLC | Not Registered | Not Registered | Not Registered |
| Willowood Fomesafen 1.88 EC | Willowood LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Glufosinate-Ammonium Technical | Willowood Glufosinate Ammonium, LLC | Not Registered | Not Registered | Not Registered |

25

| Product | Unless Specified, Holder of Outstanding State Permits | In Georgia | In Mississippi | In New Jersey |
|---|---|---|---|---|
| Willowood Glufosinate 280SL | Willowood, LLC | Willowood, L.L.C. (87290) | Not Registered | Co # 4933 Willowood LLC - CO Address |
| Willowood Glyphosate Tech | Willowood Glyphosate, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Glyphosate 62% MUP | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Glyphosate 4 | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Metriosate GT | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Glypho 41% | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Imazethapyr Technical | Willowood Imazethapyr, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Imazethapyr 2SL | Willowood, LLC | Willowood, L.L.C. (87290) | Not Registered | Co # 4933 Willowood LLC - CO Address |
| Imidacloprid Technical | Willowood Imidacloprid, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Imidacloprid 2SC | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Imidacloprid 4SC | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Co # 4257 Willowood LLC - OR Address |
| Willowood Imidacloprid PCO | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Lactofen Technical | Willowood Lactofen, LLC | Not Registered | Not Registered | Not Registered |
| Lactofen 60% MUP | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Lactofen 2EC | Willowood, LLC | Willowood, L.L.C. (87290) | Not Registered | Not Registered |
| Lambda Cyhalothrin Technical | Willowood, LLC | Willowood Lambda-Cyhalothrin, | Not Registered | Not Registered |

26

19093263

| Product | Unless Specified, Holder of Outstanding State Permits | In Georgia | In Mississippi | In New Jersey |
|---|---|---|---|---|
| | | LLC (87541) | | |
| Willowood Lambda-Cy 1 EC | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| RightLine Lambda 1EC | RightLine, LLC | RightLine, LLC (93051) | Willowood, LLC (87290) | Not Registered |
| Willowood Lambda 1EC | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Willowood Mepiquat Chloride Technical | Willowood Mepiquat Chloride, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Mepi Chlor 4.2% | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Mesotrione Technical | Willowood Mesotrione LLC | Not Registered | Not Registered | Not Registered |
| Willowood Mesotrione 480SC | Willowood LLC | Not Registered | Not Registered | Not Registered |
| Willowood Mesotrione 4SC | Willowood LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Co # 4257 Willowood LLC - OR Address |
| RightLine Mesotrione 4 SC | RightLine LLC | RightLine, LLC (93051) | Not Registered | Co # 4933 Willowood LLC - CO Address |
| Metolachlor Technical | Willowood Metolachlor LLC | Not Registered | Not Registered | Not Registered |
| Willowood Metola 8EC | Willowood LLC | Not Registered | Willowood, LLC (87290) | Co # 4933 Willowood LLC - CO Address |
| Metribuzin Technical | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Metribuzin 4SC | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Metribuzin 75DF | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Oxyfluorfen Technical | Willowood Oxyflurofen, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Oxyflo 2 EC | Willowood, LLC | Willowood, L.L.C. (87290) | Not Registered | Not Registered |

27

19093263

| Product | Unless Specified, Holder of Outstanding State Permits | In Georgia | In Mississippi | In New Jersey |
|---|---|---|---|---|
| Willowood Oxyflo 4 SC | Willowood, LLC | Willowood, L.L.C. (87290) | Not Registered | Not Registered |
| Paraquat Technical | Willowood Paraquat, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Paraquat 3SL | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Co # 4257 Willowood LLC - OR Address |
| Pronamide Technical | Willowood Pronamide, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Pronamide 3.3SC | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Willowood Pronamide 50WSP | Willowood, LLC | Willowood, L.L.C. (87290) | Not Registered | Not Registered |
| RightLine Pronamide 3.3 SC | RightLine LLC | RightLine, LLC (93051) | Willowood, LLC (87290) | Not Registered |
| Propanil Technical | Willowood Propanil, LLC | Willowood, L.L.C. (87290) | Not Registered | Not Registered |
| Willowood Propanil 4EC | Willowood, LLC | Not Registered | Willowood, LLC (87290) | Not Registered |
| Willowood Propanil 4SC | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Willowood Propanil 80DF/ 80CHS | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Propiconazole Technical I | Willowood Propiconazol, LLC | Not Registered | Not Registered | Not Registered |
| Propiconazole Technical II | Willwood Propiconazol, LLC | Not Registered | Not Registered | Not Registered |
| RightLine Propi 1.3MEC | RightLine, LLC | RightLine, LLC (93051) | Not Registered | Co # 4933 Willowood LLC - CO Address |
| Willowood Propicon 3.6EC | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Willowood Propicon Turf | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Pyraclostrobin Technical | Willowood Pyraclostrobin LLC | Not Registered | Not Registered | Not Registered |

28

19093263

| Product | Unless Specified, Holder of Outstanding State Permits | In Georgia | In Mississippi | In New Jersey |
|---|---|---|---|---|
| RightLine CHILL Fungicide | RightLine LLC | Not Registered | Not Registered | Not Registered |
| RightLine CHILLOUT fungicide | RightLine LLC | Not Registered | Not Registered | Not Registered |
| RightLine CHILL LC | RightLine LLC | Not Registered | Not Registered | Not Registered |
| Sulfentrazone Technical Herbicide | Willowood Sulfentrazone, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Sulfentrazone Assist | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Willowood Sulfen MTZ DF | Willowood, LLC | Willowood, L.L.C. (87290) | Not Registered | Co # 4933 Willowood LLC - CO Address |
| Willowood Sulfen Cloran | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Sulfen 4SC | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Willowood Sulfen Chlorim | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Sulfen Imaz | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| RightLine Sulfen 4SC | RightLine LLC | RightLine, LLC (93051) | Willowood, LLC (87290) | Co # 4933 Willowood LLC - CO Address |
| Tebuconazole Technical | Willowood Tebuconazole, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Tebucon 3.6 SC /Teb 3.6SC | Willowood, LLC | Willowood, L.L.C. (87290) | Willowood, LLC (87290) | Not Registered |
| Willowood Tebucon 45 DF / Teb 45DF | Willowood, LLC | Willowood, L.L.C. (87290) | Not Registered | Not Registered |
| Thiobencarb Technical | Willowood Thiobencarb, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Thioben 8EC | Willowood, LLC | Not Registered | Not Registered | Not Registered |
| Willowood Thionil EC | Willowood, LLC | Not Registered | Willowood, LLC (87290) | Not Registered |
| Willowood Thio | Willowood, | Not Registered | Not Registered | Not Registered |

29

19093263

| Product | Unless Specified, Holder of Outstanding State Permits | In Georgia | In Mississippi | In New Jersey |
|---------|-------------------------------------------------------|------------|----------------|---------------|
| UltraMax | LLC | | | |

30

19093263

## Section 7(h)(ii)
## Notice of Expiration or Termination of Product Registrations

1.      None.

19093263

**Section 7(i)**
**Trademarks**

| Trademark | Serial No. / Registration No. | Filing Date / Registration Date | Jurisdiction of Registration or Application | Owner | Status |
|---|---|---|---|---|---|
| "Chill" | Serial No.: 87777026 | Filing Date: 01/30/2018 | USA | Willowood USA, LLC | Submitted |
| "Chill Out" | Serial No.: 87776817 | Filing Date: 01/30/2018 | USA | Willowood USA, LLC | Submitted |
| "Rightline" | Serial No.: 87451600 | Willowood USA, LLC | USA | Willowood USA, LLC | Submitted |
| "RightLine Plant Derived Nutrients" | Serial No.: 88057548 | Filing Date: 7/30/2018 | USA | Willowood USA, LLC | Submitted |
| "RightLine PD" | Serial No.: 87778071 | Filing Date: 7/30/2018 | USA | Willowood USA, LLC | Submitted |
| "Willowood Sulfentrazone MTZ" | Serial No.: 87457149  **Reg. No.:** 5,596,655 | Registration Date: 10/30/2018 | USA | Willowood USA, LLC | Registered |
| "Willowood USA" | Serial No.: 85-823,987  **Reg. No.: 4,438,935** | Filing Date: 01/15/2013  **Registration Date:** **11/26/2013** | USA | Willowood USA, LLC | Registered |

32

19093263

**EXHIBIT A**



State list (table rows): Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming

TOTAL

Legend: Registered / Pending (P) / Discontinuing (D) / Requested to Cancel (C) / Requested to Register (R) / Discontinue

19093263

# EXHIBIT B

| | ETHO 4 SC | GLUFOS 2.3 SL | MIDA PCTO 2 SC | LAMBDA 1 EC | MESOTRIONE 4 SC | NEMAMECTIN 0.7 SC | PRONAMIDE 3.3 SC | PROPI 1.3 MEC | SULFEN 4 SC | TEB 3.6 SC | | TOTAL | Registered | Pending | Discontinuing | Requested to Cancel | Requested to Register | Exp. Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | X | | | | X | X | X | X | X | | | 6 | 6 | 0 | 0 | 0 | 0 | 12/31/2020 |
| Alaska | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Arizona | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2020 |
| Arkansas | X | | | X | | X | X | | X | | | 5 | 5 | 0 | 0 | 0 | 0 | 12/31/2019 |
| California | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Colorado | | | | X | | | | X | | | | 2 | 2 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Connecticut | | | | | | P | | P | | | | 2 | 0 | 2 | 0 | 0 | 0 | 12/31/2021 |
| Delaware | X | | | X | X | | | X | X | | | 5 | 5 | 0 | 0 | 0 | 0 | 6/30/2019 |
| District of Columbia | X | | | X | X | X | | X | X | | | 6 | 6 | 0 | 0 | 0 | 0 | 1/31/2020 |
| Florida | | | | X | X | X | X | X | X | | | 5 | 5 | 0 | 0 | 0 | 0 | 1/31/2021 |
| Georgia | X | | | X | X | X | X | X | X | | | 7 | 7 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Hawaii | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Idaho | | | | X | | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Illinois | | | | | X | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2020 |
| Indiana | | | | | X | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 12/13/2019 |
| Iowa | | | | | X | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Kansas | X | | | X | | | | | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Kentucky | X | | | X | X | X | | X | X | | | 6 | 6 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Louisiana | | | | | X | X | | X | X | | | 4 | 4 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Maine | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Maryland | | | | | X | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Massachusetts | | | | | X | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 6/30/2019 |
| Michigan | | | | | X | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 6/30/2019 |
| Minnesota | | | | | X | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Mississippi | X | | | X | | X | X | | X | | | 5 | 5 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Missouri | X | | | X | X | X | | X | X | | | 6 | 6 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Montana | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Nebraska | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Nevada | | | | | | | | | X | | | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| New Hampshire | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| New Jersey | | | | | X | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| New Mexico | | | | | | X | | | | | | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| New York | | | | P | X | | | X | | | | 3 | 2 | 1 | 0 | 0 | 0 | 3/31/2019 |
| North Carolina | X | | | X | X | X | X | X | X | | | 7 | 7 | 0 | 0 | 0 | 0 | 12/31/2019 |
| North Dakota | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Ohio | X | | | X | X | X | | X | X | | | 6 | 6 | 0 | 0 | 0 | 0 | 6/30/2019 |
| Oklahoma | | | | | | | | | X | | | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Oregon | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Pennsylvania | X | | | X | X | X | | X | X | | | 6 | 6 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Puerto Rico | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | |
| Rhode Island | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 11/30/2019 |
| South Carolina | | | | | X | X | X | X | X | | | 5 | 5 | 0 | 0 | 0 | 0 | 8/31/2019 |
| South Dakota | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 6/30/2020 |
| Tennessee | X | | | X | X | X | | X | X | | | 6 | 6 | 0 | 0 | 0 | 0 | 7/31/2019 |
| Texas | | | | | X | | X | X | X | | | 4 | 4 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Utah | | | | | | | | | X | | | 1 | 1 | 0 | 0 | 0 | 0 | 5/31/2019 |
| Vermont | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 11/30/2019 |
| Virginia | X | | | X | X | | X | X | X | | | 6 | 6 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Washington | | | | | | | | | X | | | 1 | 1 | 0 | 0 | 0 | 0 | 12/31/2020 |
| West Virginia | | | | | X | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Wisconsin | | | | | X | | | X | X | | | 3 | 3 | 0 | 0 | 0 | 0 | 12/31/2019 |
| Wyoming | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 12/31/2019 |
| **TOTAL** | 14 | 0 | 0 | 15 | 27 | 16 | 9 | 29 | 33 | 0 | | | | | | | | |
| Registered | 14 | 0 | 0 | 14 | 27 | 15 | 9 | 28 | 33 | 0 | | | | | | | | |
| Pending | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | | | | | | | | |
| Discontinuing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | |
| Requested to Cancel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | |
| Requested to Register | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | |

34

19093263

# **EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF COLORADO**

In re:

Willowood USA Holdings, LLC, *et al.*,[1]
EIN: 81-0829193,

                                    Debtors.

Case No. 19-11079-KHT

Chapter 11

Jointly Administered

**EXHIBIT A TO FINAL DIP ORDER**

**TERMS OF GLOBAL SETTLEMENT BY AND AMONG THE DEBTORS,**
**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND**
**TREE LINE DIRECT LENDING, LP, RESOLVING OBJECTIONS OF THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS TO THE PROPOSED DIP**
**FINANCING AND SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

---

[1]       The Debtors in these chapter 11 cases, and the last four digits of their employer identification numbers, where applicable, are: Willowood USA Holdings, LLC (9193), Willowood USA, LLC (7337), Willowood, LLC, RightLine LLC (1429), Greenfields Holdings, LLC (5326), and Greenfields Marketing Ltd. The Debtors' corporate headquarters is located at 1350 17th Street, Suite 206 Denver, Colorado 80202.

1.    On February 27, 2019, the Debtors filed motions (a) seeking authority to use cash collateral and obtain debtor-in-possession financing [Docket No. 27] (the "DIP Financing Motion"), and (b) seeking to establish procedures and sell substantially all of their assets [Docket No. 30] (the "Sale Motion").

2.    On March 12, 2019, the Office of the United States Trustee formed the Official Committee of Unsecured Creditors (the "Committee") in the Debtors' cases.

3.    On March 22, 2019, the Court entered an order [Docket No. 150] (the "Bidding Procedures Order") establishing bidding procedures for the sale of substantially all of the Debtors' assets.  The Bidding Procedures Order, among other things, set the Bid Deadline as Friday, April 5, 2019, and an auction on April 9, 2019.

4.    On April 9, 2019, the Debtors held a robust auction, at which Generic Crop Science was eventually selected as the winning bidder for substantially all of the Debtors' assets (other than certain excluded assets) for a purchase price of approximately $19.9 million (the "Sale Transaction").

5.    Since appointment of the Committee, the Committee and its professionals have worked diligently with the Debtors and their lenders to address numerous issues and objections raised in connection with both the DIP Financing Motion and the Sale Motion.

6.    Following the conclusion of the auction, the Committee, Debtors and Tree Line (collectively, the "Parties") reached a comprehensive agreement (the "Global Settlement") regarding various matters related to the Debtors' sale of assets and the terms of a final order on the DIP Financing Motion (the "Final DIP Order").

7.    The Global Settlement, which will resolve, among other things, the Committee's informal objections to both the DIP Financing Motion and the Sale Motion, allows

the Sale Motion, Sale Transaction, and DIP Financing Motion to proceed on a consensual basis, provides a clear framework for the Debtors' cases to proceed on a path of administrative solvency toward confirming a plan of liquidation, and provides a mechanism for both providing an assured distribution to unsecured creditors and pursuing litigation which may significantly increase the distribution to unsecured creditors.  The Global Settlement was the subject of good-faith and arm's-length negotiations among the Parties.

8.     The Global Settlement includes the following material terms (collectively, the "Global Settlement Terms"):

I.   **Final DIP Order and Sale Order:**  The Parties agree to the entry of a Final DIP Order and Sale Order addressing the objections raised by the Committee and incorporating by reference the terms of this Global Settlement, including, without limitation, removing the roll-up provisions of the Final DIP Order, and adjusting the budgets as set forth herein. The entry of the Final DIP Order and Sale Order in forms acceptable to the Committee and Tree Line shall be a condition precedent to the implementation of the Global Settlement.

II.  **Funding for the Debtors' Estates:**  The Debtors' estates will be funded in accordance with the budget attached to the Final DIP Order, which budget shall include sufficient funds for the payment of priority and administrative claims against the Debtors' estates, as well as agreed wind-down expenses.

III. **Plan Related Matters:**     The Parties agree to pursue confirmation of a liquidating chapter 11 plan (the "Plan"), which Plan shall be in form and substance acceptable to the Committee and Tree Line, and will, among other things, (a) disclose that Tree Line's claims are separately classified in an impaired class of claims that will vote to accept the

Plan, (b) pay all priority, tax and administrative claims (to the extent not previously paid), (c) establish a litigation trust as described herein (the "Litigation Trust"), (d) transfer litigation actions and potential causes of action to the Litigation Trust, (e) seek releases/exculpations for the Parties and their respective existing directors, officers and professionals (except as provided below), (f) provide that the Committee shall select, in consultation with Tree Line, the plan administrator/trustee for the Plan and Litigation Trust, and (g) such other provisions as the Parties may agree.

IV.   **Establishment of the Litigation Trust:**   There shall be established under the Plan a Litigation Trust tasked with pursuing certain litigation claims, including, without limitation, D&O and other claims against Vijay Mundhra and Brian Heinze, avoidance actions, and the pending indemnity action relating to *Vijay Mundhra and Brian Heinze v. Willowood USA Holdings, LLC*, Case No. 18-CV-23323 in the Circuit Court of Multnomah County, Oregon (the "Indemnity Action").  Upon the Effective Date of the Plan, pursuant to the terms of the Plan, Tree Line will release liens on the Indemnity Action which will be transferred to Litigation Trust.  The Litigation Trust shall also be tasked with reconciling any unresolved claims and making distributions to general unsecured creditors.  Tree Line shall retain its deficiency claim against the Debtors' estates and shall be entitled to receive distributions from the Litigation Trust as set forth herein.  The specific terms of the Litigation Trust shall be set forth in a trust agreement mutually acceptable to the Parties and approved by the Court as part of the Plan confirmation process.

V.   **Distribution of Sale Proceeds:**   The Debtors are authorized and directed to distribute the initial cash proceeds from the proceeds from the Sale Transaction, or from

4

any other sale transaction (the "Sale Proceeds") no later than three (3) business days after the Sale Proceeds are received by the Debtors in the following manner and in the following amounts:

a.   $250,000 shall be carved out from Tree Line's liens and deposited unencumbered into a segregated escrow account held by Debtors' counsel (or such other escrow account agreed to by the Parties) (the "Litigation Trust Account") solely for the funding of a litigation trust (the "Trust Administration Funds") to be established pursuant to the Debtors' plan of liquidation;

b.   An additional $300,000 shall be carved out from Tree Line's liens and deposited unencumbered into the Litigation Trust Account solely for distribution to unsecured creditors in accordance with the Debtors' plan of liquidation (the "Assured Distribution Amount") and Tree Line agrees that it shall not share in the distribution of this $300,000 to general unsecured creditors;

c.   An amount acceptable to the Debtors, the Committee and Tree Line which amount shall comply with the Bankruptcy Code regarding payment of US Trustee fees shall be deposited into a segregated escrow account held by Debtors' counsel (or such other escrow account agreed to by the Parties) to pay fees and expenses of the professionals of the Debtors and the Committee and any other administrative and priority claims and expenses incurred through the effective date of the Debtors' Plan in accordance with the Approved Budget (the "Expenses Account"); provided, the Committees' professionals' fees shall be paid in the full allowed amount up to an aggregate amount of $750,000; provided further that in the event the Debtors, the Committee and Tree Line are unable to agree on the

5

amount to be deposited in to the Expenses Account or the structure of the Expenses Account, then the Debtors or the Committee shall seek further relief from the Bankruptcy Court as to the appropriate funding of the Expenses Account;

d. Upon the later of the final allowance of the Committee's professionals' final fees or the Effective Date of the Plan, from the Expenses Account, an amount equal to $750,000 minus the total allowed Committee's professionals' fees shall remain carved out from Tree Line's liens and deposited unencumbered into the Litigation Trust Account and shall constitute additional Trust Administration Funds (for purposes of example only, if the collective professional fees of the Committee's professionals equal $525,000, an additional $225,000 shall be transferred from the Expenses Account into the Litigation Trust Account);

e. An additional $250,000 shall be carved out from Tree Line's liens and deposited unencumbered into a segregated escrow account held by the Debtors' counsel (or such other escrow account agreed to by the Parties) solely to pay expenses of the Debtors' estates (excluding, for the avoidance of doubt, expenses of the Litigation Trust) from the period following the effective date of the Debtors' plan of liquidation through dissolution of the Debtors and closing of the chapter 11 cases in accordance with the wind-down budget to be filed in connection with the Debtors' plan of liquidation (the "Wind-Down Account");

f. Upon consummation of the Plan and payment of all administrative and priority claims in the chapter 11 cases, the remaining amounts (if any) from the Expenses Account shall be distributed to Tree Line.

6

g.  Any Trust Administration Funds not required for administration of the Litigation Trust shall be distributed to general unsecured creditors per the agreed terms set forth herein; and

h.  After making the above-described carve-outs, distributions and deposits, the remaining Sale Proceeds shall be remitted to Tree Line per the terms of this Final DIP Order and the Sale Order.

In the case of a conversion of these Chapter 11 Cases to cases under Chapter 7, the Trust Administration Funds and the Assured Distribution Amount shall be disbursed to the Chapter 7 estate, provided, however, the Chapter 7 Trustee shall be limited to $50,000 in Chapter 7 fees from the Trust Administration Funds and the Assured Distribution Amount, commissions and expenses, including those of his or her professionals, further provided that distributions by the Chapter 7 Trustee shall be pursuant to Section VIII of the Global Settlement, and further provided that any distribution to Tree Line contemplated by Section VIII of the Global Settlement shall be conditioned upon Tree Line first releasing liens on the Indemnity Action.

VI.  **Increase in Committee Professionals' Carve-Out; Budget:** The "Carve-Out Amount" for the Committee's professionals (the "Committee Carve-Out") set forth in the final DIP Order will be increased to an aggregate of $750,000, which amount, for the avoidance of doubt, shall not be used to pursue any Proscribed Action. If there are any funds remaining in the Committee Carve-Out after the payment of the allowed fees and expenses of the Committee's professionals, those remaining funds shall become Trust Administration Funds as set forth above. Additionally, the Debtors' agree to increase the amount of the Committee's post-default carve-out amount, for fees and expenses incurred

7

after the delivery by the DIP Agent of a Carve-Out Trigger Notice (each as defined in the DIP Order) to $100,000.

VII.   **Reconciliation of Claims; Document/Information Preservation:** The Debtors and Committee will work cooperatively to reconcile claims prior to the effective date of the chapter 11 Plan to be confirmed in these Chapter 11 Cases.  To the extent that claims are not reconciled prior to the effective date of the Plan, the Litigation Trust shall assume responsibility for reconciliation of claims post-effective date.  The Debtors agree to coordinate with the Committee regarding the transfer of documents and information to the Litigation Trust.  Prior to discarding any documents or information, the Debtors agree to coordinate with the Committee and confirm that the Litigation Trust does not need such documents or information in connection with the Litigation Trust's reconciliation (or pursuit) of claims and wind down the Debtors' bankruptcy cases, which document and information shall not be discarded.

VIII.   **Distribution of Litigation Trust Proceeds:** The proceeds of the Litigation Trust excluding, for the avoidance of doubt, the Assured Distribution Amount, will be distributed as follows:

   a.   Tree Line will receive the first $300,000 of net proceeds from the Litigation Trust recoveries (the "Tier 1 Distribution");

   b.   The next $2.5 million of Litigation Trust recoveries (the "Tier 2 Distribution") shall be split 50:50 among Tree Line and other unsecured creditors, and Tree Line agrees that it shall not share in the up-to $1.25 million portion of the Tier 2 Distribution allocated for general unsecured creditors notwithstanding Tree Line's remaining unsecured deficiency claim;

8

c. Any additional Litigation Trust proceeds (the "Tier 3 Distribution") shall be shared pro-rata by all general unsecured creditors, including distributions to Tree Line on account of its deficiency claim; provided, however, that Tree Line shall receive a maximum of $3 million from the Tier 3 Distribution, and any remaining funds in the Tier 3 Distribution that would have otherwise gone to Tree Line on account of its remaining deficiency claim shall be waived by Tree Line and instead be distributed pro-rata to the other general unsecured creditors.

IX. **Global Settlement Controls:** In the event of a conflict or inconsistency between the terms of the Sale Order, the other provisions of the Final DIP Order, and the provisions of this Global Settlement, the Global Settlement Terms shall control. Nothing herein limits the rights of parties in interest with respect to a Chapter 11 plan.